JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  415.875.2300
Facsimile:   415.281.1350

ANNASARA G. PURCELL (CSB No. 295512)
apurcell@fenwick.com
FENWICK & WEST LLP
1191 Second Avenue, 10th Floor
Seattle, WA  98101
Telephone:  206.389.4510
Facsimile:   206.389.451

ARMEN NERCESSIAN (CSB No. 284906)
anercessian@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
Telephone:  650.988.8500
Facsimile:   650.938.5200

Attorneys for AUDIBLE, INC. and
AMAZON.COM, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## (WESTERN DIVISION – LOS ANGELES)

| | |
|---|---|
| GRANT MCKEE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AUDIBLE, INC. and AMAZON.COM, INC.,<br><br>Defendants. | Case No.: 2:17-cv-01941 GW (Ex)<br><br>**SUPPLEMENTAL DECLARATION OF JASON A. MASSELLO IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS**<br><br>Date:      July 13, 2017<br>Time:      8:30 AM<br>Crtm:      9D<br>Judge:     George H. Wu<br>Trial Date: NONE SET |

MASSELLO SUPP. DECL. ISO
DFTS' MTN TO COMPEL
ARBITRATION                         1           Case No. 2:17-cv-1941 GW(Ex)

I, Jason A. Massello, declare as follows:

1.      I am an attorney and serve as Corporate Counsel supporting Audible, Inc. ("**Audible**"), a wholly owned subsidiary of Amazon.com, Inc. (**"Amazon"**). My current responsibilities include supporting all aspects of Audible's service offerings and business operations, as well as working with the Amazon Litigation and Regulatory Department in identifying, reviewing and producing documents in litigation on behalf of Audible and Amazon.  Based on my job responsibilities and my review of Audible's and Amazon's business records, I am familiar with the agreements, customer sign-up and order process, and customer history that I discuss in this declaration.  I make this declaration based on personal knowledge and records that Audible and Amazon keep in the ordinary course of business, including information obtained from other Audible and Amazon personnel in the course of their duties.  I am competent to testify to the matters stated here.

2.      In my two earlier declarations in this case, I discussed various ways in which Mr. McKee received notice of, and agreed to, certain terms and conditions. To provide the Court with a single set of materials for ease of reference, I re-attach certain exhibits here.

### <u>Overview of Grant McKee's Use of Amazon Services</u>

3.      In the ordinary course of business, Amazon generates and maintains detailed customer account histories.  In connection with the preparation of this declaration I have reviewed the history for Plaintiff Grant McKee's Amazon account.  Mr. McKee's account history shows that he is a longtime user of Amazon and several of its services.  He has been an Amazon customer since August 19, 2008, and he joined Amazon Prime in February 2012.  He signed up for a free trial membership to Amazon Prime on February 10, 2012, which then converted to an annual paid membership on March 10, 2012.  Mr. McKee remains an active Amazon Prime subscriber and Amazon customer.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

4.      On June 26, 2016, Mr. McKee signed up for a free trial membership for Amazon's Audible digital audiobook and spoken audio information and entertainment service.  Mr. McKee enrolled in the Gold Monthly Membership plan using his existing Amazon account and designated a credit card already on file with Amazon for any future Audible purchases and subscription fees.  From June 26, 2016 until he cancelled his Audible subscription, he accrued a total of six membership credits, including one credit he received during the free trial.  While Mr. McKee was an Audible subscriber, he redeemed four of these six credits.

5.      On December 1, 2016, Mr. McKee cancelled his Gold Membership before redeeming the two membership credits that remained in his membership subscription.  Before doing so, he could have redeemed those remaining membership credits for audiobooks from a collection of over 250,000 Audible audiobook titles, and kept those audiobooks for future listening after cancelling his membership.

6.      Mr. McKee is also a user of Amazon devices that have integration with Amazon's Audible service.  For instance, Mr. McKee's account history shows that on April 19, 2016, Mr. McKee purchased an Amazon Echo device from Amazon. Amazon Echo is a hands-free, Wi-Fi connected device that connects to the Alexa Voice Service.  Plaintiff activated his Amazon Echo on April 27, 2016, linking the Amazon Echo to his Amazon account.  Upon activation, an Amazon Echo can play any Audible audiobook that appears within the Audible library associated with that user's Amazon account.  It can also play sample chapters and free Audible audiobooks that do not require an active membership or the purchase or use of a membership credit.

7.      Between the time that he signed up for Prime in 2012 and the time that he filed this lawsuit, Plaintiff placed 160 separate orders from Amazon.com using his Prime account.  On June 22, 2016, four days before he signed up for Audible

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

using his Prime account, Plaintiff used his Prime account to make a purchase from Amazon.  On July 4, 2016, eight days after he signed up for Audible, Plaintiff again made a purchase through Amazon.  Plaintiff continued to make Amazon purchases, making his last recorded Amazon purchase before this lawsuit on March 3, 3017, seven days before filing this lawsuit.

8.     At no point during his Audible membership or since did Mr. McKee contact Audible or Amazon customer support to express any dissatisfaction with his Audible service.  Nor did Mr. McKee use Audible's Great Listen Guarantee, one of his membership benefits, to return or exchange any of the audiobooks he had received in exchange for his membership credits.

9.     As I will discuss further below, during his frequent use of Amazon services, Mr. McKee repeatedly agreed to provisions that required arbitration of disputes.  He agreed to Audible's terms on at least three separate occasions: when signing up for Audible, when signing in to the Audible mobile app, and when setting up his Amazon Echo device (which plays Audible audiobooks).  He also agreed to Amazon's conditions of use, including the arbitration provision, when creating his Prime account, setting up his Amazon Echo, and when making numerous purchases from Amazon on hundreds of occasions.

**Grant McKee's Agreement to Audible Terms During Audible Sign-up**

10.     Audible's business records show that, on June 26, 2016, Mr. McKee signed up for an Audible free trial membership after being referred to the Audible mobile website by an online ad.  I understand that, at the May 4, 2017 hearing on this motion to compel, Plaintiff's counsel questioned whether the exhibits I previously submitted with my last declaration reflect the disclosures that Mr. McKee actually saw when he signed up for an Audible subscription on June 26, 2016.  I have reviewed Audible's records and confirmed that the mobile landing webpages and disclosures that Audible had in place, and which were shown to Mr.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

McKee on June 26, 2016, are accurately reflected below.  Attached as **Exhibit 1** is the complete user flow that Mr. McKee encountered on his mobile device after arriving at the Audible mobile webpage on June 26, 2016.  The only differences between what appears in these exhibits and what Mr. McKee saw that day may be in the advertising present on the mobile landing webpages, as those elements may change from access to access.  However, at all relevant times, the disclosures present on the webpages and their placement in relation to the mechanism for starting an Audible membership remain unchanged.  I describe what Mr. McKee was shown at each stage of this user sign-up flow below.

### First Webpage in Mobile Sign-Up Flow

11.    The first webpage in the sign-up flow that Mr. McKee was shown contained a button that said "Try Audible Free."  Mr. McKee pressed this button to proceed with the sign-up process.  A copy of this first mobile webpage is attached as **Exhibit 2** to this declaration.

12.    The first webpage in the sign-up flow also contained, at the bottom of that screen, hyperlinks to the Audible Service Terms of Use and Privacy Notice.  Upon pressing the Conditions of Use link on this first screen on June 26, 2016, Mr. McKee would have been directed to the Audible Service Terms of Use, last updated June 7, 2016, which I discuss in paragraphs 20-22 below.

### Second Webpage in Mobile Sign-Up Flow

13.    The second webpage in the sign-up flow that Mr. McKee was shown stated that Audible is "an Amazon company" and displayed the Amazon logo, and it invited Mr. McKee to "Sign in using your Amazon account."  Audible does not allow users to sign-up for an Audible subscription except by either using an existing Amazon account or creating a new Amazon account, and this was true at the time that Mr. McKee signed up on June 26, 2016.  Accordingly, this webpage permitted Mr. McKee to enter his Amazon login credentials, *i.e.*, e-mail address and

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

password, which he did.  Mr. McKee then pressed the "Continue" button and
proceeded to the next screen in the sign-up flow.  A copy of this second webpage is
attached as **Exhibit 3** to this declaration.

### Third Webpage in Mobile Sign-Up Flow

14.    After entering his Amazon login credentials and clicking "Continue,"
Mr. McKee was directed to a third mobile webpage, from which he could start his
Audible trial membership.

15.    This webpage required Mr. McKee to enter or select a payment
method.  The webpage states "We're an Amazon company" and it displays the
Amazon logo.  If a user has no payment method on file with Amazon, Audible
allows the user to enter a payment method on a form on the mobile webpage
depicted in Exhibit 1.

16.    If a user does have a payment method associated with an Amazon
account, Audible allows the user to designate any of the credit cards on file for his
Amazon account for an Audible membership.  Audible's records reflect that Mr.
McKee designated a credit card that he already had on file with his Amazon
account when starting his Audible membership.  Accordingly, the screen he saw
differed slightly from the membership sign up page shown in Exhibit 1.  Above an
input box reflecting the selected payment method was the following disclosure:
"Your Amazon payment method is on file for your membership."  The webpage
also stated "We're an Amazon company" and it displayed the Amazon logo as well.
Attached as **Exhibit 4** are screenshots of the mobile webpage for users designating
an existing payment method, which contains the disclosures that Mr. McKee was
shown on June 26, 2016.  The second screenshot in Exhibit 4 shows the area
directly surrounding the "Start Now" button, which Mr. McKee pressed to start his
Audible membership.

17.    Mr. McKee started his subscription by clicking a "Start Now" button.

MASSELLO SUPP. DECL. ISO
DFTS' MTN TO COMPEL
ARBITRATION                    6        Case No. 2:17-cv-1941 GW(Ex)

Immediately beneath that "Start Now" button, the website disclosed that "By completing your purchase, you agree to Audible's Conditions of Use and Privacy Notice." Right below that was a section called "Audible Free Trial Details." The text in this section informed users that they can cancel their free trial membership at any time before the end of the thirty-day period to avoid being charged, and that after the thirty-day period they will begin paying membership fee at $14.95 per month. The section also stated "Check out the full terms and policies that apply to Audible membership," with the words "terms" and "policies" hyperlinked. If a user clicked on the "terms" hyperlink, the user would be taken directly to the Audible Service Terms of Use, last updated June 7, 2016, which I describe in Paragraphs 20-22 below.

18.     On a standard iPhone 7, for the sign-up page that Mr. McKee used, there is less than one-eighth of an inch of space between the "Start Now" button and the disclosure that the user agrees to Audible's Conditions of Use. Thus, it is nearly impossible for the user of a standard iPhone 7 to scroll to the "Start Now" button without also seeing the disclosure. That is particularly true given the "momentum scrolling" effect on an iPhone. Attached as **Exhibit 5** is a video demonstrating how, in the normal use of an iPhone viewing this page, a user scrolling down to the "Start Now" button necessarily will see the disclosure. While it may be possible to scroll carefully to deliberately avoid seeing the disclosure, the mobile website is designed so that the disclosure will appear in the ordinary use of a mobile phone.

### *Fourth Webpage in Mobile Sign-Up Flow*

19.     Upon pressing "Start Now," Mr. McKee was enrolled in Audible. At that point, he was directed to a mobile webpage showing the Audible storefront, from which he could select audiobooks.

//

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

***Audible Terms As Of June 26, 2016***

20.    I understand that Mr. McKee says he did not click on any hyperlinks to any Audible or Amazon terms when he was signing up for Audible. If he had clicked on the hyperlinks to the Audible terms on the First or Third webpages shown in Exhibits 2 and 4 above, he would have been shown a copy of the Audible Service Terms of Use last updated June 7, 2016. Attached as **Exhibit 6** is a screenshot of those terms accessed from the mobile website, which Mr. McKee would have seen had he clicked on the hyperlinks when signing up on June 26, 2016. The terms remain in effect today.

21.    The first two paragraphs of the Audible Service Terms of Use as they appeared when Mr. McKee signed up for Audible June 26, 2016 stated as follows:

> This is an agreement between you and Audible, Inc. (with its affiliates, "Audible", "we" or "us") regarding the digital spoken word audio entertainment service operated by Audible (the "Service"). The rules, policies and guidance we provide regarding the Service, the Amazon.com Conditions of Use and the Amazon.com Privacy Notice (all as they may be changed over time) are collectively referred to as the "Terms" and govern your use of the Service. The Service is an Amazon Service for the purposes of the Amazon.com Conditions of Use. These Audible Service Terms of Use will take precedence over any conflicting provisions of the Amazon.com Conditions of Use.

> By signing up for or using the Service, you agree to the Terms.

The disclosure quoted above included hyperlinks in blue font to the Amazon.com Conditions of Use and the Amazon.com Privacy Notice, which appear as underlined text above.

22.    As of June 26, 2016, when Mr. McKee signed up for the Audible service, the Audible Service Terms of Use also contained an explicit reference to the Amazon dispute resolution provision that applies to Amazon Services, stating the following:

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

DISPUTES; LIMITATION OF LIABILITY

Any dispute or claim arising from or relating to these Terms or your use of the Service is subject to the binding arbitration, governing law, disclaimer of warranties, limitation of liability and all other terms in the Amazon.com Conditions of Use.

### *Printing and Saving Audible Terms*

23.    I understand that Mr. McKee has suggested that Amazon and Audible prevent saving or printing copies of these terms.  In fact, with the standard Safari browser on an iPhone 7, a user can easily share or print the Audible Service Terms of Use.  A user can simply tap the "share" button in the lower center portion of their screen.  Once the user taps this button the iPhone will present options to mail or message the page, or to convert the page to a PDF to be stored in iBooks.  Attached as **Exhibit 7** are screenshots of both steps of the two-step process necessary to save the Audible Service Terms of Use as a PDF.  Attached as **Exhibit 8** is an example of a PDF of the Audible Service Terms of Use as created using this two-step process on an iPhone 7.  If a user follows this two-step process, a PDF resembling Exhibit 8 will be saved in the native iBooks app of the user's phone until the user deletes the PDF.  A user can print that PDF directly from the phone if the user has set up the phone to print, or the user can email PDF (or save it to a cloud storage location) and print it from a personal computer attached to a printer.  This is true today and was true when Mr. McKee signed up for Audible on June 26, 2016.

24.    Users viewing the Audible Service Terms of Use on a mobile phone can also take a screenshot of the portion that they are reading at any time, and the portion on the user's screen at the time will be saved to the user's camera roll on the phone, and any cloud storage accounts where the user backs up photos.  The user can email, text, or print that screen shot using normal email and print functions.  Attached as **Exhibit 9** is a screenshot of Audible's dispute resolution provision, taken from an iPhone 7.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

25.     In sum, there are several, easy-to-use ways to print, save, and send copies of Amazon and Audible's terms using an iPhone, and Amazon and Audible do not prevent users from doing any of these things.  This is true today and was true when Mr. McKee signed up for Audible on June 26, 2016.

**Mr. McKee's Agreement to Audible Conditions Through the Audible App**

26.     In addition to agreeing to Audible terms during the mobile website signup, Mr. McKee agreed to the terms when he signed in to the Audible mobile app.  Audible provides a mobile app that allows users to access Audible audio books on their mobile devices.  Audible's business records show that Mr. McKee signed into and registered the Audible mobile app to an iPhone at 5:11pm PDT on October 25, 2016.

27.     To use the Audible app on his iPhone 7, Mr. McKee first downloaded the app from the Apple App Store.  Upon launching the app, Mr. McKee saw a sign-in page for the Audible app.  Attached as **Exhibit 10** is a screenshot showing the sign-in page for the Audible app as it appeared on an iPhone 7 at the time that Mr. McKee signed into the mobile app.  The entirety of Exhibit 10 shows up on one screen on an iPhone 7; a user does not need to scroll down to see the bottom of the image.  In large text in the center of the screen is Audible's logo, which prominently displayed the language "An Amazon Company" directly underneath the word "Audible."

28.     In order to use the Audible mobile app on his iPhone 7, Mr. McKee had to sign in using this process by entering his Amazon account credentials and pressing the "Continue" button.  Directly under the "Continue" button is the text: "By Signing in, you agree to Audible's Conditions of Use."  The "Conditions of Use" language is a hyperlink, highlighted in blue, which links directly to the Audible Service Terms of Use, which I describe in Paragraphs 20-22 of this declaration, above.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

29.     When entering his Amazon account credentials, Mr. McKee likely would have used the keyboard feature on his iPhone (unless he used separate keyboard, such as a Bluetooth keyboard).  While typing in his information, the keyboard would have temporarily obscured the "Continue" button and the disclosure about agreeing to Audible's terms.  However, before entering his information, Mr. McKee was first shown the entire screen shown in Exhibit 10 on his iPhone.  Thus, he was shown the full disclosure before entering his information and choosing to continue.  In addition, if he typed in his Amazon account information and then pressed "Done," he would have again seen the full screen before pressing the "Continue" button.

**Mr. McKee's Agreement to Audible Terms During Amazon Echo Activation**

30.     Amazon's business records show that, on April 19, 2016, Mr. McKee purchased an Amazon Echo device from Amazon.  The Amazon Echo is a hands-free speaker that utilizes Amazon's Alexa Voice Service, which enables users to access various Amazon services with the sound of their voice.  The Amazon Echo can play any Audible audiobook that appears associated with a user's Amazon account.  Before a user can activate and use the Amazon Echo, Amazon requires that the user agrees to its Conditions of Use, along with the Audible terms, and the terms of other Amazon services that are accessible using the Amazon Echo.

31.     Mr. McKee activated his Amazon Echo on April 27, 2016.  This required him to link his Amazon Echo to his Amazon account.  To do so, Mr. McKee was required to use the Alexa companion app.  Amazon recently updated its Alexa companion app.  In preparing this declaration, I reviewed a historical version of the Alexa companion app that was operative on April 27, 2016 to see the disclosures that were present at that time.  Attached as **Exhibit 11** is a screenshot showing the start-up page for the Alexa companion app (as it would appear on an iPhone) seen in the test environment, which reflects the start-up page that was

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

MASSELLO SUPP. DECL. ISO
DFTS' MTN TO COMPEL
ARBITRATION                          11          Case No. 2:17-cv-1941 GW(Ex)

available when Mr. McKee activated his Amazon Echo.  The entirety of Exhibit 11 shows up on one screen on an iPhone; a user does not need to scroll down to see the bottom of the image.  At the bottom of the screen is a button that says "Begin Setup."  Above that, there is the following disclosure: "By tapping 'Begin Setup', you agree to all the terms found here."

32.     The text "terms found here" in the disclosure above is a hyperlink, highlighted in blue.  When the user presses that button, the user is directed to the "Alexa and Amazon Echo Terms."  Attached as **Exhibit 12** is a screenshot showing how a mobile user would see these terms as rendered within the Alexa companion app; this exhibit reflects the current version of the "Alexa and Amazon Echo Terms."  A printout of the website version of the historical "Alexa and Amazon Echo Terms" as of February 6, 2016, which were in effect on April 27, 2016, is attached as **Exhibit 13** to this declaration.  The terms shown in Exhibit 13 are what a user would have seen on April 27, 2016 within the Alexa companion app upon clicking the "terms found here" link.  The terms state that "If you use or access Alexa, you agree to the following terms" and then includes a hyperlinked list of different terms that apply, including a hyperlink labelled "Audible Conditions of Use."

33.     Upon clicking on the "Audible Conditions of Use" link when activating an Amazon Echo on April 27, 2016, a user would have been directed to the Audible Service Conditions of Use.  Attached as **Exhibit 14** is a copy of the terms of use for the Audible service in place on April 27, 2016.  This version of the Audible Service Conditions of Use included the following dispute resolution provision:

> **Any dispute or claim relating in any way to your use of the Audible Service will be resolved by binding arbitration, rather than in court,** except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of these Conditions of Use as a court would.**

To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent: Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98051. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes. The AAA's rules are available at www.adr.org or by calling 1-800-778-7879. Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. Likewise, Audible will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location.

**We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in arbitration we each waive any right to a jury trial. We also both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.

Exhibit 14 at 3 (bold in original). This dispute resolution provision is essentially identical to the arbitration provision in the Amazon Conditions of Use ("COUs"), which is now incorporated by reference in the current Audible terms. The only difference is that the arbitration provision in the Amazon COUs apply more broadly to any use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com.

## Grant McKee's Agreement to Amazon Terms When Making Purchases

34.     Amazon's COUs have contained an arbitration agreement and class action waiver since August 19, 2011. Attached as **Exhibit 15** is a copy of

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Amazon's most recent COUs before the start of this lawsuit, which were updated June 21, 2016.  Attached as **Exhibit 16** is a copy of the COUs in effect from December 5, 2012 until June 20, 2016.  Attached as **Exhibit 17** is a copy of the COUs in effect from August 19, 2011 until December 4, 2012.  The arbitration agreement appearing in all these COUs contains virtually identical language.  The relevant provision of the most recent COUs before this lawsuit began appears below:

> **Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court**, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement.
>
> **There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of these Conditions of Use as a court would.**
>
> To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes. The AAA's rules are available at www.adr.org or by calling 1-800-778-7879. Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. Likewise, Amazon will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location.
>
> **We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative**

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**action.** If for any reason a claim proceeds in court rather than in arbitration **we each waive any right to a jury trial**. We also both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.

Exhibit 14 at 4 (bold in original).

35.     Since August 19, 2011, Amazon's COUs have also contained a consistent choice of law provision:

By using any Amazon Service, you agree that the Federal Arbitration Act, applicable federal law, and the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon.

Exhibit 14 at 4.

36.     As I stated in my two earlier declarations, Mr. McKee also agreed to Amazon's terms by making purchases from Amazon.com.  Each time a customer makes a purchase through Amazon's standard checkout page, the customer is required to accept Amazon's COUs.  This process is no different whether a customer makes a purchase using Amazon's standard checkout page on a mobile device or on a desktop computer.  In either case, customers have the opportunity to review and confirm their orders and, to complete their orders, they must accept the Amazon COUs.  **Exhibit 18** is an example of a standard Amazon checkout page on a desktop computer; **Exhibit 19** shows screenshots of Amazon's checkout screen from the Amazon.com mobile website and mobile app, taken on an iPhone 7.  These exhibits demonstrate that, to make a purchase, Amazon customers must click on a "Place your order" button.  In either case, there is the prominent disclosure that:  "By placing your order, you agree to Amazon's <u>privacy notice</u> and <u>conditions of use</u>."  The words "conditions of use" are a blue highlighted hyperlink to the COUs.  A customer cannot checkout from this page without first clicking on this

"Place your order" button.  This was true on dozens of occasions when Mr. McKee made purchases, including before, during, and after his Audible membership.

37.    As I noted above, between the time he signed up for Prime in 2012 and the time that he filed this lawsuit, Plaintiff placed 160 separate orders from Amazon.com using his Prime account.  Regardless of what device Mr. McKee used to make these purchases, the standard checkout screen would not be different between devices and would require agreement to Amazon's COUs for every purchase, even if made on an iPhone.  Accordingly, Mr. McKee agreed to Amazon's dispute resolution provisions on dozens of occasions before filing this lawsuit against Amazon and Audible.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 21st day of June, 2017, at Newark, New Jersey.

Jason A. Massello