## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 17-1941-GW(Ex) | Date | July 17, 2017 |
| Title | *Grant McKee v. Audible, Inc., et al.* | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**       **IN CHAMBERS - FINAL RULING ON DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS [18]**

Attached hereto is the Court's Final Ruling on Defendants' Motion to Compel.

Initials of Preparer       JG

***McKee v. Audible, Inc. et al.***, Case No. CV-17-1941-GW-(Ex)
Final Rulings on Defendants' Motions to Compel Arbitration


## I.  **Background**

Grant McKee ("Plaintiff") sues, on behalf of himself and similarly situated individuals, Audible, Inc. ("Audible") and Amazon.com, Inc. ("Amazon") (collectively "Defendants") for (1) violation of the Lanham Act, 15 U.S.C. § 1125; (2) Violation of False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.; (3) violation of the CARD Act and EFTA, 15 U.S.C. § 1693l-1(a)(2)(B); (4) violation of Gift Certificate Law, Cal. Civ. Code § 1749.45 et seq.; (5) violation of California's Automatic Purchase Renewals Law, Cal. Bus. & Prof. Code § 17600 et seq.; (6) Conversion; (7) violation of Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; (8) violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq.; and (9) Restitution, Unjust Enrichment, and Money Had and Received   *See generally* Complaint ("Compl."), Docket No. 1.

In June 2016, Plaintiff signed up for a free one-month trial with Audible on his smartphone.  Declaration of Grant McKee ("Mckee Decl."), Docket No. 21-1 at ¶ 6.  Audible is an audiobook and spoken audio information and entertainment service that Amazon acquired in 2008.  Declaration of Jason Massello in Support of Defendants' Motion to Compel Arbitration ("Massello Decl."), Docket No. 18-1 at ¶ 3.  Audible offers a subscription based service, where subscribers pay a fixed fee, and in turn receive membership benefits, including access to exclusive original audio series, discounts on audiobooks, and membership credits, which they can redeem for audiobooks and other audio content. *Id.* ¶¶ 3-4.  Each membership credit can be redeemed for one audiobook, regardless of the book's price.  *Id.*  ¶ 4.  Pursuant to Audible's conditions of use ("Audible COU"), upon termination of an account, the user forfeits any unused credits.  *Id.*  ¶¶ 6-7.  Following Plaintiff's initial 30-day trial, he was automatically enrolled in an Audible subscription.  Mckee Decl. ¶¶ 8-9; Massello Decl. ¶ 15.  In December 2016 Plaintiff cancelled his membership and forfeited several unused credits he had earned up to that point.  Mckee Decl. ¶ 10.  Plaintiff's causes of action stem from Audible's policy concerning unused credits. *See generally* FAC.

On June 26, 2016 Plaintiff used his standard size iPhone 7 smartphone to access Audible's mobile website.  Mckee Decl. ¶ 6.  On Audible's home page he pressed a Try Audible

1

Free box.  *Id.*  On the next page he pressed a "Sign In" box that signed him into Audible using the Amazon account he created in 2008.  *Id.*  He claims he did not see any disclosure of the Audible COU or Amazon COU near the Try Audible Free or Sign In boxes.  *Id.*  He then designated a credit card for any future Audible purchases he decided to make and pressed a Start Now box to accept a "free" 30-day trial membership and "free" credit.  McKee Decl. ¶¶ 6–7.  Plaintiff claims he was not prompted or required to scroll past the Start Now box, so he did not do so.  *Id.*  He claims he never saw a disclosure near the Start Now box stating that by accepting a free trial membership and credit he agreed to the Audible COU.  *Id.* ¶¶ 6–7.   Plaintiff claims he made no purchases on June 26, 2016.  *Id.* ¶ 7.

Plaintiff took several screenshots in 2017 of Audible's mobile website from his personal cellular device.  *See* Declaration of Jamin S. Soderstrom ("Soderstrom Decl.") Ex. 11, Docket No. 21-14 at p. 4.  Similar images were submitted by Defendants.  *See* Supplemental Declaration of Jason A. Massello ("Supp. Massello Decl.") Ex. 4, Docket No. 30-1 at p. 25 ("Audible Sign In Screenshot").   These images collectively reflect that, immediately below the Start Now box Plaintiff admits he selected, the following disclosure appears:  "By completing your purchase, you agree to Audible's Conditions of Use and Privacy Notices and authorize us to charge your designation credit card or another available credit card on file."  *Id.*  The phrase does not appear to be hyperlinked.  *Id.*  Immediately below the disclosure there is additional language that does contains a hyperlink to the "terms and policies" that apply to Audible Membership.  *Id.*[1]

Plaintiff claims he never saw the disclosure, or the hyperlink that followed.  McKee Decl. ¶¶ 6–7.  The parties do not dispute that Audible COU on June 26, 2016 contained the following provision:

> "Any dispute or claim arising from or relating to these Terms or your use of the Service is subject to the binding arbitration, governing law, disclaimer of warranties, limitation of liability and all other terms in the Amazon.com Conditions of Use."

*See* Massello Decl. Ex. 4, Docket No. 18-5 at p. 4.  The Amazon Conditions of Use ("Amazon COU") provide:

> **Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or**

---

[1] In support of their Motion to Compel Defendants attach screenshots from Audible's traditional, as in not mobile, website.  *See* Massello Decl. Ex. 12, Docket No. 18-13.  Unlike the mobile version, there is a hyperlink in the disclosure immediately below the Start Now button.  *Id.*

**distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court,** except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement.

**There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of these Conditions of Use as a court would.**

To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer Related Disputes. The AAA's rules are available at www.adr.org or by calling 1-800-778-7879. Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. Likewise, Amazon will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location.

**We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in **arbitration we each waive any right to a jury trial**. We also both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.

*Id.* (bold in original).

 Prior to signing up for Audible, Plaintiff had an Amazon account dating back to 2008, and an Amazon "Prime" Membership since 2012. McKee Decl. ¶¶ 2, 4. When Plaintiff first joined Amazon in 2008 there was no arbitration provision contained in the Amazon COU but one was added on August 19, 2011. Massello Decl. ¶ 8. The current Amazon COU include the arbitration provision cited above. *Id.* Plaintiff joined Amazon Prime ("Prime") in February,

2012. McKee Decl. ¶ 4. In order to join Prime, Plaintiff was required to press a button immediately above the following disclosure: "By signing up, you agree to the Amazon Prime terms." Massello Decl. ¶ 12; Ex. 9. This statement hyperlinks to the Prime Terms, which include notice that:

> "Use of the Amazon.com website and Prime membership are also governed by [Amazon's] Conditions of Use…as well as other applicable terms…all of which (as changed over time) are incorporated into these Terms. If you sign up for a Prime membership, you accept these terms… Please read these Terms carefully."

*See* Massello Decl. Ex. 11 ("Prime Terms"); *see also id.* ¶ 12. Each time an Amazon customer makes a purchase a disclaimer appears-on both the mobile and traditional sites-that indicates by purchasing the item the customer agrees to the Amazon COU. Massello Decl. ¶¶ 11-12. Plaintiff has made several purchases on both Amazon and with his Amazon Prime account following the addition of the arbitration provision in Amazon's COU. Massello Decl. ¶ 14; McKee Decl. ¶ 5.

Plaintiff filed this action on March 10, 2017. *See generally* Compl. On April 5, 2017 Defendants filed this Motion to Compel Arbitration contending that Plaintiff agreed to Audible's Conditions of Use ("Audible COU"), which contained an arbitration provision, and that Plaintiff also agreed to Amazon's Conditions of Use ("Amazon COU"), containing the same provision. *See* Defendants' Motion to Compel Arbitration ("MTC"), Docket No. 18. Plaintiff has filed an opposition. *See* Plaintiff's Opposition to Defendants' Motion to Compel ("Opp'n"), Docket No. 21. The Court issued a tentative ruling on May 4, 2017 suggesting that it would grant Defendants' motion based, in substantial part on its assumption that Plaintiff's agreements to arbitrate with Amazon would by extension bind them to arbitrate with Audible, and (2) that Audible could only be accessed or used through Amazon itself. *See* May 4, 2017 Minutes ("Minutes"), Docket No. 25 at 10 ("Plaintiff's arguments as they relate to Plaintiff's Audible account, which he contends he only visited from his smartphone and that contains a less clear disclosure, may be more persuasive but ultimately the Court does not need to address whether Plaintiff assented on June 26, 2016. This is because he had repeatedly assented to the Amazon COU.") At the May 4, 2017 hearing, Plaintiff's counsel noted, persuasively, that Plaintiff had

4

no notice that in agreeing to Amazon's arbitration agreement, Plaintiff agreed to arbitrate claims brought against Audible.  In other words, it was important for the Court to specifically address Plaintiff's transactions with Audible and not just Amazon.  The Court ordered supplemental briefing, which the parties provided.  *See* Supp. Br. In Support of Defs.' Mot. to Compel Arbitration ("Supp. Mot."), Docket No. 30; Supp. Br. in Support of Pl.'s Opposition to Defs.' Mot. to Compel Arbitration ("Supp. Opp'n"), Docket No. 29; Defs.' Response in Support of Defs.' Mot. to Compel Arbitration ("Defs.' Resp."), Docket No. 33; Supp. Response Brief in Support of Pl.'s Opp. to Defs.' Mot. to Compel Arbitration ("Pl.'s Resp."), Docket No. 32.   The parties also submitted additional evidence and declarations.  *See* Massello Supp. Decl,; Exs. 1-20; Supplemental Declaration of Grant McKee ("McKee Supp. Decl."), Docket No. 29-6; Further Supplemental Declaration of Jason Massello ("Massello Further Supp. Decl."), Docket No. 33-1; Further Supplemental Declaration of Grant McKee ("McKee Further Supp. Decl."), Docket No. 32-1.

## II.  <u>Legal Standard</u>

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2010) (citation omitted).  A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for in the parties' agreement.  *See* 9 U.S.C. § 4.  "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original); *see also* 9 U.S.C. § 4.  "The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.  If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms."  *Daugherty v. Experian Info. Solutions, Inc.*, 847 F.Supp.2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'"  *Macias v. Excel Bldg. Servs. LLC*, 767 F.Supp.2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v.*

*Alterra Healthcare Corp.*, 433 F.Supp.2d 538, 540 (E.D. Pa. 2006)).

### III.  Analysis

#### A.  Choice of Law

Federal courts sitting in diversity look to the law of the forum state when making choice of law determinations.  *Klaxon Co. v. Stentor Elec*. Mfg. Co., 313 U.S. 487, 496 (1941).  Under California law, the parties' choice of law reflected in a contract clause will govern provided the chosen state bears a substantial relationship to the parties or their transaction and enforcement of the provision does not violate a fundamental public policy of California.  *Hatfield v. Halifax PLC,* 564 F.3d 1177, 1182-83 (9th Cir. 2009) (quoting *Boracchia v. Biomet, Inc.,* No. C-07-0650 MMC, 2008 WL 512721, at *3 (N.D. Cal. Feb. 25, 2008)).  A substantial relationship exists between a party and the state that party is domiciled, resides, or is incorporated in.  *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 467 (1992) (holding incorporation and domicile status create substantial relationship); *see also Software, Ltd. v. Photon Infotech Private, Ltd.*, No. 5:12-CV-04382-EJD, 2014 WL 1728705, at *3, (N.D. Cal. May 1, 2014) (collecting cases holding that a party has a "substantial relationship" to its state of domicile or incorporation). Enforcing a choice of law provision does not violate a fundamental public policy of California if doing so would not create a conflict with California law.  *Nedlloyd*, 3 Cal.4th at 466; *see also Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 916-17 (Cal. 2001).  Washington law, at least in the context of consumer protection, does not conflict with California law.  *See Fagerstrom v. Amazon.com, Inc.*, 141 F.Supp.3d 1051, 1063–64 (S.D. Cal. 2015) (noting that "[i]f the two state's laws are not equally protective of consumers, and equally hostile to unconscionable terms in consumer contracts, they are certainly close," and that "a plausible case can be made that Washington's unconscionability doctrine is more protective of consumers than California's") (emphasis in original).  The burden is on the party opposing the choice-of-law provision to establish both the "fundamental conflict" and "materially greater interest" prongs. *See Wash. Mut.*, 24 Cal. 4th at 917 (Cal. 2001) ("If the proponent of the clause… demonstrates that the chosen state has a substantial relationship to the parties or their transaction… [the] parties' choice generally will be enforced unless the other side can establish both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue.").

Here, the parties do not dispute that the Amazon COU incorporated by reference in the

Audible COU contains a choice of law provision that provides for the application of the laws of the state of Washington. *See* Amazon COU at 4. Additionally, the parties do not dispute that Defendant Amazon has Washington as its principle place of business. MTC at 9:23-27. Defendant Amazon also wholly owns and operates Defendant Audible. Massello Decl. ¶ 3. Furthermore, there does not appear to be, nor has Plaintiff argued that Washington law conflicts with California law on the relevant issue of contract formation and the enforceability of arbitration provisions. *See* Opp'n at 10 n. 1. In fact, Plaintiff concedes Washington law may be more protective than California law. *Id.* Finally, the parties both concede that the choice of law will make no difference here. *Id.*; MTC at 9:23-10:10. As such, the Court would, in keeping with California choice of law principles, honor the parties' choice of law provision and apply Washington law.[2]

      B.  <u>Whether a valid arbitration agreement exists</u>

"[T]he federal policy favoring arbitration is inapplicable to the determination of whether a valid agreement to arbitrate between the parties exists." *Campos v. Campos Family Farms, LLC*, No. 12-598-LJO, 2012 WL 2090303, at *8 (E.D. Cal. June 8, 2012) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)). Rather, that determination is made by reference to ordinary state law contract principles. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). As the party moving to compel arbitration, Defendants bear the burden of proving by a preponderance of the evidence the existence of a valid arbitration agreement. *See Lucas v. Hertz Corp.*, 875 F.Supp.2d 991, 998 (N.D. Cal. 2012) (citing *Olvera v. El Pollo Loco*, 173 Cal. App. 4th 447, 453 (2009)).

Defendants argue Plaintiff agreed to the Audible COU three times: (1) on June 26, 2016 when he signed up for a free trial; (2) on October 25, 2016 when he activated his mobile Audible App, and (3) when he activated his Amazon Echo using the Alexa App. MTC at 5:19-7:8; Supp. Mot. at 3:3-7:16; Massello Supp. Decl. ¶¶ 6, 26, 30, 33. Defendants further argue the Audible COU incorporate the valid arbitration provision contained in the Amazon COU. *See* MTC at 11:14-18. Defendants also contend that Plaintiff agreed to the Amazon COU on multiple occasions since he became a member in 2008, including each of the dozens of times he has made

---

[2] The Court notes that, in determining whether a contract was formed in the first place, the choice of law provision is irrelevant. While the parties dispute whether California or Washington law should apply to issues of formation, both concede there is no substantive difference in the states' law of contract formation. For the sake of uniformity the Court has cited to Washington contract law but would reach the same conclusions under California law.

purchases on the site.  MTC at 5:19-7:8; Supp. Mot. at 10:11-11:24.  Defendants also argue that Plaintiff's agreement to Amazon's COU is an agreement to arbitrate any claims brought against Audible.  Supp. Mot. at 10:11-11:24.  In their supplemental briefing submitted following the May hearing, Defendants argue an alternative basis to compel Plaintiff to arbitration, one based on principles of equitable estoppel.  *See* Supp. Mot. at 11.

> i.  *Mutual Assent*

Under Washington law in order to form a valid contract the parties must manifest their mutual assent.  *See Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 177–78 (2004); *see also Hauenstein v. Softwrap Ltd.*, No. C07-0572-MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007).[3]  In the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of a merchant's terms of service agreement.  *See, e.g.*, *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014) ("We agree with the district court that Barnes & Noble did not provide reasonable notice of its Terms of Use, and that Nguyen therefore did not unambiguously manifest assent to the arbitration provision contained therein.").  Reasonable notice in this context requires that the consumer had either actual or constructive notice of the terms of service; constructive notice occurs when the consumer has inquiry notice of the terms of service, like a hyperlinked alert, and takes an affirmative action to demonstrate assent to them.  *See id.* at 1176-79.   This "inquiry turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract."  *Id.* at 1177.

Constructive notice is generally clear where the user is actually required to, and does click a button explicitly agreeing to the terms of the contract, even if the user does not actually read the terms of services.  *See e.g.*, *Riensche v. Cingular Wireless, LLC*, C06–1325Z, 2006 WL 3827477, at *1 (W.D. Wash. 2006) (concluding that plaintiff assented to arbitration clause when he indicated his agreement to the terms of service online); *Feldman v. Google*, Civil Action No. 06–2540, 2007 WL 966011, at *5–8 (E.D. Pa. March 27, 2007) (holding that where user had to "click" the "Yes, I agree to the above terms and conditions" button in order to proceed with the online transaction, there was reasonable notice of the terms and mutual assent to the contract). Courts have also found constructive notice where sites contain a disclosure statement that

---

[3] The relevant California law is functionally identical.  *See Bowman v. Victor*,  83 Cal. App. 2d 693 (1948); *Roth v. Malson*,  67 Cal. App. 4th 552, 557 (1998).

indicates if a user signs up for a given service they accept the terms of service provided the design of the website puts a reasonably prudent user on inquiry notice. *See e.g.*, *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 835 (S.D.N.Y. 2012) (enforcing forum selection clause based on disclosure below "Sign Up" button); *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them"). Courts commonly refer to these agreements as "sign-in-wrap" agreements. *See Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 394-403 (E.D.N.Y. 2015) (describing four general types of online consumer contracts).[4]

Alternatively, some courts have refused to enforce sign-in-wrap, or click-wrap agreements where aspects of the website, such as the location and appearance of the disclosure statement, the actual terms of the agreement, and the appearance and location of the hyperlink to the agreement, prevent a reasonable consumer from being on constructive notice. *See, e.g.*, *Nguyen*, 763 F.3d at 1173 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *see also Specht v. Netscape Communications Corp.* 306 F.3d 17, 22-23 (2d Cir. 2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Metter v. Uber Technologies, Inc.*, Case No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017) (denying motion to compel arbitration where sign-in-wrap agreement was only visible if user scrolled down, an action not necessary to complete the sign up process); *Meyer v.*

---

[4] *Berkson* provides a helpful summary of the four common varieties of electronic contracts of adhesion:

> Browsewrap exists where the online host dictates that assent is given merely by using the site. Clickwrap refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. Scrollwrap requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services.

97 F.Supp.3d at 394-395

*Kalanick*, 199 F.Supp.3d 752, 763 (S.D.N.Y. 2016) (refusing to enforce agreement where plaintiff "did not have to click any button explicitly indicating assent to Uber's User Agreement")

While courts addressing constructive notice in internet commerce have avoided establishing hard and fast rules, review of the case law at the district level provides important guidance. Again *Berkson* includes a helpful summary:

> First, "terms of use" will not be enforced where there is no evidence that the website user had notice of the agreement; "the validity of the [internet] agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen,* 763 F.3d at 1177 (emphasis added) (collecting cases).
>
> Second, "terms of use" will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage. *See, e.g., Ticketmaster Corp.,* 2003 U.S. Dist. LEXIS 6483, 2003 WL 21406289, at *2 (noting that the warning on website that further use binds a user to the 'terms of use' 'could not be missed'); *see also cf.* Woodrow Hartzog, *Website Design as Contract*, 60 Am. U. L. Rev. 1635, 1664-70 (2011) (discussing features of website design that hinder understanding of privacy policies).
>
> Third, 'terms of use' will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it. *See, e.g., Specht*, 306 F.3d at 23 (refusing to enforce "terms of use" that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F. Supp. 2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); *Van Tassell*, 795 F. Supp. 2d at 792-93 (refusing to enforce arbitration clause in internet agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Hines*, 668 F. Supp. 2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen−an action that was not required to effectuate her purchase").

97 F.Supp.3d at 401-02.

With this guidance in mind, and after a review of several but admittedly not all of the sign-in-wrap agreements examined by courts throughout the country, the Court examines each of

the instances in which Defendants contend Plaintiff was made aware of, and assented to Audible's COU.

a.   June 26 Sign Up for Audible on Audible's Website

Defendants contend Plaintiff agreed to Audible's COU through a sign-in-wrap agreement when he signed up for a free subscription to Audible on June 26, 2016.  Plaintiff counters that he never had actual, or constructive notice of those terms and therefore cannot be bound to them.  For the reasons discussed below, the Court would find that Plaintiff did *not* assent to Audible's COU on June 26, 2016.

On June 26, 2016 Plaintiff elected to sign up for a free trial 30-day trial of Audible online using his smartphone.  McKee Decl. ¶ 6.   To do so he accessed Audible's website and clicked on a button that said "Try Audible Free."  *Id.*   On the next page Plaintiff pressed a sign in box that automatically signed him into Audible using his pre-existing Amazon account.  *Id.*  Plaintiff was then directed to a screen on which he entered his credit card information and clicked on a box that said "Start Now."  *Id.*   Directly below the Start Now button the site contains the following disclosure: "By completing your purchase you agree to Audible's Conditions of Use and authorize us to charge your designated credit card or another available credit card on file."  *See* Defs.' Supp. Br. Ex. 4 ("Audible Sign Up Screenshot") at p. 25.  This disclosure did not contain hyperlinks.  *Id.*  Below this disclosure there was a paragraph describing some terms of the free trial, the last sentence of which states "Check out the full terms and policies that apply to Audible membership."  *Id.*   The words "terms" and "policies" were hyperlinked.  *Id.*   These hyperlinks lead to a site containing a document with the header Audible's "Terms of Use" which in turn reference and provide a hyperlink to Amazon's COU.  Defs.' Supp. Br. Ex. 6.  The entire disclosure is in the smallest font that appears on the page.  *See* Audible Sign Up Screenshot.  It is also undisputed that, it is at least possible to click the "Start Now" button without these disclosures appearing on the screen of a standard I-Phone.  Plaintiff contends he did so.  McKee Supp. Decl. ¶ 2.

The Court does not agree with Defendants that, by clicking the "Start Now" button, Plaintiff agreed to the arbitration provision in Audible's COU for several reasons.   First, a reasonable consumer would not be put on notice that the disclosure below the "Start Now" button actually attached any contractual consequences to clicking *that particular button* to begin a free membership, much less an arbitration agreement contained in an agreement titled "Terms

11

of Use." This is in part because the disclosure does not explicitly refer to clicking on the button (*i.e.* "by clicking on the above" or "by pressing the Start Now button"), or starting the free trial (*i.e.* "by beginning your free trial"). Instead the disclosure states that "making" a "purchase" binds the user to Audible's COU. *Id.* But clicking the "Start Now" button does not make a purchase, it simply initiates a free membership. Indeed, Plaintiff did not make a purchase on June 26, 2016. *See* McKee Decl. ¶¶ 7, 9. Therefore, even if this disclosure provided notice that "making a purchase" would bind the Plaintiff to a contract, it fails to provide notice that selecting the "Start Now" button, or beginning the free trial bound him to anything. *See Meyer*, 199 F. Supp. 3d at 763 (refusing to enforce agreement where plaintiff "did not have to click any button explicitly indicating assent to Uber's User Agreement"); *Id.* at 765 (lack of "parallel wording" between button and disclosure statement factors against notice).

Further, the linguistic imprecision found on Audible's sign up page undermines Defendants' position in a more fundamental way: if Plaintiff did not make a purchase on Audible on June 26, 2016 (it is uncontested that he did not), *he did not actually agree to Audible's Terms of Use*. As a result, even if the Audible site provided Plaintiff with constructive notice of Audible's COU (the Court believes it did not), Defendants have failed to demonstrate Plaintiff actually assented those terms by making a purchase.

The Court finds further support for the conclusion that the Audible site fails to afford notice in the site's general design, including the location and appearance of the disclosure. First, the initial disclosure is not hyperlinked and appears in small, undifferentiated font. *See Meyer*, 199 F.Supp.3d at 764-65 (disclosure with small font and not prominently displayed "did not make the terms of use (i.e., the contract details) readily and obviously available to the user."); *see also Berkson*, 97 F.Supp.3d at 380 ("Undiscussed by courts is what the average internet user, one who does not necessarily conduct much of her business online, perceives to be the purpose of a website's 'terms of use.' Especially when presented in lowercase, this phrase does not clearly inform a user that she is subjecting herself to a one-sided contract that purports to modify her basic legal rights and remedies.").

The disclosure also appears below the Start Now button so that a user must scroll down to view it and may proceed to the next page without ever doing so. *See Sprecht*, 306 F.3d at 22-23; *see also Nguyen*, 763 F.3d at 1177 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely

to see it, courts have refused to enforce the browsewrap agreement.")   Additionally, the disclosure statement references "Conditions of Use" while the document that allegedly contains the arbitration clause contains the heading "Audible's Terms of Use."   Therefore, even were a consumer to understand that selecting the "Start Now" button bound that user to Audible's Conditions of Use, that consumer would also need to surmise that Audible really meant the document titled "Terms of Use" that appears on the following page.   Defendants ask too much of their site's users and this level of notice is inferior to most of the cases where sign-in-wrap, or clickwrap agreements have been enforced.   *See Berkson*, 97 F.Supp.3d at 401 (listing district level decisions where buttons appeared next to or above disclosure that explicitly tied pressing the button to terms of service).   The design of the Audible site is more akin to those rejected by other courts.   *See supra* III.B, p. 10.   (listing cases where agreements were rejected).

Finally, as Plaintiff points out, nothing prevents a company like Audible from ensuring its website provides disclosures that are properly labelled, conspicuously located, and linguistically precise.   If such a company wishes to condition use of its website on a customer's willingness to forgo access to the courts, it must do so carefully, as indeed many other companies have.   *Id.*; *Berkson*, 97 F.Supp.3d at 401.   It is Defendants' burden to show their site afforded constructive notice to Plaintiff and that Plaintiff unambiguously assented to the Audible COU. They have failed to carry that burden here.

In sum, the Court would not find that Plaintiff's June 26, 2016 sign up for Audible's free 30-day trial manifested assent to the arbitration provision in Audible's COU.

b.  Audible Mobile application on October 25, 2016

Defendants also contend Plaintiff agreed to Audible's COU when he signed into his Audible account through Audible's mobile application on October 25, 2016.   *See* Massello Supp. Decl. at ¶ 26.   Plaintiff argues the Audible App did not provide effective notice.

To sign in to the Audible Mobile App Plaintiff entered the email and password associated with his Amazon account and clicked an orange "Continue" button located near the middle of the screen.   Massello Supp. Decl. ¶¶ 27-28; Defs.' Supp. Br., Ex. 10 ("App Screenshot").   An Audible logo appears on the top of the screen that includes the phrase "an amazon company" in small letters.   *See* App Screenshot.   Just below the logo, visitors are instructed to "Sign in to Audible using [their] Amazon account."   *Id.*

The following disclosure appears at the very bottom of the screen, approximately 30-40%

13

of screen's length below the Continue button: "By signing in, you agree to Audible's Conditions of Use [vertical line] Privacy Notice."  *Id.*  The phrases "Conditions of Use" and "Privacy Notice" are blue hyperlinks.  *Id.*  The remainder of the text is grey.  *Id.*  The entire disclosure is separated from the rest of the screen by a horizontal line.  *Id.*  The hyper linked "Conditions of Use" button links to Audible's "Terms of Use" that incorporate and hyper link to Amazon's COU.  Massello Supp. Decl. ¶¶ 20-22, 28.

Plaintiff then entered the requested information.  McKee Further Supp. Decl. ¶ 2.  He did so using the pop-up keyboard on his phone.  *Id.*  He does not remember ever viewing the disclosure at the bottom of the screen.  *Id.*  Defendants admit that given the location of the disclosure, use of a pop-up keyboard would temporarily block it from view.  Massello Supp. Decl. ¶ 29.  The result is that a user who reads the page starting at the top and follows the site's instructions would be immediately blocked from seeing the disclosure as the user enters their information.  *See* App Screenshot.  After the information is entered if the user continues to read down the screen the next object the user encounters is the orange Continue button.  *Id.*  If the user then clicks the Continue button he or she moves to the next page and is "signed in" to Audible.  Massello Supp. Decl. ¶ 28.

The Court finds that Audible's Mobile App Sign In page shares many of the deficiencies of its website's sign-in, including (1) the appearance and location of the disclosure (in small font, and below the Continue button), (2) lack of parallel wording ("Continue" compared with "Signing In"), (3) potential for the disclosure to be obscured from view (by the popup keyboard), and (4) mislabeled hyperlinks ("Conditions of Use" as compared to "Terms of Use").  These deficiencies create serious doubts as to whether Audible's mobile app provided Plaintiff with constructive notice that, in electing to "Continue" (or rather in clicking the "Continue" button), he agreed to arbitrate any potential claims against Audible.  It is also not readily apparent that clicking the Continue button is the same thing as "signing in" to the App.  While this final observation alone might not be determinative, it is a factor, and Defendant Amazon itself uses more precise language in other applications.  *See infra* III.B.iii (describing sign-in procedure on Alexa App),

Further, the disclosure again appears below the Continue button, this time significantly so.  *See* App Screenshot.  As a result, use of a pop-screen immediately obscures the disclosure from view as the user begins to enter the information the site requests.  *Id.*  Finally, the hyperlink

is once again labeled as Conditions of Use but links the user to a document titled Terms of Use. *Id.*

Given the above, and with the previously cited cases in mind, the Court would find that the Audible App did not afford Plaintiff notice that clicking the "Continue" button bound him to an arbitration provision incorporated in Audible's COU.

### c. Plaintiff's Amazon Echo Activation on April 19, 2016

Defendants assert an additional agreement in their supplemental briefing: that Plaintiff agreed to Audible's COU when he registered his Amazon Echo device, through Amazon's Alexa App. As an initial matter the Court can refuse to grant the motion on this ground given it was not addressed in the moving papers but only in the Reply. Defendants' argument also fails on its merit.

Plaintiff purchased an Amazon Echo device on April 19, 2016. Massello Supp. Decl. ¶ 30. He activated his Echo several days later, a process that required him to "Setup" the device using Echo's companion App called Alexa. *Id.* ¶¶ 30-31. The process begins on the start up page of the Alexa App. *Id.* ¶ 31. This page contains information about Alexa, a disclosure, and a "Begin Setup" button. *See* Massello Supp. Decl. Ex. 11 ("Alexa Screenshot"). The disclosure on the Alexa start-up page is different than Audible's. In the case of Alexa, the disclosure appears above the "Begin Setup" button and explicitly states that "By tapping Begin Setup [the user agrees] to all the terms found here."[5] *Id.* Plaintiff pressed the Begin Setup button. *Id.* The phrase "terms found here" is hyperlinked, and leads to a page containing "Alexa's Terms." Massello Supp. Decl. ¶ 32. Alexa's Terms provide that "if you use or access Alexa, you agree to the following terms." Massello Supp. Decl. Ex. 12 ("Alexa's Terms"). Below this phrase, following a colon, are seven hyperlinks to various user agreements associated with Amazon products, including "Amazon's Conditions of Use" and "Audible's Conditions of Use," both of which contain the arbitration provision Defendants now seek to enforce. *See* Alexa's Terms. Nothing on this page directs, much less requires a user to click on any of the hyperlinks. *Id.*

While Alexa's sign in page does not suffer from the same design flaws as Audible's pages, Defendants' contention that Plaintiff's selection of the Begin Setup button on the Alexa app binds him to the arbitration clause contained in *Audible's* COU suffers from its own

---

[5] The Court notes that this design appears to be superior to Audible's placement of the disclosure far below the button as well as Audible's decision to not explicitly connect the action of pressing the button with agreeing to contract terms.

problems.  As an initial matter, the Court is concerned that the laundry list of user agreements hyperlinked as part of Alexa's terms of use adds a level of procedural unconscionability that would likely alter the Court's previous unconscionability ruling, reiterated below.  Additionally, Alexa's disclosure that "tapping" the Begin Setup button binds the user to *Alexa's* Terms (those terms "found here") is not the same thing as a disclosure that initiating setup binds the user to the terms contained *in all seven of the agreements* listed as part of Alexa's Terms (those terms "found here, including all those terms contained in the separate agreements linked here").  For this reason, when Plaintiff selected Begin Setup he was only on notice, and only agreed to Alexa's terms that appear on the subsequent screen.  The most important term found on that screen in turn, states that "If you use or access Alexa, you agree to the following [sets of] terms [listed below.]"  In other words, by pressing the Setup button Plaintiff only agreed *to agree* that if he then *used* or *accessed* Alexa, he would be bound by various *other* agreements.  Defendants do not actually present any evidence Plaintiff "used or accessed" Alexa, or that before doing so, he had notice of any contractual implications of doing so.  Furthermore, the hyperlink to Audible's Terms of Use is again mislabeled.  *See* Alexa's Terms.  As such, Alexa's Terms provide no notice that a user is being bound to an alternatively titled document called Terms of Use, nor is it clear that use of Alexa would bind a user to Audible's Terms of Use.

The Court is further troubled by the fact that Plaintiff was actually seeking to activate his Amazon Echo (which required him to use the Alexa App), two products not made, or directly associated with Audible.  Additionally, it is undisputed that Plaintiff had yet to sign up for Audible, or contract with Audible in any way in April of 2016.  These facts are important to the notice inquiry.  It is simply hard for the Court to imagine that a reasonable consumer registering the Amazon Echo expects to be presented with terms of use governing his or her contractual relationship with separate corporate entities, let alone one he or she has never dealt with.  As a result, though the Alexa Sign in page may afford notice of Alexa's Terms, it does not necessarily afford notice of Audible's COU.  Indeed, the Court would hold that Alexa's sign in page does not afford a reasonable consumer notice, constructive or otherwise, that by "setting up" Alexa, he or she was agreeing to arbitrate claims against Audible.  No amount of hyperlinking, cross promotion, or pro-arbitration jurisprudence changes the reality of internet commerce: a consumer agreeing to terms of use for his or her Echo cannot be reasonably expected to know they are

giving up the right to sue Audible.[6]

d.   Effect of Plaintiff's Assent to Amazon's COU

Defendants' final attempt to bind Plaintiff to the arbitration clause contained in Audible's COU is to argue that he pre-agreed to arbitrate claims against Audible each and every time he purchased a product from Amazon.  This is because, Defendants contend, Amazon's COU cover all of Amazon's affiliates and their products.  *See* Defs.' Supp. Br. at 10:11-23.  It appears to be undisputed Plaintiff has made multiple purchases on Amazon and that, each time he assented to Amazon's COU.  *See* Massello Supp. Decl. at ¶¶ 36-37, Exs. 18-19.  Defendants argue that because Amazon's COU define "Amazon" to include its affiliates, Plaintiff, in making purchases on Amazon.com enters into arbitration agreements with every single Amazon affiliate.  This line of argument is unpersuasive.  First, it is a relatively basic proposition that a party can only assent to a contract with notice of its essential terms, including, the actual parties to the contract.  *See Lee v. Intelius Inc.*, 737 F.3d 1254, 1260 (9th Cir. 2013) ("Washington law requires that the 'essential elements' of the contract be set forth in writing. An essential element is identification of the parties to the contract.")  Audible is not listed as a party to the Amazon COU.

Further, Defendants contention that the Amazon sign in page provided Plaintiff with notice that he was making an agreement *with Audible* has other problems.  For one, unless the Amazon agreement directs Plaintiff to Audible's COU in some way, or notifies Plaintiff of the existence of Audible as an Amazon affiliate it does not afford notice.  The Court is unwilling to hold that a reasonable consumer signing into Amazon would believe he or she is also waiving the right to sue several additional corporations.  While Amazon may be able to compel Plaintiff to arbitrate his claims based on purchases he made on Amazon, Audible may not.

In sum, the Court would find that Defendant Audible has failed to establish, by a preponderance of evidence that Plaintiff ever agreed to arbitrate claims against it.  The Court would find, however, that Plaintiff is bound to arbitrate claims against Amazon.[7]

---

[6] The Court would also ask Defendants why the Alexa agreement was not part of their original moving papers.  The Court would also ask Plaintiffs what, if any legal consequence that failure should have.  Presumably Plaintiff has had any number of interactions with Amazon, or an Amazon affiliate leading up to the date he filed suit.  Absent some procedural bar, the Court is concerned Defendants will simply submit new screen shots should their motion be denied.

[7] As indicated in the Court's prior tentative ruling, Amazon's checkout page provides sufficient notice of the Amazon COU.  *See* Minutes at 8-9, 10.  This is because the disclosure and hyperlink that appear on the Amazon checkout page are of the same nature as those upheld in courts across multiple districts, including those applying

ii. *Unconscionability and Enforceability*[8]

Having found that Plaintiff was on constructive notice of the Amazon COU and agreed to be bound by them, the Court turns to the enforceability of the arbitration agreement contained therein.  Plaintiff argues the agreement is unconscionable both procedurally and substantively, and that it places users under duress.  The Court would find, like several other courts interpreting virtually the same agreement, that the arbitration agreement at issue is enforceable with the exception of a recently added provision appearing on the Audible website that the Court would

---

Washington law.  *See, e.g.*, *Doe v. Project Fair Bid Inc.*, No. C11-809 MJP, 2011 WL 3516073, at *4 (W.D. Wash. Aug. 11, 2011) ("This kind of 'clickwrap' agreement has been upheld in several cases in this circuit and elsewhere."); *Hauenstein v. Softwrap Ltd.*, No. C07-0572MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007) (enforcing arbitration agreement because plaintiff "manifested his assent to the License Agreement by 'clicking' the appropriate box"); *see also Selden*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja*, 841 F.Supp.2d at 835; *Starke*, No. 13 CIV 5497 LLS, 2014 WL 1652225, at *3 (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them").

Further, unlike cases in which courts refused to enforce provisions where the disclosures were not visible without additional scrolling, the disclosure on Amazon's checkout page appear between the Place Your Order button and an order summary.  *See* Massello Decl. Ex. 8.  A disclosure also appears elsewhere on the screen directly next to, not above, another Place Your Order button.  *See* Massello Decl., Ex. 8.  This disclosure appears directly below a section that allows shoppers to review their items and shipping selections.  *Id.*  Unlike the cases on which Plaintiff relies, the checkout site does not bury the disclosures on a submerged screen, or obscure their view through pop ups.  *See Sprecht*, 306 F.3d at 32 (finding "a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms."); *see also Metter*, Case No. 16-cv-06652-RS, 2017 WL 1374579 (denying motion to compel arbitration where sign-in agreement was only visible if user scrolled down).  The Court would thus find that an agreement existed with Amazon, that if enforceable, covers Plaintiff's claims against Amazon.  This finding is in line with at least two other courts that have examined purchases made on Amazon in this context.  *See Ekin v. Amazon Servs., LLC*, 84 F.Supp.3d 1172, 1175-78 (W.D. Wash. 2014); *Fagerstrom*, 141 F.Supp.3d at 1057-60.  Plaintiff also agreed to Amazon's COU when he signed up for his Prime membership.  *See* Massello Decl. Exs. 10-11; supra at 3-4 (citing relevant language contained in the Prime Terms).

Finally, despite Plaintiff's contention otherwise, the fact Amazon did not add an arbitration provision until 2011 does not change the Court's conclusion.  Plaintiff agreed to the updated Amazon COU when he signed up for Prime in 2012.  Massello Decl. Exs. 10-11; supra at 3-4.  Upon doing so, Plaintiff was placed on notice that Amazon's COU had "changed over time" and was directed to carefully review those terms.  This distinguishes the case at bar from *Douglas v. United States Dist. Court*, 495 F.3d 1062 (9th Cir. 2007).  *See id.* at 1066 (holding plaintiff customer received no notice when new terms were posted to the defendant company's website because plaintiff never visited the site and was never given any reason to view the updated terms); *see also Rodman v. Safeway Inc.*, Case No. 11-CV-03003-JST, 2015 WL 604985. *10-11 (N.D. Cal. February 12, 2015) (applying *Douglas* to hold that a plaintiff customer received no notice of changed terms despite making subsequent purchases on the defendant company's website because plaintiff was not required to agree to updated terms and conditions with each new purchase).  The Court also notes that no district court has applied *Douglas* to hold that repeated purchases that require agreeing to hyperlinked Conditions of Use do not constitute assent to those terms as written at the time of purchase.

---

[8] The Court adopts its prior tentative with respect to unconscionability and finds that the only contract agreed to, the Amazon COU is enforceable with the exception of the severable provision discussed below.  The Court has included its analysis of Audible's COU with the acknowledgement that because the Court does not find that Plaintiff agreed to those terms its enforceability is moot.

sever.

Plaintiff bears the burden of establishing the defense of unconscionability.  *See Zuver v. Airtouch Communications*, 153 Wn.2d 293, 302-03 (2004).  Washington law recognizes both procedural and substantive unconscionability.  *Id.* at 303.  Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh.  *Id.*  Procedural unconscionability is the lack of meaningful choice, considering all the circumstances surrounding the transaction including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms [were] hidden in a maze of fine print.  *Id.*; *see also Brinkley v. Monterey Fin. Servs., Inc.*, 242 Cal. App. 4th 314, 336 (2015) (applying Washington law).  These three factors for determining procedural unconscionability are not applied mechanically without regard to whether in truth a meaningful choice existed.  *Zuver*, 153 Wn.2d at 303.

a.  Procedural Unconscionability

Plaintiff argues the arbitration provision contained in the Amazon COU is procedurally unconscionable because, among other things it is a contract of adhesion, offered solely online, allows for unilateral modification, contains tiny font, ambiguous labels, and incorporates by reference.  *See* Opp'n at 19:19- 22:10.

The Court would agree the contract is one of adhesion.  However, that alone does not render it procedurally unconscionable.  *See Concepcion*, 563 U.S. at 346-47 (enforcing arbitration provision in an adhesion contract, noting "the times in which consumer contracts were anything other than adhesive are long past."); *see also Fagerstrom*, 141 F.Supp.3d at 1068 (holding Amazon COU were not procedurally unconscionable even though adhesive in nature). Similarly, the Court would not find that the fact the Amazon COU are only available online means the agreement is procedurally unconscionable because Plaintiff provides no authority for that proposition.  In fact, courts have applied Washington law and upheld the Amazon COU at issue.  *See*, *e.g.*, *Fagerstrom*, 141 F.Supp.3d at 1068.  Furthermore, the Court already concluded Plaintiff was on reasonable, constructive notice via the hyperlinks that appear during the Amazon checkout process.  *See supra* Section III.B.i (finding Amazon websites and mobile sites provided Plaintiff with constructive notice of the terms).  As a result the Court would not find the size of the text makes the agreement procedurally unconscionable.  *See Fagerstrom*, 141 F. Supp. 3d at 1068 ("The notice of the [Amazon] COUs may not dominate the entire checkout page display,

19

but it is reasonable notice, and that is all that is required.").  Plaintiff's incorporation by reference argument is also unavailing because the arbitration provision itself was contained in the Amazon COU in bold font of the same size as the surrounding text.  *See Brown v. MHN Government Services, Inc.*, 176 Wash.2d 258, 267 (2013) (finding no procedural unconscionability where the arbitration provision was in the same typeface, font, and size as the rest of the terms of use).  In sum, the Court does not find the Amazon COU to be procedurally unconscionable.[9]

### b. Substantive Unconscionability

Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh.  *Id.*  "Shocking to the conscience," "monstrously harsh," and "exceedingly calloused" are terms sometimes used to define substantive unconscionability.  *Nelson v. McGoldrick*, 127 Wn.2d 124, 131 (1995).

Plaintiff contends that the arbitration agreement is substantively unconscionable because it (1) permits unilateral modifications, (2) contains an IP carveout, (3) prohibits public injunctive relief, (4) limits liability, (5) contains a choice of law provision, (6) contains a class action waiver, and (7) includes "deceptive concessions."  Opp'n at 22:11-24:9.  Defendants contend that the agreement contains several pro-plaintiff elements and is therefore not one sided.  MTC at 15:3-16.  The Court would agree with the other courts that have examined the Amazon COU and find that it is not substantively unconscionable.  *See Ekin*, 84 F.Supp.3d. at 78 (finding that Amazon's arbitration provision was not unconscionable); *Fagerstrom*, 141 F.Supp.3d at 1064-76 (same); *Peters v. Amazon Servs. LLC*, 2 F.Supp.3d 1165, 1170 (W.D. Wash. 2013) (same).

As an initial matter, Plaintiff's class action waiver argument ignores the breadth of case law permitting such waivers.  *Concepcion*, 131 S. Ct. at 1753; *see also Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (upholding class action waiver and noting that Rule 23 does not establish an entitlement to class proceedings for the vindication of statutory rights).  While Plaintiff is correct the presence of a waiver may be a factor, it is not sufficient to demonstrate substantive unconscionability.  Similarly, Plaintiff's choice of law argument is unavailing.  As discussed above, Plaintiff admits Washington law is as protective of consumers if not more so than California.  Opp'n at 10 fn. 1; *see also Fagerstrom*, 141 F. Supp. 3d at 1063.  The Court is also not convinced that the Amazon COU contain deceptive concessions.  Similarly,

---

[9] The Court would note that additional procedural unconscionability concerns would arise were it to have held that Plaintiff had agreed to Audible's COU through the Alexa terms of service.  In that event, the Court would have revisited the unconscionability analysis.

the Court agrees with Defendants that there is no prohibition on injunctive relief in the arbitration provision.  *See* Reply at 18:2-11.

Plaintiff's unilateral modification argument fails because there are other limitations to Amazon's ability to abuse this power.  *See Fagerstrom*, 141 F.Supp.3d at 1017.  Specifically, the performance obligations of both parties, including the core obligation to arbitrate disputes, is fixed and in effect under the current Agreement, and (2) the implied duty of good faith and fair dealing requires Amazon to exercise its discretion in a manner consistent with the justified expectations of the parties.  *Id.*  The Court would also agree with the court in *Fagerstrom* that the IP carveout is not necessarily entirely one-sided as it is at least conceivable an Amazon user could end up in an IP dispute.  *Id.*  Moreover, the IP carveout, though it may be unequal, does not itself create substantive unconscionability.  *Id.*; *see also* Rev. Code Wash. § 62A.2–302 ("The principle [of unconscionability] is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power.").

On the other hand, Plaintiff's argument concerning a provision that caps Audible's total amount of potentially liability at the amount of money a member has spent in the previous year is problematic for Defendants.  *See* Opp'n at 23:9-28; Soderstrom Decl. Ex. 4, Docket No. 21-7.  This is because that provision is wholly one-sided and arbitrarily caps damages.  *See Zuver*, 153 Wash.2d at at 317-19 (finding remedy limitation provision unconscionable where it was one-sided).  The Court would find that this term is unconscionable and sever that provision without disturbing the rest of the agreement.  *Id.* at 320.[10]

Plaintiff's duress argument is not persuasive.  Opp'n at 24:20-25:18.  Plaintiff argues that because the only way a user can refuse to agree to a unilateral modification is to cancel its membership-a move that may require it to forfeit its stored credits-Audible effectively forces its users to give up the credits or accept the changes.  This is because, to actually use the credits before cancellation, would be to accept the new terms.  *Id.*  The Court would find that this feature of the agreement is not unconscionable as much as part of the bargain.  *See* Rev.Code Wash. § 62A.2–302 ("The principle [of unconscionability] is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power.").  Defendants provide users credits as part of their Audible subscription, and those

---

[10] Defendants do not address this liability limitation provision in their Reply.  The Court would entertain argument on this point at the hearing before finalizing the decision with regard to severing this term.

credits may be effected negatively should a user wish to terminate its membership. That reality does not render the arbitration provision unconscionable. Moreover, and as stated above, there are other limitations on the Defendants' unilateral ability to modify the agreement. *See Fagerstrom*, 141 F.Supp.3d at 1017.

In sum, the Court would find that, apart from the offending limitation of liability provision, the Amazon COU and Audible COU are not unconscionable and are enforceable.[11] As stated above, this conclusion is in line with the other courts that have examined this agreement. *See Ekin*, 84 F.Supp.3d. at 78 (finding that Amazon's arbitration provision was not unconscionable); *Fagerstrom*, 141 F.Supp.3d at 1064-76 (same); *Peters*, 2 F.Supp.3d at 1170 (same).

C. Equitable Estoppel

Defendants assert an alternative argument for granting their motion in their supplemental briefing based on equitable estoppel. Defs.' Supp. 2:10-20; 11:25-14:6. Not only is this argument new, and outside the scope of the requested briefing, it is based on a misunderstanding, or perhaps a willful misstatement of Ninth Circuit law on equitable estoppel in this context. Equitable estoppel may allow a non-signatory to compel a signatory to arbitration in two circumstances:

> Equitable estoppel is a limited exception to the general rule that parties cannot be required to submit to a contract to which they have not agreed: "Equitable estoppel 'precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes.'" *Mundi*, 555 F.3d at 1045; *see also Townsend*, 173 Wash. 2d at 461 (citing *Mundi*, 555 F.3d at 1045). The Mundi court recognized two types of equitable estoppel in the arbitration context. *Id.* at 1046. In the first, a nonsignatory may be held to an arbitration clause *where the nonsignatory knowingly exploits the agreement containing the arbitration clause* despite having never signed the agreement. *Id.* In the second, a signatory may be required to arbitrate a claim *brought by a nonsignatory* where the subject matter of the dispute is intertwined with the contract providing for arbitration, and the nonsignatory and signatory parties have a close relationship. *Id.*

*East West Bank v. Bingham*, 992 F. Supp. 2d 1130, 1133 (W.D. Wash. 2014).

Here, Audible seeks to invoke the arbitration clause contained in an agreement between

---

[11] As to the Audible COU, were Defendants to seek to enforce them through Alexa's Terms of service the Court would revisit this analysis.

Plaintiff and co-Defendant Amazon even though Audible is non-signatory to that agreement. Therefore, this case fits neither of the scenarios discussed above. In fact, the Ninth Circuit has directly opposed extending equitable estoppel in the manner Defendants ask the Court to: to allow a non-signatory defendant to invoke equitable estoppel against a signatory plaintiff.[12]  *See Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) ("We have never previously allowed a non-signatory defendant to invoke equitable estoppel against a signatory plaintiff, and we decline to expand the doctrine here."); *see also Mundi. v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) ("In light of the general principle that only those who have agreed to arbitrate are obliged to do so, we see no basis for extending the concept of equitable estoppel of third parties in an arbitration context beyond the very narrow confines delineated [previously]."). While *Mundi* notes that other Circuits have allowed non-signatory Defendants to force a signatory Plaintiff's claims into arbitration, it also notes those cases involved Plaintiffs who had sued under the contract, and thus had sought to claim the benefit of the contract.  *See Mundi*, 718 F.3d at 1047.  Here, Plaintiff has not claimed the benefits of his agreement to arbitrate his claims against Amazon.  He has sued Audible and Amazon on statutory grounds. *See generally* Compl.  As a result, Audible cannot invoke principles of equity to force Plaintiff to arbitrate his claims against it regardless of its relationship with Amazon.  *See Mundi*, 555 F.3d at 1047 (declining to force Plaintiff's statutory claims against non-signatory into arbitration).  The Court would not grant Audible's Motion to Compel Arbitration based on equitable estoppel.

**IV.  <u>Conclusion</u>**

For the reasons stated above, the Court DENIES Audible's Motion to Compel Arbitration, but GRANTS Amazon's Motion to Compel Arbitration.

---

[12] Defendants fail to address the Ninth Circuit's explicit rejection of their position.