# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 17-1941-GW(Ex) | Date | October 26, 2017 |
| Title | *Grant McKee v. Audible, Inc., et al.* | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jamin Samuel Soderstrom | Jedediah Wakefield |

**PROCEEDINGS:**      **DEFENDANT AUDIBLE'S MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS AS TO SETH BEALS [41];**

                           **DEFENDANT AUDIBLE'S MOTION TO DISMISS CLAIMS [42]**

The Court's Tentative Rulings are circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Defendant's Motions are TAKEN UNDER SUBMISSION. Court to issue ruling.

                                     :    25

Initials of Preparer    JG

*McKee v. Audible, Inc. et al.*, Case No. CV-17-1941-GW-(Ex)
Tentative Ruling on Defendants' Motion to Compel Arbitration as to Plaintiff Beals

## I.  Background

Plaintiffs Grant McKee ("McKee") and Seth Beals ("Beals") sue, on behalf of themselves and similarly situated individuals, defendant Audible, Inc. ("Audible" or "Defendant") for: (1) violation of the Lanham Act, 15 U.S.C. § 1125; (2) violation of False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.; (3) violation of the CARD Act and EFTA, 15 U.S.C. § 1693l-1(a)(2)(B); (4) violation of Gift Certificate Law, Cal. Civ. Code § 1749.45 et seq.; (5) violation of California's Automatic Purchase Renewals Law, Cal. Bus. & Prof. Code § 17600 et seq.; (6) Conversion; (7) violation of Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; (8) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.; and (9) Restitution, Unjust Enrichment, and Money Had and Received.  *See generally* First Amended Complaint ("FAC"), Docket No. 40.[1]

Audible is an audiobook and spoken audio information and entertainment service that Amazon acquired in 2008.  Declaration of Jason Massello in Support of Defendants' Motion to Compel Arbitration ("Massello Decl. I"), Docket No. 18-1 at ¶ 3.  Audible offers a subscription based service, where subscribers pay a fixed fee, and in turn receive membership benefits, including access to exclusive original audio series, discounts on audiobooks, and Membership Credits, which they can redeem for audiobooks and other audio content.  *Id.* ¶¶ 3-4.  Each Credit can be redeemed for one audiobook, regardless of the audiobook's price.  *Id.*  ¶ 4.  Pursuant to Audible's Conditions of Use ("Audible COU"), upon termination of an account, the user forfeits any unused Membership Credits.  *Id.*  ¶¶ 6-7.

In or around April of 2015, Beals used a desktop computer to sign up for an Audible 30-day trial through his existing Amazon account.  Declaration of Seth Beals in Support of Plaintiffs' Opposition to Audible's Motion to Compel Arbitration ("Beals Decl."), Docket No. 44-8 at ¶ 2; Declaration of Jason Massello in Support of Audible's Motion to Compel Arbitration

---

[1] Beals was not included as a plaintiff in the original Complaint, which also named Amazon Inc. ("Amazon") as a defendant.  *See generally* Docket No. 1.  Both Audible and Amazon moved to compel McKee's claims to arbitration on April 5, 2016.  *See* Docket No. 18.  The Court granted the motion but only as to Amazon after finding that Plaintiff never assented to Audible's Conditions of Use.  *See* Ruling on Defendants' Motion to Compel Arbitration ("Ruling"), Docket No. 35.  In granting Amazon's Motion to Compel, the Court found that the arbitration clause was enforceable and not unconscionable.  *Id.* at 18-21.

as to Seth Beals ("Massello Decl."), Docket No. 41-1 at ¶¶ 6, 10.  Upon signing up, Beals received two Membership Credits.  *Id.* ¶ 10.  He used one of those Membership Credits during the signup process.  *Id.*  After Beals' 30-day trial ended, Audible began charging his pre-designated credit card each month.  Massello Decl. ¶ 12; Beals Decl. ¶ 3.  Beals received a single Membership Credit each month moving forward.  *Id.* ¶ 3.  Thereafter, Beals used several of his monthly Membership Credits to obtain audiobooks.  *Id.* ¶ 3.  Beals cancelled his Audible membership in August or July of 2015.  *Id.* ¶ 4.  After cancelling his membership, Beals received a 12-month gift membership as a birthday present from his wife.  *Id.*  Beals used his computer to redeem his gift membership at Audible.com.  *Id.*  His gift membership included 12 Gift Credits.  *Id.* ¶ 4.  He later redeemed 11 of those 12 Gift Credits.  *Id.*  The last Gift Credit expired.  *Id.*

The Audible COU in effect on May 26, 2015 contained an arbitration provision that incorporates the American Arbitration Association ("AAA") rules, contains a class action waiver, and exempts infringement claims.  *See* Massello Decl. Ex. 4 ("Audible COU"), Docket No. 41-5 at p. 4; *see also* MTC Beals at 5:11-6:7 (block quoting entire arbitration provision as it appears in the Audible COU).  The Audible COU also: (1) contain a severance provision, (2) permit unilateral modification by Audible, (3) state that continued use of Audible's services following modification constitute acceptance of all modified terms, and (4) state that the member agrees "that the Federal Arbitration Act, applicable federal law, and the laws of the state of Washington . . . wil;l govern these Conditions of Use and any dispute of any sort that might arise between you and Audible."  *See* Audible COU.

Now pending before the Court is Audible's Motion to Compel Arbitration as to Seth Beals ("MTC Beals"), Docket No. 41, filed concurrently with Audible's Motion to Dismiss Plaintiffs' First Amended Complaint ("MTD"), Docket No. 42.  Beals opposes the MTC.  *See* Plaintiff Seth Beals' Opposition to Defendant's Motion to Compel Arbitration as to Seth Beals ("Opp'n MTC"), Docket No. 44.  Defendant has filed a Reply.  *See* Docket No. 46.

Audible contends Beals agreed to arbitrate his claims against Audible because unlike McKee, Beals signed up for a 30-day trial on his desktop computer.  MTC Beals at 2:8-2:17.  Audible also argues that Beals agreed to Audible's COU each time he redeemed a Membership Credit for an audiobook using his desktop computer.  *Id.* at 6:14-25, 11:2-14.  According to Audible, Beals' use of a desktop computer as opposed to a smartphone, and the fact he redeemed credits for audiobooks differentiates his experience from that of McKee such that the Court's

2

Ruling denying Audible's previous Motion to Compel should not apply to Beals.  *See* Ruling at 11-17.

## II. <u>Legal Standard</u>

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2010) (citation omitted).  A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for in the parties' agreement.  *See* 9 U.S.C. § 4.  "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original); *see also* 9 U.S.C. § 4.  "The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.  If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms."  *Daugherty v. Experian Info. Solutions, Inc.*, 847 F.Supp.2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'"  *Macias v. Excel Bldg. Servs. LLC*, 767 F.Supp.2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F.Supp.2d 538, 540 (E.D. Pa. 2006)).

## III. <u>Analysis</u>

### A. <u>Choice of Law</u>

Federal courts sitting in diversity look to the law of the forum state when making choice of law determinations.  *Klaxon Co. v. Stentor Elec*. Mfg. Co., 313 U.S. 487, 496 (1941).  Under California law, the parties' choice of law reflected in a contract clause will govern provided the chosen state bears a substantial relationship to the parties or their transaction and enforcement of the provision does not violate a fundamental public policy of California.  *Hatfield v. Halifax PLC,* 564 F.3d 1177, 1182-83 (9th Cir. 2009) (quoting *Boracchia v. Biomet, Inc.*, No. C-07-0650 MMC, 2008 WL 512721, at *3 (N.D. Cal. Feb. 25, 2008)).  A substantial relationship exists between a party and the state that a party is domiciled, resides, or is incorporated in.  *See*

3

*Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 467 (1992) (holding incorporation and domicile status create substantial relationship); *see also Software, Ltd. v. Photon Infotech Private, Ltd.*, No. 5:12-CV-04382-EJD, 2014 WL 1728705, at *3, (N.D. Cal. May 1, 2014) (collecting cases holding that a party has a "substantial relationship" to its state of domicile or incorporation).    Enforcing a choice of law provision does not violate a fundamental public policy of California if doing so would not create a conflict with California law.  *Nedlloyd*, 3 Cal.4th at 466; *see also Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 916-17 (Cal. 2001). Washington law, at least in the context of consumer protection, does not conflict with California law.  *See Fagerstrom v. Amazon.com, Inc.*, 141 F.Supp.3d 1051, 1063–64 (S.D. Cal. 2015) (noting that "[i]f the two state's laws are not equally protective of consumers, and equally hostile to unconscionable terms in consumer contracts, they are certainly close," and that "a plausible case can be made that Washington's unconscionability doctrine is more protective of consumers than California's") (emphasis in original).  The burden is on the party opposing the choice-of-law provision to establish both the "fundamental conflict" and "materially greater interest" prongs.  *See Wash. Mut.*, 24 Cal. 4th at 917 (Cal. 2001) ("If the proponent of the clause… demonstrates that the chosen state has a substantial relationship to the parties or their transaction… [the] parties' choice generally will be enforced unless the other side can establish both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue.").

For the reasons stated in the Court's Ruling on Defendants' previous Motion to Compel, the Court applies Washington law.  *See* Ruling at 6-7 (holding that Washington law applies). Also, neither side contends that the application of California or Washington law would alter the Court's analysis in any meaningful way.  *Id.* at 7, n. 2.

B.  Plaintiffs' Evidentiary Objections

Plaintiffs devote a significant portion of their Opposition to attack the authenticity and admissibility of the evidence Defendant proffers relating to Beals' purported assent to the Audible COU.  *See* Opp'n MTC at 7-14.  Specifically, Plaintiffs contend that the "flows" attached as exhibits to the declaration of Audible in-house counsel Jason Massello are inadmissible for a variety of reasons, including authenticity, hearsay, and the Best Evidence rule. *Id.* at 7:7-8:2.  For example, according to Plaintiffs, Massello lacks the personal knowledge necessary to authenticate exhibits 3 and 5, which Massello claims are printouts that reflect the

4

contents of Audible's website on April 26, 2015, and on May 27, 2015.  *See* Opp'n MTC at 8:3-10:18; *see also* Massello Decl. Ex. 3 ("Sign Up Flow"), Docket No. 41-4; *Id.* Ex. 5 ("Credit Flow"), Docket No. 41-6; *Id.* ¶¶ 1, 10, 13.  Plaintiffs further argue that the Sign Up Flow and Credit Flow are not self-authenticating, are not business records for the purposes of hearsay, and that Massello improperly summarizes the contents of other documents.  Opp'n MTC at 10:19-14:24.  Plaintiffs ask the Court to ignore Defendant's evidence based on these alleged deficiencies, and to hold that in the absence of any admissible evidence, Audible fails to meet its affirmative burden to show mutual assent.  *Id.* at 14:25-16:4.  For the reasons stated below, the Court would overrule Plaintiffs' objections and will consider Audible's evidence.[2]

On a Motion to Compel Arbitration, the Court applies a standard similar to the summary judgment standard applied under Rule 56 of the Federal Rules of Civil Procedure.  *Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 804 (N.D. Cal. 2004) (citing *McCarthy v. Providential Corp.*, No. C 94-0627, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994)).  Under Rule 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."  *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)) (internal quotation marks omitted).

Similarly, at the summary judgment stage the Court does not "focus on the admissibility of the evidence's form," but rather "focus[es] on the admissibility of its contents."  *Fraser*, 342 F.3d at 1036.  Objections on the basis of a failure to comply with the technicalities of authentication requirements or the best evidence rule are, therefore, inappropriate.  *See Adams v. Kraft*, No. 5:10-CV-00602-LHK, 2011 WL 5079528, at *25 n. 5 (N.D. Cal. Oct. 25, 2011) ("On summary judgment, unauthenticated documents may be considered where it is apparent that they

---

[2] Plaintiffs also request discovery on the issue of mutual assent.  Opp'n at 24:19-26.  While the Court agrees that Plaintiffs may be entitled to discovery on that issue, it would first require the parties to meet and confer as to the authenticity and/or accuracy of the Sign Up Flow and Credit Flow.  The Court would also require Plaintiffs to submit an offer of proof as to why they require discovery on this issue.  It is the Court's view that the parties should be able to stipulate to the authenticity and accuracy of the Sign Up Flow and Credit Flow.  If the Court is mistaken in this regard, and Plaintiffs can show good cause as to why such a stipulation is impossible without formal discovery, the Court would permit very limited discovery on the issue.  *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999) ("The FAA provides for discovery and a full trial in connection with a motion to compel arbitration only if 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue.'") (quoting 9 U.S.C. § 4).

are capable of being reduced to admissible evidence at trial."); *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (holding that even if declaration violated best evidence rule, court was not precluded from considering declaration in awarding summary judgment).

Here, Audible submits printouts of website "flows" attached to Massello's declaration. *See generally* Massello Decl. Exs. 3-5.  Massello states as follows:

> Based on my job responsibilities and my review of Audible's business records, I am familiar with the agreements, customer sign-up and order process, and customer history that I discuss in this declaration.   I make this declaration based on personal knowledge and records that Audible keeps in the ordinary course of business, including information obtained from other Audible personnel in the course of their duties.  I am competent to testify to the matters stated here.

Massello Decl. ¶ 1.

Massello also states that exhibit 3 (Sign Up Flow) and exhibit 5 (Credit Flow) accurately reflect the web content Beals encountered on Audible.com on April 26, 2015, and May 27, 2015.[3]  *Id.* ¶¶ 10, 13.  The Court finds that Massello's testimony is sufficient under the applicable Rule 56 standard.  *See* Fed. R. Civ. Evid. 901(a) (To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.");  *E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d 1392, 1398 (9th Cir. 1989) (authentication showing satisfied where documents were found in defendant's control);  *see also Burgess v. Premier Corp.*, 727 F.2d 826, 835 (9th Cir. 1984) (same);  *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) (rule only requires proponent to establish proof that a reasonable juror could find in favor of authenticity);  *accord United States v. Gadson*, 763 F.3d 1189, 1203 (9th Cir. 2014).

The Court's conclusion is also consistent with *Cordas v. Uber Technologies, Inc.*, 228 F.Supp.3d 985, 989 (N.D. Cal. Jan. 5, 2017).  In *Cordas*, the court found that similar declaration testimony was sufficient to authenticate printouts of web content.  *See id.* at 989 (overruling objections to printouts of Uber's "sign up flow").  The only difference between Massello and the *Cordas* declarant is Massello's job title: Massello is an attorney while the *Cordas* declarant worked in the software department.  *Id.*  The Court is not persuaded that Massello's job title

---

[3] Massello explains that the only differences between the materials presented and Audible.com, as seen by Beals, involve the actual audiobook selected or are the result of differences in third party advertisements.  *See* Massello Decl ¶¶ 10, 13.

renders him incapable of testifying as to the contents of the Audible.com website on the dates in question.

Further, Plaintiffs' hearsay objections lack merit because the screenshots are not hearsay. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1155 (C.D. Cal. 2002) ("To the extent these images and text are being introduced to show the images and text found on the websites, they are not statements at all - and thus fall outside the ambit of the hearsay rule."). Moreover, Plaintiffs present no evidence that undermines the veracity of Massello's testimony, or the authenticity of the flows. As discussed above, if Plaintiffs establish a genuine dispute as to the contents of the Audible website when Beals signed up for Audible and redeemed Membership Credits, the Court would permit limited discovery on this issue. *See* supra 5, n. 2. However, at present, Plaintiffs' arguments address what are (at most) technical issues with Audible's evidence and are thus insufficient grounds to sustain his objections. *See Hughes*, 953 F.2d at 543; *Fraser*, 342 F.3d at 1036–37.

   C.   Whether a valid arbitration agreement exists

"[T]he federal policy favoring arbitration is inapplicable to the determination of whether a valid agreement to arbitrate between the parties exists." *Campos v. Campos Family Farms, LLC*, No. 12-598-LJO, 2012 WL 2090303, at *8 (E.D. Cal. June 8, 2012) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)). Rather, that determination is made by reference to ordinary state law contract principles. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). As the party moving to compel arbitration, Defendant bears the burden of proving by a preponderance of the evidence the existence of a valid arbitration agreement. *See Lucas v. Hertz Corp.*, 875 F.Supp.2d 991, 998 (N.D. Cal. 2012) (citing *Olvera v. El Pollo Loco*, 173 Cal. App. 4th 447, 453 (2009)).

Defendant argues Beals agreed to the Audible COU on at least two occasions: (1) when he signed up for a free trial of Audible on April 26, 2015 through Amazon.com using his desktop computer; and (2) when he redeemed a Membership Credit for an audiobook on May 27, 2015 through Amazon.com, again accessed on his desktop computer. MTC Beals at 10:11-11:14; Massello Decl. ¶¶ 10, 13. Defendant further argues that the Audible COU contain an enforceable arbitration provision that covers all of Beals' claims. *See* MTC Beals at 14:6-17:4; Massello Decl. ¶ 11.

Plaintiffs make two substantive arguments in opposition. First, Plaintiffs argue that both

7

the Sign Up Flow and Credit Flow failed to provide Beals with constructive notice of the arbitration provision. Opp'n MTC at 16:5-18:26. Second, Plaintiffs argue that equitable principles require Defendant to honor Audible's Gift Membership Terms ("Gift Terms"), which did not contain an arbitration provision during Beals' Gift Membership. *Id.* at 19:1-21:9. Plaintiffs contend that, pursuant to the Gift Terms, claims related to Gift Memberships are not subject to arbitration. *Id.* at 21:10-17.

i. *Mutual Assent*

Under Washington law in order to form a valid contract the parties must manifest their mutual assent. *See Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 177–78 (2004); *see also Hauenstein v. Softwrap Ltd.*, No. C07-0572-MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007).[4] In the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of a merchant's terms of service agreement. *See, e.g.*, *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014) ("We agree with the district court that Barnes & Noble did not provide reasonable notice of its Terms of Use, and that Nguyen therefore did not unambiguously manifest assent to the arbitration provision contained therein."). Reasonable notice in this context requires that the consumer had either actual or constructive notice of the terms of service; constructive notice occurs when the consumer has inquiry notice of the terms of service, like a hyperlinked alert, and takes an affirmative action to demonstrate assent to them. *See id.* at 1176-79. This "inquiry turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177.

Constructive notice is generally clear where the user is actually required to, and does click a button explicitly agreeing to the terms of the contract, even if the user does not actually read the terms of service. *See, e.g.*, *Riensche v. Cingular Wireless, LLC*, C06-1325Z, 2006 WL 3827477, at *1 (W.D. Wash. 2006) (concluding that plaintiff assented to arbitration clause when he indicated his agreement to the terms of service online); *Feldman v. Google*, Civil Action No. 06-2540, 2007 WL 966011, at *5-8 (E.D. Pa. March 27, 2007) (holding that where user had to "click" the "Yes, I agree to the above terms and conditions" button in order to proceed with the online transaction, there was reasonable notice of the terms and mutual assent to the contract).

---

[4] The relevant California law is functionally identical. *See Bowman v. Victor*, 83 Cal.App.2d 693 (1948); *Roth v. Malson*, 67 Cal.App.4th 552, 557 (1998).

Courts have also found constructive notice where sites contain a disclosure statement that indicates that if a user signs up for a given service they accept the terms of service provided the design of the website puts a reasonably prudent user on inquiry notice. *See, e.g.*, *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 835 (S.D.N.Y. 2012) (enforcing forum selection clause based on disclosure below "Sign Up" button); *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them"). Courts commonly refer to these agreements as "sign-in-wrap" agreements. *See Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 394-403 (E.D.N.Y. 2015) (describing four general types of online consumer contracts).[5]

Alternatively, some courts have refused to enforce sign-in-wrap, or click-wrap agreements where aspects of the website, such as the location and appearance of the disclosure statement, the actual terms of the agreement, and the appearance and location of the hyperlink to the agreement, prevent a reasonable consumer from being on constructive notice. *See, e.g.*, *Nguyen*, 763 F.3d at 1173 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *Sprecht v. Netscape Communications Corp.* 306 F.3d 17, 22-23 (2d. Cir. 2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Metter v. Uber Technologies, Inc.*, Case No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017) (denying motion to compel arbitration where sign-in-wrap agreement was only

---

[5] *Berkson* provides a helpful summary of the four common varieties of electronic contracts of adhesion:

> Browsewrap exists where the online host dictates that assent is given merely by using the site. Clickwrap refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. Scrollwrap requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services.

97 F.Supp.3d at 394-95.

visible if user scrolled down, an action not necessary to complete the sign up process); *Meyer v. Kalanick*, 199 F.Supp.3d 752, 763 (S.D.N.Y. 2016) (refusing to enforce agreement where plaintiff "did not have to click any button explicitly indicating assent to Uber's User Agreement").

While courts addressing constructive notice in internet commerce have avoided establishing hard and fast rules, review of the case law at the district level provides important guidance. *Berkson* includes a helpful summary:

> First, "terms of use" will not be enforced where there is no evidence that the website user had notice of the agreement; "the validity of the [internet] agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177 (emphasis added) (collecting cases).

> Second "terms of use" will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage. *See, e.g., Ticketmaster Corp.*, 2003 U.S. Dist. LEXIS 6483, 2003 WL 21406289, at *2 (noting that the warning on website that further use binds a user to the 'terms of use' 'could not be missed'); *see also cf.* Woodrow Hartzog, *Website Design as Contract*, 60 Am. U. L. Rev. 1635, 1664-70 (2011) (discussing features of website design that hinder understanding of privacy policies).

> Third, 'terms of use' will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it. *See, e.g., Specht*, 306 F.3d at 23 (refusing to enforce "terms of use" that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F. Supp. 2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); *Van Tassell*, 795 F. Supp. 2d at 792-93 (refusing to enforce arbitration clause in internet agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Hines*, 668 F. Supp. 2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen − an action that was not required to effectuate her purchase").

97 F.Supp.3d at 401-02.

      With this guidance in mind, and after a review of several, but admittedly not all of the sign-in-wrap agreements examined by courts throughout the country, the Court examines the particular design of the Sign Up Flow and Credit Flow to determine if Audible provided constructive notice of the Audible COU.

<div align="center">a.  April 26 Sign Up on Amazon.com</div>

      Defendant contends Beals agreed to Audible's COU through a sign-in-wrap agreement when he signed up for a free subscription to Audible on April 26, 2015.  Plaintiffs counter that the Sign Up Flow did not provide actual, or constructive notice of the Audible COU and therefore Beals never agreed to the arbitration provision contained therein.  For the reasons detailed below, the Court would find that Plaintiff did *not* assent to Audible's COU on April 26, 2015.

      On April 26, 2015 Plaintiff elected to sign up for a free 30-day trial of Audible online using his desktop computer.  Beals Decl. ¶ 2; Massello Decl. ¶ 10.  To do so he accessed Amazon.com, designated a method of payment, and clicked on a button ("Sign Up Button") that contained the words "Confirm your free trial."  *Id.* ¶ 10; *see also* Massello Decl. Ex. 3, Docket 41-4 ("Sign Up Flow").  The word "Summary" appears in bold below the Sign Up Button, followed by several lines of text, and then an Audible insignia.  *See* Sign Up Flow.  A disclosure appears below the Audible insignia and is separated from both the Sign Up Button and the summary by a thin border.  *Id.*  The disclosure reads: "By completing your purchase you agree to Audible's Conditions of Use and authorize us to charge your designated credit card or another available credit card on file."  *See* Massello Decl. ¶ 10; Sign Up Flow.  The words Conditions of Use contain a hyperlink to a webpage titled "The Audible Services Conditions of Use."  Massello Decl. ¶ 11, Audible COU.  The rest of the disclosure appears in plain grey text that is slightly smaller than the text appearing below the word "Summary."  *See* Sign Up Flow.  The entire disclosure is in the smallest font that appears on the page.  *See id.*

      The Court finds that the Sign Up Flow does not afford constructive notice for several reasons.  First, a reasonable consumer would not be put on notice that the disclosure actually attaches any contractual consequences to clicking *that particular button* to begin a free membership.  This is in part because the disclosure does not explicitly refer to clicking on the button (i.e. "by clicking on the above" or "by pressing the 'Begin free trial now' button"), or

<div align="center">11</div>

starting the free trial (i.e. "by beginning your free trial").   Instead the disclosure states that "making" a "purchase" binds the user to Audible's COU.   *Id.*   But clicking the Sign Up Button does not make a purchase, it initiates a free membership.   Indeed, Beals did not make a purchase on April 26, 2015; he began a free trial membership and received a free audiobook in the process.   *See* Beals Decl. ¶ 3.   Therefore, even if this disclosure provides notice that "making a purchase" binds the user to a contract, it fails to provide notice that clicking the Sign Up Button, or beginning a free trial binds a user to anything.   *See Meyer*, 199 F.Supp.3d at 763 (refusing to enforce agreement where plaintiff "did not have to click any button explicitly indicating assent to Uber's User Agreement"); *Id.* at 765 (lack of "parallel wording" between button and disclosure statement factors against notice).

Further, the linguistic imprecision in Audible's Sign Up Flow undermines Defendant's position in a more fundamental way: if Beals did not make a purchase on Audible on April 26, 2015 (it is virtually uncontested that he did not), *he did not actually agree to Audible's Conditions of Use*.   As a result, even if the Audible site provides constructive notice of Audible's COU (the Court believes it did not), Defendant fails to demonstrate Plaintiff actually assented to those terms by making a purchase.   The fact Beals received a free audiobook in exchange for his bonus credit does not change this analysis because a reasonable consumer would not consider the selection of a free book, included upon signing up for a free trial, to be a "purchase."[6]

The Court finds further support for the conclusion that the Sign Up Flow fails to afford notice in the site's general design, including the location and appearance of the disclosure.   First, the disclosure appears in small, undifferentiated font.   *See Meyer*, 199 F.Supp.3d at 764-65 (disclosure with small font and not prominently displayed "did not make the terms of use (i.e., the contract details) readily and obviously available to the user."); *see also Berkson*, 97 F.Supp.3d at 380 ("Undiscussed by courts is what the average internet user, one who does not necessarily conduct much of her business online, perceives to be the purpose of a website's 'terms of use.'   Especially when presented in lowercase, this phrase does not clearly inform a user that she is subjecting herself to a one-sided contract that purports to modify her basic legal rights and remedies.").

The disclosure also does not appear directly below the button, it is separated by several

---

[6] Webster's New World Dictionary defines a purchase as an "act of buying."   Webster's New World Dictionary 1091 (3d ed. 1988).   "Buy" is defined as "to get by paying or agreeing to pay money or some equivalent," and purchase is defined as "to obtain for money or by paying a price; buy."   *Id.*; *Id.* at 191.

lines of text, an Audible insignia, and a border.  *See Sprecht*, 306 F.3d at 22-23; *see also Nguyen*, 763 F.3d at 1177 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement.")  For these reasons, the level of notice the Sign Up Flow provides is inferior to most of the cases where sign-in-wrap, or clickwrap agreements have been enforced.  *See Berkson*, 97 F.Supp.3d at 401 (listing district level decisions where buttons appeared next to or above disclosure that explicitly tied pressing the button to terms of service).  The design of the Audible site is more akin to those rejected by other courts.  *See supra* at 9-10.  (listing cases where agreements were rejected).  Finally, as Plaintiffs point out, nothing prevents a company like Audible from ensuring its website provides disclosures that are properly labelled, conspicuously located, and linguistically precise.  If such a company wishes to condition use of its website on a customer's willingness to forgo access to the courts, it must do so carefully, as indeed many other companies have.  *Id.*; *Berkson*, 97 F.Supp.3d at 401.  It is Defendant's burden to show its site afforded constructive notice to Beals and that Beals assented to the Audible COU.  Defendant failed to carry that burden as to the Sign Up Flow.

       In sum, the Court would find that Beals' April 26, 2015 sign-up for Audible's free 30-day trial did not manifest assent to the arbitration provision in Audible's COU.

<div align="center">

b. Beals' Credit Redemption on May 27, 2015
</div>

       Defendant also contends Beals agreed to Audible's COU when he redeemed a Membership Credit in exchange for an audiobook on May 27, 2015.  *See* MTC Beals at 11:2-17; Massello Decl. at ¶ 13; *see also* Credit Flow.  Plaintiffs argue the notice provided by the Credit Flow is also deficient.  Opp'n MTC at 17:19-23.

       To redeem a Membership Credit for an audiobook on May 27, 2015, Beals clicked an orange "Buy with 1 Audible Credit" button ("Buy Button") located above another orange button of the same size and shape that reads "Buy with 1-Click [price of selected audiobook]" ("1-Click Button").  Massello Decl. ¶ 13; Credit Flow.  A disclosure appears immediately below the 1-Click Button and reads "By completing your purchase, you agree to Audible's Conditions of Use and Privacy Policy.  *See* Docket No. 41-6.  The phrase "Conditions of Use" is hyperlinked to Audible's COU.  Massello Decl. ¶ 13.  The remainder of the text is grey and is slightly smaller than the text that appears on the buttons.  Credit Flow.  The disclosure is not separated from the buttons by any border or other text.  *Id.*

<div align="center">

13
</div>

The Court finds that the Credit Flow placed Beals on constructive notice and that he would assent to the Audible COU upon completing his "purchase" of one audiobook for one credit on May 27, 2015.  While the Credit Flow shares some similarities with the Sign Up Flow (i.e. small text), several details are unique and factor toward notice.  First, the Credit Flow is linguistically precise because it equates the action of "buying" an audiobook with "completing a purchase."  The fact the Credit Flow presents two options for "buying" the audiobook would not affect the reasonable user's notice.  *See supra* at 12 n. 6 (citing dictionary definitions of "purchase" and "buy" to include exchange for cash or a cash equivalent).  Second, unlike the Sign Up Flow, the disclosure appears immediately below the buy buttons and is not separated by a summary, insignia, or a border.  *See* Credit Flow.  Third, in selecting the Buy Button, Beals did "complete" the "purchase" of an audiobook in exchange for an Audible Member Credit.

Additionally, Beals, unlike McKee, accessed Amazon.com on the computer, meaning there was no scrolling issue, or pop-up key board issue.  *Cf.* Ruling at 12 ("The disclosure also appears below the Start Now button so that a user must scroll down") (citing *Nguyen*, 763 F.3d at 1177 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely.")); *see also Metter*, 2017 WL 1374579 (denying motion to compel arbitration where sign-in agreement was only visible if user scrolled down).  Beals also did not encounter the mislabeled hyperlinks that characterized McKee's experience on Audible's mobile website.  *See* Ruling at 12 ("[T]he disclosure statement references 'Conditions of Use' while the document that allegedly containd the arbitration clause contains the heading 'Audible's Terms of Use.'").

As such, the Credit Flow presented Beals with the type of clickwrap agreement routinely enforced by other district courts.  *See, e.g.*, *Doe v. Project Fair Bid Inc.*, No. C11-809 MJP, 2011 WL 3516073, at *4 (W.D. Wash. Aug. 11, 2011) ("This kind of 'clickwrap' agreement has been upheld in several cases in this circuit and elsewhere."); *Hauenstein v. Softwrap Ltd.*, No. C07-0572MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007) (enforcing arbitration agreement because plaintiff "manifested his assent to the License Agreement by 'clicking' the appropriate box"); *see also Selden,* No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja*,  841 F.Supp.2d at 835; *Starke*, No. 13 CIV 5497 LLS, 2014 WL 1652225, at *3 (enforcing arbitration clause, noting that plaintiff "was directed

14

exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them").

In sum, the Court would find that the Credit Flow, as it is reflected in exhibit 5, did afford constructive notice that redeeming a credit for an audiobook constituted assent to the Audible COU and the arbitration provision contained therein.

ii. *Unconscionability and Enforceability*[7]

The Court adopts its prior tentative with respect to unconscionability and finds that the arbitration provision contained in the Audible COU is enforceable. *See* Ruling at 18-21 (holding that nearly identical arbitration provision contained in Amazon's Terms of Service is enforceable). As stated previously, this conclusion is in line with the other courts that have examined the Amazon agreement. *See Ekin*, 84 F.Supp.3d. at 78 (finding that Amazon's arbitration provision was not unconscionable); *Fagerstrom*, 141 F.Supp.3d at 1064-76 (same); *Peters*, 2 F.Supp.3d at 1170 (same).

D. Equitable Estoppel

Plaintiffs' final argument against compelling arbitration relates to the effect of another agreement posted on Audible's website during the relevant period: Audible's Gift Membership Terms. *See* Opp'n MTC at 19:1-21:27; Supplemental Declaration of Jamin S. Soderstrom in Support of Plaintiff's Opposition to Defendants' Motion to Compel Arbitration, Ex. 4 ("Gift Membership Terms"), Docket No. 29-5. Plaintiffs appear to argue that (1) Audible must abide by the Gift Membership Terms, and (2) pursuant to the Gift Membership Terms, Beals cannot be forced to arbitrate his claims arising from his Gift Membership. It is unclear whether Plaintiffs contend that equity prohibits Audible's attempt to compel Beals to arbitrate his non-Gift Membership claims as well. To the extent Beals makes such an argument the Court would reject it.

However, the Court would find that Audible's Gift Membership Terms require that Gift Membership related claims be adjudicated in court, but not *this* Court. The Court's reasoning is based on the following observations.

First, the Audible COU states that, in agreeing to the Audible COU, a user is also bound

---

[7] The Court adopts its prior tentative with respect to unconscionability and finds that the only contract agreed to, the Amazon COU is enforceable with the exception of the severable provision discussed below. The Court has included its analysis of Audible's COU with the acknowledgement that because the Court does not find that Plaintiff agreed to those terms its enforceability is moot.

to "any other policies, guidelines, terms and agreements posted on, or otherwise made available to you through, the Audible Service (collectively, the "Terms")…. If these Conditions of Use contradict such Terms, *the Terms will control*."). *See* Audible COU. Presumably this language covers the Gift Membership Terms. *See* Supplemental Declaration of Jamin S. Soderstrom ¶ 4; Gift Membership Terms (appearing on Audible.com under the heading "Terms and Conditions For Gift Audiobooks, Gift Cards, Gift Memberships and Coupons").

The Gift Membership Terms in effect during Beals' membership do not contain, or incorporate an arbitration provision. *See generally* Gift Membership Terms; *see also* Declaration of Jamin Soderstrom in Support of Seth Beals' Opposition to Motion to Compel Arbitration ("Soderstrom Decl.") ¶ 6, Docket No. 44-1; *see also id.* Ex. 6 ("Updated Gift Membership Terms"), Docket No. 44-7 at p. 3 (incorporating Audible's arbitration provision). However, the Gift Membership Terms Membership do contain a "dispute" provision. *See* Gift Membership Terms at 3. The dispute provision provides that "[a]ny dispute relating in any way to Audible Gift Audiobooks, Gift Cards, Gift Memberships or Coupons in which the aggregate total claim for relief sought on behalf of one or more parties exceeds $7,500 *shall* be adjudicated in any state or federal court *in New York County, New York*, and [the user consents] to exclusive jurisdiction and venue in such courts." *Id.* (emphasis added).[8]

Thus, to the extent the Audible COU cover claims related to Beals' Gift Membership, the arbitration provision contained therein contradicts the dispute provision in the Gift Membership Terms. The Audible COU contemplates this possibility and provides that the Gift Membership Terms would control. *See* Audible COU ("If these Conditions of Use contradict such Terms, the Terms will control."). Though the Court is without full briefing on this issue, the record before the Court strongly suggests that any claims brought by Beals (or any other potential class member whose claims concern a Gift Membership) can only be adjudicated in a state or federal court in New York County, in the state of New York. *See* Gift Membership Terms. Defendant appears to concede as much in its Reply. *See* Reply at 20:14-23. As a result, the Court would deny the pending motion to compel arbitration as to Beals' claims that relate to his Gift Membership. However, the Court would also agree with Defendant that the same claims are not properly before this Court and should either be dismissed without prejudice, or transferred to the

---

[8] Plaintiffs seek damages in excess of $7,500. *See* FAC ¶ 8 (alleging that the case meets the minimum $5,000,000 requirement to invoke CAFA jurisdiction).

Southern District of New York for further proceedings.

Defendant's only argument as to why the Gift Membership Terms are not applicable is that Plaintiffs do not allege that Beals ever agreed to the Gift Membership Terms. *See* MTC Beals at 17:15-25. Defendant repeats and expands upon this argument in its Reply but neither version is persuasive. *See* Reply at 19:14-10:1. This is because Defendant repeatedly claims that Beals agreed to Audible's COU. *Id.* at 19:24-10:1 ("[T]he undisputed evidence shows that, when Mr. Beals redeemed his first gift membership credit in August 2015, he once again agreed to the Audible Service Conditions of Use and its arbitration provision."). As explained above, if Defendant is correct that Beals agreed to the Audible COU, he also agreed to the Gift Memberships Terms at the same time.[9] *See supra* at 16 (citing the Audible COU's incorporation of "any other policies, guidelines, terms and agreements posted on, or otherwise made available to you through, the Audible Service").

In sum, the Court would find that Beals agreed to arbitrate some of his claims against Audible pursuant to the Audible COU. The Court would also find that Beals and Defendant agreed that Beals' Gift Membership related claims must be adjudicated in court, and in New York.

## IV.  Conclusion

The Court would DENY in part, and GRANT in part Audible's Motion to Compel Arbitration. Specifically, the Court would compel Beals to arbitrate any of his claims to the extent they arise from his Audible Membership, but not his claims that arise from his gift membership.[10]

---

[9] Defendant also argues that enforcement of the Gift Membership Terms would prove fatal to Beals' substantive claims. *See* Reply at 20. However, that issue is not currently before the Court.

[10] The Court might ask that the parties submit supplemental briefing as to whether this Court may and/or should transfer the entirety of Beals' remaining claims to the Southern District of New York.

_**McKee v. Audible, Inc. et al.**_, Case No. CV-17-1941-GW-(Ex)
Tentative Ruling on Defendant's Motion to Dismiss the First Amended Complaint


## I. __Background__

      Plaintiffs Grant McKee ("McKee") and Seth Beals ("Beals") (collectively, "Plaintiffs") sue Defendant Audible, Inc. ("Audible") on behalf of a proposed nationwide class of consumers for: (1) violation of the Lanham Act, 15 U.S.C. § 1125; (2) violation of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 _et seq._; (3) violation of Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD") and Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693*l*-1(a)(2)(B); (4) violation of the California Gift Certificate Law ("GCL"), Cal. Civ. Code §§ 1749.45 _et seq._; (5) violation of California's Automatic Purchase Renewals Law ("CAPRL"), Cal. Bus. & Prof. Code §§ 17600 _et seq._; (6) Conversion; (7) violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 _et seq._; (8) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 _et seq._; and (9) Restitution, Unjust Enrichment, and Money Had and Received.  _See generally_ First Amended Class Action Complaint, Docket No. 40 ("FAC").

      Ass alleged in the FAC, Audible, an affiliate of Amazon, Inc. ("Amazon") is a leading provider of spoken audio entertainment, information, and educational programming.  FAC ¶ 14.  Audible advertises and sells audiobooks and other related products and services mainly on its website: www.audible.com.  _Id._  Consumers are able to sign up by making recurring monthly or annual payments in exchange for credits ("Membership Credits"), where normally each credit can be used to acquire any audiobook.  _Id._ ¶ 19.  By signing up for membership and credits, Audible offers "complimentary" or "free" items as an added incentive, but "purchasing prepaid credits automatically on a recurring basis is the _sine qua non_ of Audible's so-called 'memberships.'"[1]  _Id._

      Many of Audible's audiobooks may be purchased by redeeming one credit, but Audible

---

[1] Consumers are able to purchase memberships which include the following benefits: (1) 30% discount off the regular price of audiobook purchases; (2) unlimited listening to Audible Channels (an on-demand audio entertainment service that offers original audio series and curated audio playlists); (3) a complimentary subscription to the digital audio digest of _The Wall Street Journal_ or _The New York Times_; (4) the Great Listen Guarantee – the ability for a member to return or exchange an audiobook within 365 days of the original date of purchase; and (5) credits to select one or more books each month or year (depending on their plan).  Declaration of Jason A. Massello in Support of Audible's Motion to Dismiss and Motion to Compel Arbitration as to Seth Beals, Docket No. 42-1, ("Massello Decl.") ¶¶ 2-3.

also sells audiobooks and other goods and services which require consumers to redeem two or more credits for purchase.  FAC ¶ 26.  Audible prices its audiobooks and related products and services in different increments, and consumers may combine credits to purchase audiobooks and related products and services that are priced at more than one credit.  *Id.*  Consumers are only able to redeem a credit for an audiobook, product, or service up to the value fixed by Audible.  *Id.*  However, Audible holds sales promotions where credits may be combined (e.g. "buy 3 audiobooks for 2 credits").  *Id.*  ¶ 27.  Audible's credit pricing scheme allows for both "good" and "bad" deals.  *Id.* ¶ 29.  A consumer may be able to use a credit to get an audiobook that is worth more than what the consumer paid for the membership and credit, but at the same time a consumer may use a credit to receive an audiobook that is worth less than what a consumer paid for the membership and credit.  *Id.*  Consumers may also buy "extra credits" that are separate from the Membership Credits they receive monthly; those extra credits are subject to the same terms and practices as Membership Credits.  *Id.* ¶ 28.  Audible has a "rollover" policy where the total number of Membership Credits a consumer has in his or her account at one time is capped and older credits are set to expire to "make room" for new credits.  *Id.* ¶ 30.  When a member cancels his or her membership, the remaining Membership Credits expire immediately.[2] FAC ¶ 75.

In addition, until April 2017, Audible let members send Membership Credits as gifts to other consumers.  *Id.*  ¶ 4.  Now, Audible continues to sell "Gift Memberships" that include Gift Credits, which are sold in sets of three, six, or twelve.  *Id.*  Gift Credits and Membership Credits are essentially the same, except that Membership Credits have varying expiration dates based on Audible's rollover and cancellation policies, while Gift Credits automatically expire six months after the Gift Membership ends.  *Id.*  When an Audible member receives a Gift Credit, it is intermingled with the Membership Credits in his or her account, and a member cannot choose whether to redeem a Membership Credit as opposed to a Gift Credit.  *Id.* ¶ 34.  If a consumer has a twelve-month Gift Membership, the Gift Credits expire exactly six months after the Gift Membership ends.  *Id.* ¶ 75.

Plaintiffs allege that upon signing up for Audible or otherwise receiving a credit, Audible represents that (1) "one credit equals one audiobook;" (2) "consumers 'get 1 book each month;'"

---

[2] Audible provides notice before cancellation that credits expire upon cancellation.  Declaration of Grant McKee, Docket No. 21-1 ("McKee Decl."), at ¶ 10.

(3) "credits 'do not expire;'" and (4) "members can 'cancel anytime' with 'no strings attached' while getting to "keep all your books." *Id.* ¶ 16. In addition, in order to sign up for Audible, a consumer must designate a specific credit card for Audible to charge automatically each month or year, depending on the recurring payment plan. *Id.* Though it is inadequately disclosed to consumers, Audible will charge, automatically and without notice, a different credit card linked to an Audible member's Amazon account if the card designated by the consumer at sign up is declined. *Id.* ¶ 6.

### A. Plaintiff McKee's Experience

McKee is a citizen and resident of Los Angeles County, California. *Id.* ¶ 12. In June 2016, McKee signed up for a free thirty day trial with Audible after viewing Audible's advertisements and received one free credit.[3] *Id.* During the Audible sign-up process, McKee saw that: (1) "one credit equals one audiobook;" (2) "consumers will 'get 1 book each month;'" and (3) "credits 'do not expire.'"[4] FAC ¶ 16. Audible also advertised that "consumers can 'cancel anytime' with 'no strings attached' while getting to 'keep all your books.'" *Id.* ¶ 16. McKee believed that each recurring payment he made was the equivalent of purchasing one or more audiobooks that he could pick at a later date and keep, even if he cancelled recurring payments later in the future. *Id.* ¶ 18. Following McKee's initial thirty day trial, Audible automatically charged his designated credit card and enrolled him in an Audible "Gold Monthly" subscription.[5] *Id.* Pursuant to the Gold Monthly subscription McKee received one Membership Credit per month. *Id.*

In December 2016, McKee cancelled his recurring payments for the subscription. *Id.* Prior to cancelling, McKee saw that his remaining credits would expire immediately without a refund if he completed his cancellation, but he still cancelled the subscription so that he would not be automatically paying for new credits that might expire before he could use them. McKee Decl. ¶ 10. When McKee cancelled, his two remaining Membership Credits expired and he did

---

[3] In McKee's declaration submitted with Plaintiffs' opposing papers, he states that he does not recall "any of the statements [he] saw and relied on before and during the online sign-up process mentioning anything about credits expiring." Declaration of Grant McKee, Docket No. 43-1 ("McKee Decl. II").

[4] In the original complaint filed in this action ("Complaint"), Plaintiffs alleged that Audible represented that "membership credits do not expire as long as you have a membership . . . and stored credits are 'rolled over' to your next billing cycle, either monthly or yearly.'" Class Action Complaint, Docket No. 1, ("Complaint"), ¶ 25.

[5] The Complaint alleged that McKee was charged $14.95 per month, as a Gold Monthly plan member. Complaint at ¶ 7.

not receive a refund from Audible or an audiobook.  *Id.*

### B.  Plaintiff Beals' Experience

Plaintiff Beals is a citizen and resident of Michigan.  FAC ¶ 13.  In April 2015, Beals signed up for Audible after viewing Audible's advertisements and representations and received a "free" thirty-day trial membership and a Membership Credit.  *Id.*  After thirty days, Audible began automatically charging Beals for a "Gold Monthly" subscription and he subsequently received one Membership Credit per month.  *Id.*  He cancelled his recurring payments in August 2015, after redeeming all of his Membership Credits for audiobooks.  *Id.*  However, that same month Beals also received a twelve month Gift Membership.  *Id.*  The Gift Membership came with twelve prepaid Gift Credits, which were set to expire eighteen months later in February 2017.  *Id.*  Beals alleges Audible represented that twelve Gift Credits were equivalent to twelve audiobooks.  *Id.*  Beals redeemed eleven of his Gift Credits, but the twelfth expired before he redeemed it*.  Id.*

### C.  Procedural History and Remedies Sought

Plaintiffs seek (1) certification of this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as class representatives and Soderstrom Law PC as class counsel; (2) award of actual, consequential, and punitive damages to Plaintiffs and class members; (3) award of restitution and/or disgorgement of profits and revenues; (4) individual and public declaratory and injunctive relief; (5) litigation costs, expenses, and attorney's fees; (6) award to Plaintiffs and Class members of pre-judgment and post-judgment interest, to the extent allowed by law; and (7) any and all other relief as equity and justice requires.  FAC at 35-36.

Initially, this lawsuit was brought against Audible and Amazon by McKee.  *See* Docket No.1.  Defendants moved to compel arbitration.  *See* Docket No. 18.  The Court issued a tentative ruling granting the motion but after hearing oral arguments by counsel ordered supplemental briefing.  *See* Docket No. 25.  After reviewing said briefing, the Court issued another tentative ruling indicating that, for various reasons, it would grant Amazon's motion to compel arbitration but deny Audible's motion (*see* Docket No. 35); and on July 17, 2017, it Court rendered final rulings along the same lines.  *See* Docket No. 37.

Following the filing of the FAC which added Beals as a plaintiff, Audible filed motions to dismiss and to compel arbitration of his claims.  *See* Docket Nos. 41, 42.  The Court issued a tentative ruling as to both motions.  *See* Docket No. 50.  After hearing arguments of counsel, the

Court continued both motions to October 26, 2017.  *Id.*

The present tentative ruling will address Audible's Motion to Dismiss the Complaint. *See* Motion to Dismiss ("MTD"), Docket No. 42.  Defendant moves to dismiss Plaintiffs' claims under Rule 12(b)(1) for lack standing and under Rule 12(b)(6) for failure to state a claim.  *See generally* MTD.   In a separate tentative ruling issued on this date, the Court will address Audible's Motion to Compel Arbitration as to Beals, Docket No. 41.

## II.  Legal Standard

### A.   Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure governs motions to dismiss for lack of subject matter jurisdiction.  In order for a federal court to have subject matter jurisdiction, a plaintiff must have standing to bring forward the claim.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  In order for a plaintiff to hold Article III standing a plaintiff must: (1) show an injury in fact that already occurred or is imminent; (2) establish a "causal connection between the injury and the conduct complained of;" and (3) demonstrate that the injury is "likely" to be "redressed by a favorable decision.''  *Lujan*, 504 U.S. at 560-61.  Plaintiffs bear the burden of establishing these elements.  *Id.* at 561.

The injury in fact must be (a) "concrete and particularized," *Warth v. Seldin*, 422 U.S. 490, 508 (1975), and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  For an injury to be particularized, it "must affect the plaintiff in a personal and individual way." *Spokeo v. Robins*, 136 S. Ct 1540, 1549 (2016) (quoting *Lujan*, 504 U.S. at 560).  The injury in fact must also be concrete; "it must actually exist."  *Spokeo*, 136 S. Ct. at 1548.  Additionally, even when a statute "grants a person a statutory right and purports to authorize that person to sue to vindicate that right" the plaintiff does not "automatically satisfy the injury-in-fact requirement."  *Spokeo*, 136 S. Ct. at 1549.

### B.   Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal

5

under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). Further, in deciding a 12(b)(6) motion the court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).

A court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of L.A.*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief." *Ashcroft*, 556 U.S. 662, 679 (2009) (citations omitted). Rule 12(b)(6) dismissals are "especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (citations omitted).

### C.   Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9 requires a heightened pleading standard when alleging fraud in federal court. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The allegations must contain "an account of the time, place, and specific content of the false representation as well as the identities of the parties to the misrepresentation." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). "The plaintiff must plead facts explaining why the statement was false when it was made." *Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1152 (S.D. Cal. 2001).

The heightened pleading standard applies to both state and federal claims brought in federal court. *See Vess*, 317 F.3d at 1103 (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.

6

1985) ("[W]hile a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule.").

## III. <u>Analysis</u>

### A. Standing

In order for a plaintiff to hold Article III standing a plaintiff must (1) have suffered or imminently will suffer an injury in fact; (2) show there is a "causal connection between the injury and the conduct complained of;" and (3) demonstrate it must be "likely" that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (1992). The injury in fact must be (a) "concrete and particularized," *see Warth*, 422 U.S. 490, 508 (1975), and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). Additionally, even when a statute "grants a person a statutory right and purports to authorize that person to sue to vindicate that right" the plaintiff does not "automatically satisfy the injury-in-fact requirement." *Spokeo*, 136 S.Ct. 1540, 1549 (2016).

#### i. <u>Plaintiff Beals</u>

Per the Court's tentative ruling concerning Defendant's Motion to Compel Arbitration of Plaintiff Beals, Beals cannot bring any of his claims before this Court because he either: (1) agreed to arbitrate them, or (2) agreed that his claims must be adjudicated in state or federal court in New York County, in the state of New York. *See* Docket No. 50. The Court finds that Beals has properly alleged sufficient Article III standing for purposes of rendering those decisions.

#### ii. <u>McKee Has Standing to Set Forth Claims Concerning Credits under Federal and California Gift Certificate Law</u>

In the third and fourth causes of action, McKee alleges Audible's Membership Credits violate federal and California gift card/certificate laws because the credits are designed to expire before five years. *See* FAC ¶¶ 72-87. To state a claim under CARD and EFTA, the Article III standing requirements must be met. *Cody v. SoulCycle Inc.*, No. CV 15-6457-GHK (JEMx), 2016 WL 4771392, *5 (C.D. Cal. Jan. 11, 2016) (citing *Lujan*, 504 U.S. at 560)). The Court agrees with Defendant that McKee lacks standing to assert a claim concerning the rollover limits imposed on the Membership Credits. While McKee alleges that Defendant's credit rollover policy allows members to accumulate a certain number of Membership Credits in his or her

account before the credits expire, he fails to allege that he ever reached the rollover limit and/or lost any Membership Credits due to Audible's rollover policy.  FAC ¶ 37.  As a result, McKee fails to establish that he suffered an injury in fact caused by Audible's rollover policy.

However, McKee has standing to assert his claims regarding the loss of the Membership Credits at cancellation.  Under EFTA, as amended by CARD, gift cards/store cards must not expire within five years of issue; while under California law, a gift certificate or gift card or store card cannot have any expiration date.  15 U.S.C. § 1693*l*-1(c)(2); Cal. Civ. Code § 1749.5.  Two of McKee's Membership Credits automatically expired when he cancelled.  FAC ¶ 12.  Thus, McKee suffered a concrete injury and has standing to raise the contention that, under applicable law, Membership Credits as sufficiently similar to gift certificates or store cards so as to warrant relief.

Defendant contends Defendant put McKee on notice that his Membership Credits would expire if he cancelled and that, as a result it was McKee's decision to terminate membership without first redeeming his credits, not Defendant's policies that led to McKee's harms.  MTD at 8.   However, McKee rightfully contends that notice does not change the fact that his Membership Credits expired before he used them pursuant to Audible's cancellation policy. Opp'n at 14.  Thus, the Court would find that McKee has standing to bring forth a claim pertaining to the cancellation theory.

> iii.   McKee Has Standing to Set Forth All Claims Regarding False
> Advertisements Brought Under the FAL, UCL, and CLRA

In the second, seventh, and eighth causes of action, McKee alleges he relied on Defendant's false and misrepresenting advertisements to his detriment and that Defendant's representations violate the FAL, UCL, and CLRA.  FAC ¶¶ 68, 70, 103, 116.  "The FAL, UCL, and CLRA are the core of California's consumer protection regime."  *Price v. Synapse Grp., Inc.*, No. 16-cv-01524-BAS-BLM, 2017 WL 3131700, *4 (S.D. Cal. July 24, 2017).  To start, for an individual to have standing under the FAL, the person must have "suffered injury in fact and lost money or property as a result of a violation of this chapter."[6] *Kwikset Corp. v. Superior*

---

[6] UCL's standing requirements are identical to FAL.  *Hinojos v. Kohl's Corp.*, 718 F. 3d 1098, 1103 (9th Cir. 2013) (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 321-22 (2011).  Additionally, the Ninth Circuit has held that if a plaintiff has standing under the UCL and FAL, the plaintiff will also have standing under the CLRA. *See Hinojos*, F.3d at 1108 ("[a]ny plaintiff who has standing under the UCL's and FAL's 'lost money and property' requirement will, *a fortiori,* have suffered 'any damage' for purposes of establishing CLRA").

*Court*, 51 Cal. 4th 310, 322 (2011) (quoting Cal. Bus. & Prof. Code § 17535).  This requirement demands no more than the "corresponding requirement under Article III standing." *Reid v. Johnson & Johnson*, 780 F.3d 952, 957 (2015) (citing *Hinojos*, 718 F.3d 1098, 1104 (9th Cir. 2013)).  For false advertising cases, plaintiffs meet this requirement if plaintiffs can show that after relying on the advertisement they "paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so." *Hinojos*, 718 F.3d at 1104, n.3, 1108; *see also Davidson v. Kimberly-Clark*, --- F.3d ---, 2017 WL 4700093, *6 (9th Cir. Oct. 20, 2017) ("Under California law, the economic injury of paying a premium for a falsely advertised product is sufficient harm to maintain a cause of action.").

Here, McKee alleges he relied on the advertisements regarding "credits, expiration terms, and cancellation" because he "would not have signed up for Audible, agreed to purchase credits automatically and on a recurring basis, continued to make recurring payments for as long as [he] did, or paid as much for each credit knowing [he] may never get an audiobook for each credit [he] purchased." FAC ¶¶ 20, 70.  The specific advertisements McKee relied on were: "one credit equals one audiobook, membership 'includes 1 audiobook each month', credits 'do not expire,' and members may 'cancel anytime' with no 'strings attached.'" FAC ¶ 68.  These allegations are sufficient to possibly establish that McKee relied on and was injured by Defendant's statements. *See Lujan,* 504 U.S. at 560-61; *see also Davidson*, 2017 WL 4700093, *6 (("[A] consumer's allegation that she would not have bought the product but for the misrepresentation ... is sufficient to allege causation ... [and] to allege economic injury.") (quoting *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 330 (2011)).

Defendant contends McKee lacks Article III standing because he suffered no concrete, or actual existing injury that is traceable to Audible's conduct.  MTD at 5-6.  Additionally, Defendant argues McKee lacks standing to bring forth misrepresentation claims regarding the advertising of the expiration of credits because he was aware his remaining credits would cancel when he cancelled his membership.[7]  MTD 7-8.  McKee correctly counters that even if he saw no reference to the expiration of credits during the sign-up process, the fact that McKee later learned of the credit expiration policy, does not "nullify McKee's initial and continued reliance

---

[7] In Defendant's Reply, Defendant changed its argument based on Plaintiff's declaration testimony that he "did not recall any of the statements [he] saw and relied on before and during the online sign-up process mentioning anything about credits expiring."  McKee Dec. II at 2.

on Audible's up-front advertisements that never mention credits are designed to expire automatically." Opp'n at 8.  Defendant's argument that McKee's declaration testimony undermines his standing is not persuasive.  The declaration testimony cited does not contradict the allegations contained in the FAC.  McKee Dec. II at 2.  Plaintiff's testimony in the declaration is only that he did not recall being informed that his credits would be cancelled upon the termination of his account. *Id*.

In sum, the Court would find that McKee has standing to assert claims under the FAL, UCL, and CLRA based on Audible's alleged false advertisements.  The Court would DENY Defendant's 12(b)(1) motion as to these claims.

### iv.  McKee Lacks Standing to Bring Forth Claims Regarding Charging of Non-Designated Credit Cards

In the seventh and eighth causes of action, McKee also asserts a claim under CLRA and UCL for Defendant's alleged practice of charging non-designated credit cards in the user's Amazon accounts if the card designated during the Audible sign up is declined.  FAC ¶¶ 106-110, 117-120.  As described above, *see supra* p. 8-9 n.7, if a plaintiff has met the UCL's "lost money and property" standing requirement, the plaintiff also has met the CLRA's "any damage" standing requirement.  *See Hinojos*, F.3d at 1108.

The Court finds McKee lacks standing to bring claims pertaining to Defendant's practice of charging non-designated credit cards.  This is because − while McKee alleges that Audible claims the right to charge any credit card that a user has on file with Amazon if the designated credit card for the Audible membership does not work (*see* FAC ¶ 42) − McKee fails to allege that he himself ever had a non-designated credit card charged or that he was economically injured by the policy.  As a result, McKee cannot show he suffered an injury in fact as required for Article III standing.  *See Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 638 (2009) (holding that a consumer who entered into a contract containing an allegedly unconscionable provision could not bring an action under the CLRA if that provision was never actually invoked against him or her).  Accordingly, the Court would find that McKee lacks standing for all claims that rely on this theory brought within the seventh and eighth causes of action.

### v.  McKee Has Standing to Bring Forth a CAPRL Predicate Claim under the UCL

McKee alleges in the eighth cause of action he suffered economic injury by Defendant's inadequate disclosures at time of sign-up that violate the CAPRL.  FAC ¶ 106.  Under the UCL,

10

a "private plaintiff may bring a UCL action even when "the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action." *Marilao v. McDonald's Corp.*, No. 09-CV-01014-H (AJB), 2009 WL 3007368, at *2 (S.D. Cal. Sept. 21, 2009) (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002)). To have standing for a CAPRL claim under the UCL, a plaintiff only needs to show that if not for the alleged act, the plaintiff would not have been harmed. *Ingalls v. Spotify USC, Inc.*, No. C16-03533 WHA, 2017 WL 3021037, at *4 (N.D. Cal. July 17, 2017) (citing *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1099 (2007)). CAPRL requires all businesses offering an automatic renewal payment system to: (1) present automatic renewal terms to the consumer in a clear and conspicuous manner; (2) obtain the consumer's consent; (3) provide the consumer with an acknowledgement that says how to cancel; and (4) provide an easy to use mechanism for cancellation. Cal. Bus. & Prof. Code § 17602.

McKee has standing to bring forth a CAPRL predicate claim under the UCL.[8] Defendant started automatically charging McKee after his thirty-day trial end and McKee alleged he suffered harm by this action by making more payments than he would have made if there had been adequate disclosures of Defendant's automatic charging practices during sign up. FAC ¶¶ 89-91. Thus, McKee has shown that he has standing to bring forth the CAPRL predicate claim under the UCL. *See Ingalls*, 2017 WL 3021037, at *4.

Defendant contends McKee lacks standing because he knew he was signing up for a monthly plan by designating a credit card to be charged and did not allege that he found the cancellation disclosure confusing. MTD at 9; Reply at 10. The Court does not find this argument compelling because McKee alleges that Audible failed to disclose all the required terms and policies, and he would not have signed up if he had been fully informed. FAC ¶ 91.

In sum, the Court would find that McKee has standing to bring his CAPRL predicate claim under the UCL.

**B. Failure to State a Claim Under 12(b)(6)**

Defendant moves to dismiss all of Plaintiffs' claims for failure to state a claim. MTD at

---

[8] Plaintiff brings forth the CAPRL claim as a predicate claim under the UCL, as CAPRL does not allow for a private right of action. *See Johnson v. Pluralsight, LLC*, No. 2:16-cv-0148-MCE-CKD, 2017 WL 661953, at *5 (E.D. Cal. Feb. 16, 2017); *Roz v. Nestle Waters N. Am., Inc.*, No. 2:16-cv-04418-SVW-JEM, 2017 WL 132853, at *4 (C.D. Cal. Jan. 11, 2017).

11.

i. <u>McKee States a Claim Under the CARD Act & EFTA</u>

McKee's third cause of action is brought under CARD and EFTA and is based on the fact that his Membership Credits automatically expired when he cancelled his membership.[9]  FAC ¶¶ 21-35.  "As amended by CARD, the EFTA provides that "it shall be unlawful for any person to sell or issue a gift certificate, store gift card, or general-use prepaid card that is subject to an expiration date."  15 U.S.C. § 1693*l*-1(c)(1).  The EFTA defines "gift certificate" as:

> [A]n electronic promise that is – (i) redeemable at a single merchant or an affiliated group of merchants that share the same name, mark or logo; (ii) issued in a specified amount that may not be increased or reloaded; (iii) purchased on a prepaid basis in exchange for payment; and (iv) honored upon presentation by [sic] such single merchant or affiliated group of merchants for goods or services.

15 U.S.C. § 1693*l*-1(a)(2)(B).  The EFTA defines "store gift card" like a "gift certificate" but replaces "issued in a specified amount that may not be increased or reloaded" with "issued in a specified amount, whether or not that amount may be increased in value or reloaded at the request of the holder."  15 U.S.C. § 1693*l*-1(a)(2)(C).  In general, a store gift card or gift certificate issued or sold may not be subject to an expiration date.  15 U.S.C. § 1693*l*-1(c)(1).  An exception is if the expiration date on a gift certificate or store gift card is more than five years after the date the gift certificate was issued, or the date on which card funds were last loaded on a store gift card, and if "the terms of expiration are clearly and conspicuously stated."  15 U.S.C. § 1693*l*-1(c)(2).

The EFTA also states that the Federal Bureau of Consumer Financial Protection ("Bureau") "shall prescribe regulations to carry out this section, in addition to any other rules or regulations required by this subchapter…" and "shall determine the extent to which the individual definitions and provisions of this subchapter or Regulation E should apply" to gift certificates and store gift cards.  15 U.S.C. § 1693*l*-1(d)(1)(A)-(B).  To that end, Regulation E ("Regulation E"), 12 C.F.R. §1005.20 provides similar language as the statute and states that a gift card or certificate must be issued "in a specified amount."  12 C.F.R. §§ 1005.20(a)(1)(i), 1005.20 (a)(2)(i) (2013).  In supplementary materials to Regulation E, the Bureau provides additional guidance, including that "[c]ertain cards, codes, or other devices may be redeemable

---

[9]As found above, McKee lacks standing to bring forth violations of CARD and EFTA based on Audible's rollover policy.

upon presentation for a specific good or service, or 'experience' are generally not subject to the requirements of this section because they are not issued to a consumer 'in a specified amount' as required under the definitions of 'gift certificate,' 'store gift card' or 'general-use prepaid card.'" *See* 12 C.F.R., Pt. 1005, Supp. I § 1005.20(a)(3).  However, if a card, code, or other device "is issued in a specified or denominated amount that can be applied toward the purchase of a specific good or service, such as a certificate or card redeemable for a spa treatment up to $50, the card, code, or other device is subject to this section." *Id.*

McKee contends that Audible's "credits" violate the EFTA, as amended by CARD, because the credits meet the definition of a gift card or gift certificate and expire before five years.  FAC ¶¶ 21-35.  McKee alleges the violation harmed him because he purchased or received one or more Membership Credits that expired earlier than five years after the credit was issued, he did not receive a full refund or an audiobook in exchange for the purchase price of each expired credit, and he paid more for each credit than he would have paid if he had known the credits were designed to expire automatically within months.  *Id.* ¶ 78.

Defendant argues McKee fails to state a claim because McKee cannot show that Membership Credits are issued in a "specified amount," thus showing that the credits do not need to comply with CARD and EFTA.  MTD 16-17.  McKee argues the credits can be construed as being issued in a "specified amount," even though they are not assigned a specific cash value, and analogizes the Audible credits to class subscriptions in *Cody*, 2016 WL 4771392, at *6-7.  Opp'n at 15.  In *Cody*, the plaintiff purchased a "Series Certificate," which could be used to redeem SoulCycle classes at a "time of their choosing."  *Cody*, 2016 WL 4771392, at *1.  The "Series Certificates" were sold at different price points and for a specific monetary value, which depended on the price point of the sessions purchased.  *Id.*  When a consumer purchased the Series Certificate, the amount was tied to their SoulCycle account and staff members were able to see how many sessions were purchased, and what the price point of the sessions were.  *Id.*  An individual was able to use the Series Certificate to attend sessions that cost less than what the certificate was purchased for, but could not use the certificate to attend sessions that were at a higher price point than what the session was purchased for.  *Id.*  The court held the SoulCycle Series Certificates were issued in a "specified amount," and were subject to the EFTA.  *Id.* at *3.

Defendant argues that *Cody* is distinguishable from its own credits, because the credits can be used to redeem an audiobook of *any* value.  MTD at 18, Reply at 14.  Defendant directs

13

the Court to *Hughes v. CorePower Yoga, LLC*, No. 12-CV-00905 (SRN/TNL), 2013 WL 1314456, at *6 (D. Minn. Mar. 28, 2013), for support. MTD at 17; Reply at 14. In *Hughes*, the plaintiff brought an EFTA claim against CorePower Yoga after purchasing a "Class Pack" for prepaid yoga class sessions, which expired after six months. *Hughes*, 2013 WL 1314456, at *1. Unlike in *Cody*, the yoga classes did not carry any specific cash value and were redeemable for any class offered by the studio. The Court found that the Class Pack thus, was not issued in a "specified amount." *Id.* at *6.

Both *Cody* and *Hughes* placed great emphasis on "monetary" value, as opposed to "specified amount." *See Cody*, 2016 WL 4771392, at *3-4; *Hughes*, 2013 WL 1314456, at *5-7. Nothing in the statute, or corresponding guidance requires that the value of the "specified amount" be denominated in cash. *But see Wells v. Holiday Cos.*, No. A12-1476, 2013 WL 777384, *1-4 (Minn. Ct. App. March 4, 2013) (the Minnesota Court of Appeals assumed, but did not decide that under the state's gift certificate "value" meant cash value, and thus denied defendant's motion to dismiss concerning a car-wash receipt that contained the dollar amount an individual paid for the car wash and an access code for future car wash); *Wells v. Holiday Cos.*, 862 N.W.2d 492, 498 (Minn. Ct. App. 2015) (the Minnesota Court of Appeals later held in an appeal on summary judgment that the receipt with the car-wash code was not a gift certificate under state law). There also appears to be a dearth of case law on this specific issue.

Here, the credits at issue are not necessarily given a cash value. However, unlike the yoga classes in *Hughes*, and the car wash in *Wells*, Plaintiff alleges that the credits may be combined to purchase certain products "priced" at more than one credit. FAC ¶ 26. This tiered pricing system, pursuant to which certain Audible products are valued at two credits, as opposed to one suggests that it is possible Audible does effectively issue credits in a "specified amount." At the very least, because there has been no discovery on Audible's pricing structure, the Court finds that resolution of this claim at the pleading stage is premature. *See Wells*, 2013 WL 7777384, at *4 (reversing district court's 12(b)(6) dismissal on gift card claims because of the "limited record that can be considered in the context of Rule 12"); *see also McGary*, 386 F.3d at 1270 (courts disfavor 12(b)(6) dismissals on claims that set forth a novel legal theory before more factual development). In other words, it is plausible that Audible issues credits in a

14

"specified amount" even if the amount cannot not be reduced to a specific *cash* value.[10]

As such, the Court would find that Plaintiff's EFTA claims survive the pleading stage, albeit barely.

ii. <u>McKee States a Claim under the California GCL</u>

McKee also alleges in his fourth cause of action that the Audible credits violate the GCL. Similar to the CARD Act and EFTA, under California law, a gift certificate cannot be sold with an expiration date.  Cal. Civ. Code § 1749.5.  The GCL is construed much more broadly than CARD and EFTA as there is no explicit definition of what constitutes a gift certificate, and no binding authority requires a specific denominated cash value.  *See* Cal. Civ. Code § 1749.5; *but see Reynolds v. Philip Morris USA, Inc.*, 332 F. App'x 397, 398 (9th Cir. 2009) ("but covered gift certificates must have a 'cash value' or 'face value.'").  As explained in the above EFTA as amended by CARD section, as it appears the Audible Membership Credits are a novel issue, the Court is disinclined to dismiss the action at this time, without affording Plaintiff the chance to take discovery on the specifics of Audible's pricing structure.  The Court would therefore DENY Defendant's Motion to Dismiss the fourth cause of action.

iii. <u>McKee Sufficiently States FAL, UCL, and CLRA claims based on a Misrepresentation Theory</u>

The second, seventh, and eighth causes of action are brought under the FAL, UCL, and CLRA on a misrepresentation theory.  FAC ¶¶66-70,103,115.  Specifically, McKee alleges Defendant knowingly made misleading statements, which McKee relied upon when he signed up for Audible.  FAC ¶¶ 66-71, 103, 116.  Claims under the FAL, UCL, and CLRA are grounded in fraud and need to be pled with particularity.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009).  In California, "a cause of action for fraud or misrepresentation requires the plaintiff to prove (a) a knowingly false misrepresentation by the defendant, (b) made with the intent to deceive or to induce reliance by the plaintiff, (c) justifiable reliance by the plaintiff, and (d) resulting damages."  *Wilhelm v. Pray, Price, Williams & Russell,* 186 Cal.App.3d 1324, 1331 (1986); *Swartz*, 476 F.3d at 764.  The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Semegen*

---

[10] Defendant's own website treats credits as a near equivalent to cash.  *See, e.g.,* Declaration of Jason Massello in Support of Audible's Motion to Compel Arbitration, Ex. 5, Docket No. 41-6 (screen shot of Amazon.com pricing an audiobook at "$22.05 or 1 Audible Credit" and allowing a user to "buy" the audiobook "with 1 Audible Credit").

*v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Additionally, Fed. R. of Civ. Proc. 9 requires a heightened pleading standard when alleging fraud in federal court, which applies to both state and federal claims brought to federal court. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1003, 1106 (9th Cir. 2003). The allegations must contain "an account of the time, place, and specific content of the false representation as well as the identities of the parties to the misrepresentation." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted).

The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500. Plaintiffs must "show that 'members of the public are likely to be deceived.'" *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (quoting *Freeman v. Time, Inc.*, 68 F.3d 285, 298 (citation omitted)). "California false advertising law prohibits not just false advertising, but also advertising which, although true, is either actually misleading or which has the capacity, likelihood or tendency to deceive or confuse the public." *Westside Shepherd Rescue of Los Angeles, Inc. v. Pollock*, No. CV 09-3677-GW (Ex), 2009 WL 10675040, at *14 (C.D. Cal. July 16, 2009) (citing *Williams*, 552 F.3d at 938) (citations omitted)). Plaintiffs' claims are governed by the "reasonable consumer" test. *Williams*, 552 F.3d at 938 (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)). "[T]he primary evidence in a false advertising case is the advertising itself." *Williams*, 552 F.3d at 938 (quoting *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003)). However, California courts "have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer." *Williams*, 552 F.3d at 938.

Here, McKee sufficiently alleges Defendant made misleading statements under the FAL, UCL, and CLRA. He identifies several specific statements as allegedly misleading in light of Audible's cancellation and rollover policies, including Audible's representations that "one credit equals one audiobook", membership 'includes 1 audiobook each month', credits 'do not expire,' and that members may 'cancel anytime' with no 'strings attached.'" FAC ¶ 68. Furthermore, McKee meets the particularity standard by showing alleging: "who (Audible), what (identified statements), when (in connection with sign up), where (online, among other places), and how (e.g. they never mention expiration policies)" in the FAC. Opp'n at 10.

Defendant argues McKee's use of short quotes in the FAC does not provide enough context of the origins of the quotations. MTD at 14. However, Defendant was able to produce a

16

defense.  Additionally, Defendant is presumably familiar with the advertisements that appear on its own website.  Finally, the Court also agrees with McKee that whether or not the business practice is deceptive "will usually be a question of fact not appropriate for decision on demurrer." *Williams*, 552 F.3d at 938.  Thus, the Court finds McKee sufficiently pled his FAL, including those brought under the UCL and CLRA.  *See Kasky*, 27 Cal. 4th at 950-51 (quoting *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 2010 (1983)) ('[a]ny violation of the false advertising law . . . necessarily violates" the UCL); *Kearns*, 567 F.3d at 1126 (holding UCL, CLRA, and FAL claims have the same particularity standard).

In sum, the Court would DENY Defendant's Motion to Dismiss the second, seventh, and eighth causes of action insomuch as those claims are based on Defendant's misrepresentations in advertisements.

> iv.  <u>McKee Fails to State a Claim Concerning Prohibited and Unconscionable Terms under the CLRA</u>

The seventh cause of action is also brought under the CLRA based on prohibited and unconscionable terms contained in Audible's credit card expiration policies and Defendant's policy of charging non-designated credit cards automatically.  FAC ¶¶ 106-110.  Since the Court has already found that McKee lacks standing regarding the charging of non-designated credit cards, and has shown McKee sufficiently alleged false and misleading advertising claims, the only claim under the CLRA at issue is if McKee sufficiently pled the unconscionable terms of the credits expiration policies under Cal. Civ. Code §§ 1770(a)(14), 1770 (a)(19).  Under California law, a court may deem a contract provision unconscionable and therefore unenforceable, only if it is both procedurally and substantively unconscionable.  *Byler v. Deluxe Corp.*, 222 F. Supp. 3d 885, 903 (S.D. Cal. 2016).

Here, McKee has not alleged procedural and substantive unconscionability of the credit expiration policy in the FAC, he only alleges procedural and substantive unconscionability regarding the automatic charging of a non-designated credit card.  FAC ¶ 106-109.  Thus, the Court finds McKee has not sufficiently pled that the credit expiration policy was unconscionable under Cal. Civ. Code § 1770(a)(19).  The Court would GRANT Defendant's Motion to Dismiss the CLRA claim in the seventh cause of action to the extent it is based on Audible's credit expiration policies.

> v.  <u>McKee Fails to State a Claim for Unlawful Conduct under the UCL</u>

The eighth cause of action is also brought under the theory that Defendant violated CAPRL, and thus UCL, by utilizing unlawful automatic renewal payment policies and providing incomplete disclosures of the policies.  FAC ¶ 117.  The UCL prohibits any "unlawful, unfair or fraudulent business act or business."  Cal. Bus. & Prof. Code § 17200.  "By proscribing any unlawful business practice, the UCL borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 n.8 (9th Cir. 2011) (alteration and internal quotation marks omitted).  The UCL allows private plaintiffs to bring a UCL action when the conduct alleged violates a statute that does not give a private right of action.  *Marilao*, 2009 WL 3007368, at *2. However, "'[i]f a plaintiff cannot state a claim under the predicate law, however, [the UCL] claim also fails.'"  *Hadley v. Kellogg Sales Co.*, 243 F.Supp.3d 1074, 1094 (N.D. Cal. 2017) (quoting *Stokes v. CitiMortgage, Inc.*, No. CV 14-02278 BRO (SHx), 2014 WL 4359193, *11 (C.D. Cal. Sept. 3, 2011)).

CAPRL makes it unlawful for a business making an automatic renewal offer to California consumers to:

(1) Fail to present automatic renewal offer terms in a clear and conspicuous manner before the subscription agreement is fulfilled, and in visual proximity to the request for consent to the offer.  Cal. Bus. & Prof. Code §17602(a)(1).

(2) Charge the consumer's credit, debit, or third party payment account without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms.  Cal. Bus. & Prof. Code §17602(a)(2).

(3) Fail to provide an acknowledgement that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.  Cal. Bus. & Prof. Code § 17602(a)(3).

Further, "clear and conspicuous" means "in large type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."  Cal. Bus. & Prof. Code § 17601(c).

Here, McKee fails to allege a CAPRL claim, and subsequently a claim under the UCL. This is because McKee does not sufficiently detail the content of disclosures he alleges Audible includes during the sign-up process in the FAC.  *See Bell Atl. Corp.,* 550 U.S. 544, 555 (2007) (a

18

sufficient pleading requires more than a formulaic recitation of the elements of a cause of action). Thus, the Court finds McKee has not sufficiently pled a violation of the UCL based on Defendant's automatic renewal practice. The Court would GRANT Defendant's Motion to Dismiss as to Plaintiff's UCL claims to the extent such claims are based on CAPRL violations.

<div style="margin-left:2em">

vi. <u>McKee Fails to State a Claim for Restitution, Unjust Enrichment, and Money Had and Received</u>

</div>

McKee also brings claims for restitution, unjust enrichment, and money had and received against Defendant in the ninth cause of action. FAC ¶¶ 123-128. "To plead a claim for unjust enrichment, a plaintiff must allege a receipt of a benefit and unjust retention of the benefit at the expense of another." *In re Apple In-App Purchase Litig.*, 855 F. Supp. 2d 1030, 1042 (N.D. Cal. 2009) (citing *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 989 (N.D. Cal. 2009)). "The foundation of an action for conversion on a money had and received count is the unjust enrichment of the wrongdoer, and in order for plaintiff to recover in such action she must show that a definite sum, to which she is justly entitled, has been received by Defendant." *Walter v. Hughes Communications, Inc.*, 682 F. Supp. 2d 1031, 1047 (N.D. Cal. 2010) (quoting *Bastanchury v. Times-Mirror Co.*, 68 Cal. App. 2d 217, 236 (1945)).

 "A plaintiff must plead that the defendant 'is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff.'" *Id.* (quoting *Schultz v. Harney*, 27 Cal. App. 4th 1611, 1623 (1994)). California courts have held that when a "common count is used as an alternative claim seeking the same recovery demanded in a specific cause of action based on the same facts, the common count may be dismissed if the cause of action is dismissed." *In re Apple In-App Purchase Litigation*, 855 F. Supp. 2d at 1032 (citing *McBride v. Boughton*, 123 Cal. App. 4th 379, 394-95 (2004)).

Here, McKee's unjust enrichment claims stem from his previously discussed causes of actions. FAC ¶¶ 123-128. Though the Court finds McKee may maintain claims under the FAL, CLRA, UCL, and federal and state gift certificate laws, his unjust enrichment and related claims fail because McKee fails to allege a specific sum of money had and received by Defendant. FAC ¶ 127; *see In re Apple In-App Purchase Litig.*, 855 F. Supp. 2d 1030, 1042 (N.D. Cal. 2012) (citing *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 989 (N.D. Cal. 2009) ("To plead a claim for unjust enrichment, a plaintiff must allege a receipt a benefit and unjust retention of the benefit at the expense of another.")). Thus, the Court GRANTS Defendant's Motion to Dismiss to the

ninth cause of action without prejudice.

vii.  Plaintiffs Voluntarily Dismiss their First, Fifth, and Sixth Causes of Action

Plaintiffs voluntarily dismiss the first cause of action with prejudice and the fifth and sixth causes of action without prejudice.  Opp'n at 5, 18, 20.  Accordingly, Defendant's Motion to Dismiss the first, fifth, and sixth causes of action is granted, and the first cause of action is DISMISSED with prejudice and the fifth and sixth causes of action are DISMISSED without prejudice.

**IV.  Conclusion**

The Court would GRANT Defendant's Motion to Dismiss as to the Fifth, Sixth, and Ninth causes of action without prejudice.  The Court would GRANT the Motion to Dismiss as to the First cause of action with prejudice.  The Court would DENY the Motion to Dismiss as to the Third, Fourth, Second, Seventh, and Eighth causes of action except to the extent noted herein.