1  **Jamin S. Soderstrom, Bar No. 261054**
2  **jamin@soderstromlawfirm.com**
   **SODERSTROM LAW PC**
3  **3 Park Plaza, Suite 100**
   **Irvine, California 92614**
4  **Tel:   (949) 667-4700**
   **Fax:   (949) 424-8091**
5

6  *Counsel for Plaintiffs and the Proposed Class*
7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **(WESTERN DIVISION – LOS ANGELES)**

11

12  **GRANT MCKEE, TAYLOR FISSE,**          **Case No. 2:17-cv-01941 GW (Ex)**
    **BRYAN REES, ERIC WEBER, and**
13  **MICHAEL ROGAWSKI, individually**
    **and on behalf of all others similarly**    **PLAINTIFFS WEBER AND**
14  **situated,**                                 **ROGAWSKI'S SURREPLY IN**
                                                   **OPPOSITION TO DEFENDANT'S**
15              **Plaintiffs,**                    **MOTION TO COMPEL**
                                                   **ARBITRATION AND DISMISS**
16  **v.**                                         **CLAIMS**

17  **AUDIBLE, INC.,**
18              **Defendant.**                     Date:       April 2, 2018
                                                   Time:       8:30 A.M.
19                                                 Courtroom:  9D
                                                   Judge:      George H. Wu
20                                                 Trial Date: None Set
21

22

23

24

25

26

27

28

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page(s)**

I.   Weber is not required to arbitrate his claims against Audible. ................................ 1

   a.   The evidence shows that Weber did not knowingly and unambiguously consent to arbitrate his claims against Audible. ............................................................. 1

   b.   The Court should not reconsider its July 17, 2017 ruling and let Audible compel arbitration based on Amazon's conditions of use. ............................................... 2

   c.   Even if Audible could rely on Amazon's conditions of use, Weber never agreed to Amazon's arbitration clause. ......................................................................... 5

      1.   Weber agreed to Amazon's conditions of use before they had an arbitration clause and he never agreed to any modifications that added a new arbitration clause. ....................................................................................... 6

      2.   Weber did not agree to arbitration by making purchases or by being charged for a new Amazon Prime membership. ...................................... 8

II.   Audible's knowing and intentional waiver of its right to rely on recent revisions to compel arbitration strengthens the case for corrective action. .................................... 10

III.   The parties are continuing to meet and confer concerning whether Rogawski necessarily saw the 2015 webpage on which Audible relies. ...................................... 13

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Court Cases**

*Campbell v. General Dynamics Government Systems Corp.*,
  407 F.3d 546 (1st Cir. 2005) ..................................... 8

*Douglas v. United States District Ct. for the Cent. Dist. of Cal.*,
  495 F.3d 1062 (9th Cir. 2007) ................................... 6

*Fisher v. A.G. Becker Paribas Inc.*,
  791 F.2d 691 (9th Cir. 1986) ................................... 11

*In re Facebook Biometric Information Privacy Litigation*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) ..................... 7

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) ................................... 6

*O'Connor v. Uber Technologies, Inc.*,
  2014 WL 1760314 (N.D. Cal. May 2, 2014) ........................ 12

*Plazza v. Airbnb, Inc.*,
  2018 WL 583122 (S.D.N.Y. Jan. 26, 2018)........................7, 8

*Rodman v. Safeway Inc.*,
  2015 WL 604985 (N.D. Cal. Feb. 12, 2015).......................... 6

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) ................................... 12

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ................................... 7

ii

## SURREPLY

### I.    Weber is not required to arbitrate his claims against Audible.

When given the chance to correct its error[1] in relying on the wrong consumer's information when moving to compel Plaintiff Eric Weber's claims to arbitration, Defendant Audible, Inc. submitted in its reply **zero** documents and information related to Weber's Audible sign-up and credit redemption history. In other words, Audible concedes that Weber did not knowingly and unambiguously agree to the *Audible terms of use* and arbitration clause. Audible's concession is entirely consistent with Weber's opposition and supporting evidence.

Despite this concession, Audible still asks the Court to compel Weber's claims *against Audible* to arbitration based on the separate *Amazon conditions of use* and arbitration clause. The Court rejected this exact argument when it held that Audible could not rely on Amazon's separate conditions of use to compel Plaintiff Grant McKee's claims to arbitration, and it should do so again for the same reasons. Dkt. 37 at 17.

### a.    The evidence shows that Weber did not knowingly and unambiguously consent to arbitrate his claims against Audible.

Weber alleged that he signed up for Audible in May 2017. Dkt. 65 (SAC ¶ 16). In opposition to Audible's motion, he submitted testimony and evidence showing he signed up on May 7, 2017 and he is currently paying for one credit per month in a Gold Monthly plan. Dkt. 77-2 (original Weber declaration); Dkt. 77-3 (exhibit to declaration). His testimony explains that he signed up using his mobile phone and he never saw any

---

[1] Audible unfairly suggests that it is Plaintiffs' counsel's fault that Audible failed to submit relevant evidence in its opening brief, apparently believing that Plaintiffs' counsel had an affirmative obligation to ensure Audible had all the information it wanted before it filed its motion. Reply at 12. Plaintiffs' counsel willingly confirmed that Audible had identified the correct consumer information when asked for such confirmation, but it is Audible's own fault that it strategically chose not to take any discovery (and thereby strategically prevented Plaintiffs from taking any discovery) and then guessed incorrectly when there were multiple consumers in its records with the same name.

disclosure of Audible's terms of use or arbitration clause during the sign-up process. Dkt. 77-2. He also redeemed several of his prepaid credits without ever seeing any disclosure of Audible's terms or arbitration clause. *Id*. When he learned that Audible had recently revised its disclosures and terms to try to compel him and other consumers to arbitrate their claims, he immediately stopped redeeming credits because he would not knowingly agree to a retroactive arbitration clause that waived his right to participate in this action or file a separate action against Audible. *Id*.

Nothing in Audible's reply brief or supporting evidence disputes or contradicts any of Weber's evidence or testimony. In fact, Audible does not even try to argue in its reply that Weber had reasonable notice of and knowingly and unambiguously consented to the *Audible* terms of use or arbitration clause. This concession alone should cause the Court to deny Audible's motion against Weber.[2]

> **b.**     **The Court should not reconsider its July 17, 2017 ruling and let Audible compel arbitration based on Amazon's conditions of use.**

Instead of arguing that Weber agreed to Audible's terms of use and arbitration clause, Audible argues that Weber indirectly agreed to arbitrate claims *against Audible* based on the separate Amazon conditions of use. This is the same "indirect notice and

---

[2] Audible suggests that Plaintiffs "speculate wildly" about the sufficiency of the relevant disclosures of Audible's terms during the class period. Reply at 12. Yet even without any discovery, the evidence shows that (i) McKee did not see any sufficient disclosures between June and December 2016, (ii) Weber did not see any sufficient disclosures from May 2017 to the present, and (iii) Amazon only used the webpage that compelled Beals' claims to arbitration during a narrow window of time in 2015, after which it deleted the relevant disclosure from the webpage. Moreover, the wrong "Eric Weber" apparently signed up for Audible in March 2013, but the only webpages and disclosures that Audible could find to support its motion were the recently revised disclosures from October and December 2017. *See* Motion at 10. It is not wild speculation to construe the absence of relevant evidence as suggesting that Audible did not use sufficient disclosures for a large part of the relevant class period. Of course, discovery will put this side dispute to rest.

agreement" argument Audible made unsuccessfully against McKee. Audible is essentially asking the Court to reconsider its July 17, 2017 ruling which stated:

> Defendants' final attempt to bind [McKee] to the arbitration clause contained in Audible's COU is to argue that he pre-agreed to arbitrate claims against Audible each and every time he purchased a product from Amazon. This is because, Defendants contend, Amazon's COU cover all of Amazon's affiliates and their products. [Citation.] It appears to be undisputed [McKee] has made multiple purchases on Amazon and that, each time, he assented to Amazon's COU. [Citation.] Defendants argue that because Amazon's COU define "Amazon" to include its affiliates, [McKee], in making purchases on Amazon.com enters into arbitration agreements with every single Amazon affiliate. This line of argument is unpersuasive. First, it is a relatively basic proposition that a party can only assent to a contract with notice of its essential terms, including, the actual parties to the contract. *See Lee v. Intelius Inc.*, 737 F.3d 1254, 1260 (9th Cir. 2013) ("Washington law requires that the 'essential elements' of the contract be set forth in writing. An essential element is identification of the parties to the contract.") Audible is not listed as a party to the Amazon COU.
>
> Further, Defendants' contention that the Amazon sign in page provided [McKee] with notice that he was making an agreement with Audible has other problems. For one, unless the Amazon agreement directs [McKee] to Audible's COU in some way, or notifies [McKee] of the existence of Audible as an Amazon affiliate it does not afford notice. The Court is unwilling to hold that a reasonable consumer signing into Amazon would believe he or she is also waiving the right to sue several additional corporations. While Amazon may be able to compel [McKee] to arbitrate his claims based on purchases he made on Amazon, Audible may not.

Dkt. 37 at 17. Audible does not analyze or address the Court's prior ruling. Instead, Audible tries to sidestep the contract formation issues *between Weber and Audible* by arguing "when Mr. Weber gave Amazon his credit card, he was on notice that any claims relating to the allegedly unauthorized use of that card, or the allegation that Amazon

wrongly provided his credit card information to another, were encompassed by the [Amazon] arbitration provision to which he agreed. Mr. Weber's claim is essentially one of allegedly improper collaboration between Amazon and one of its affiliates, and this claim is squarely encompassed within Amazon's arbitration provision." Motion at 23.[3]

Audible is wrong. <u>First</u>, there is no evidence that a consumer has reasonable notice that by storing a payment method on an Amazon account he or she is agreeing to arbitrate claims *against an unidentified affiliate company* if that card is ever charged without authorization by such affiliate. Audible has not submitted any evidence concerning disclosures made when a consumer stores a card on an Amazon account (particularly a card that is never designated for *Audible* purchases). <u>Second</u>, as the Court previously noted, the Amazon conditions of use do not identify Audible as an Amazon affiliate or claims against Audible as being covered by Amazon's arbitration clause (only Audible's terms of use do that). A consumer could only learn that the defined term "Amazon Service" used in Amazon's conditions of use covers products and services offered by Audible, and a consumer could only learn that claims against Audible are covered by the Amazon arbitration clause, <u>if the consumer sees the *Audible* terms of use</u>. *Compare* Dkt. 82-7 and Dkt. 82-8 (Amazon's old and revised terms) *with* Dkt. 73-4 and Dkt. 73-10 (Audible's old and revised terms). <u>Third</u>, Audible confuses the broad scope of Amazon's arbitration clause with the question of whether a contract was ever formed *between Weber and Audible*. Assuming consumers agreed to Amazon's arbitration clause, Amazon may have a right to compel most disputes against it to arbitration based on the "any dispute or

---

[3] Audible continues to mischaracterize Weber's claims by suggesting that he only has a single "wrong credit card" claim. Reply at 15. The Second Amended Complaint makes clear that Weber is bringing a number of claims based on a variety of facts and violations, including false advertising, insufficient disclosures, unlawful charges, unlawful gift certificate terms, and unjust enrichment. SAC ¶¶ 68-155. Most of Weber's claims are not dependent on the fact that Audible charged a non-designated credit card without notice or authorization. Audible's wish that Weber's claims were confined to a single wrongful act does not make it true.

claim" language, but broad language does not prove that consumers who store payment methods with Amazon knowingly agreed to arbitrate claims *against Audible*. Put simply, nothing in Audible's evidence shows that Weber had reasonable notice that by signing up for an Amazon account, storing payment methods on his Amazon account, and making non-Audible-related purchases on Amazon.com, he knowingly agreed to forgo his access to the courts and arbitrate any disputes and claims he had *against Audible*.

The fact that Weber has claims pending against both Audible and Amazon does nothing to change this analysis. The same was true for McKee. McKee brought the same false advertising, insufficient disclosure, unlawful gift certificate, conversion, and related claims against both Audible and Amazon based on the same or substantially similar conduct, and McKee's relevant payment method was also stored on an Amazon account. *See* Dkt. 1. The Court found that *Audible* could not compel arbitration of McKee's claims because McKee never agreed to arbitrate claims *against Audible*. Dkt. 37. The Court found that *Amazon* could compel arbitration of McKee's same claims, however, because it found that McKee had agreed to arbitrate claims *against Amazon*. *Id.*

To compel Weber's claims against Audible to arbitration, Audible needed to provide Weber with reasonable notice of its own terms and arbitration clause and Audible needed to secure Weber's knowing and unambiguous consent. Audible has not even tried in its reply brief to meet its evidentiary burden to prove a valid agreement to arbitrate was ever formed *between Weber and Audible*. The Court should therefore find that no valid agreement to arbitrate exists and it should deny Audible's motion.

**c.   Even if Audible could rely on Amazon's conditions of use, Weber never agreed to Amazon's arbitration clause.**

The Court should not even reach Audible's arguments based on Weber's separate Amazon sign-up and purchase history because even if Weber did agree to arbitrate claims *against Amazon*, he never agreed to arbitrate claims *against Audible*.

Nevertheless, because Audible's reply makes essentially the same arguments and submits the same evidence against Weber that its affiliates Amazon.com, Inc. and

Amazon Services LLC have made and submitted in the related case pending before the Court, *Weber et al. v. Amazon.com, Inc., et al.*, Case No. 2:17-cv-08868-GW-E, Weber summarizes his arguments and submits evidence showing that he never knowingly and unambiguously agreed to Amazon's arbitration clause to ensure that he has not unintentionally waived any arguments. *See Amazon* Case Dkt. 30 (Weber's opposition to Amazon's motion to compel arbitration, including supporting declarations and exhibits).

1. **Weber agreed to Amazon's conditions of use before they had an arbitration clause and he never agreed to any modifications that added a new arbitration clause.**

Weber does not dispute that he agreed to Amazon's conditions of use when he first signed up for an Amazon account and started making purchases on Amazon.com. Weber Decl. ¶ 2. He does dispute, however, that he never had notice of or agreed to the arbitration clause that Amazon unilaterally inserted into its conditions of use without notice on August 19, 2011. *Id.* The question of whether a contract was formed between Weber and Amazon *that contains an arbitration clause* thus turns on whether Amazon provided reasonable notice *of the modified terms* and secured Weber's knowing and unambiguous consent *to the modified terms*. *Douglas v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 495 F.3d 1062, 1066-67 (9th Cir. 2007) (holding that a plaintiff could not be bound by modified contract terms when he was not notified of the changes); *see also Rodman v. Safeway Inc.*, 2015 WL 604985, at *11-12 (N.D. Cal. Feb. 12, 2015) (modified online terms were not enforceable against consumers because they could have completed all their subsequent online purchases without ever being made aware that the original terms had been modified); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 235 (2d Cir. 2016) ("While the [Amazon] 2008 Conditions of Use did reserve Amazon's right to change those terms at any time, this did not necessarily bind [plaintiff] to any change of terms without notice. Under Washington contract law, unilateral modifications to terms of a contract are only binding if there is notice and assent to the changed terms.").

6

Amazon's modified terms and arbitration clause can only be enforceable against Weber if Amazon *affirmatively* gave Weber notice that ensured he was aware of and agreed to the modifications and new arbitration clause. *See Plazza v. Airbnb, Inc.*, 2018 WL 583122, at *7-8 (S.D.N.Y. Jan. 26, 2018) (defendant "presented an actual scroll box with the modified [terms] and would not allow users to access any part of [defendant's] website or continue using the platform until they indicated their assent to the [modified terms];" defendant also sent multiple hyperlinked emails concerning modified terms); Soderstrom Decl. ¶ 6, Ex. 6 (attaching examples of Airbnb's email and pop-up notices); *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (online users assented to modified terms where the website owner gave "individualized notice" by sending an email notice and link to the modified terms and placing an additional notice each user's "newsfeed").

But even if Amazon did give some form of affirmative notice of the modified terms and arbitration clause, that does not automatically mean Weber understood and consented to arbitration. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123-28 (2d Cir. 2012) (email did not provide reasonable notice of modified terms because the email effectively obscured the details of the terms and conditions and the passive manner in which they could be accepted). The only evidence Audible has ever submitted in support of its argument that Weber knowingly and unambiguously agreed to Amazon's modified conditions of use and arbitration clause are *passive* hyperlinks that never mention the fact that modifications were made and that never identify the substance of any modifications.

The evidence shows that Amazon never sent Weber a notice on or after August 19, 2011 informing him that a new arbitration clause and jury trial and class action waivers were added to the conditions of use. Weber Decl. ¶ 3; Soderstrom Decl. ¶ 3, Ex. 1 (Amazon admitted it did not send an email notice of the COU modification on or after August 19, 2011). Weber also was never told that his continued use of Amazon.com would constitute his agreement to any new terms that were added to or incorporated by reference into the original conditions of use he agreed to, including a retroactive

7

arbitration clause that would apply to all of his prior actions on Amazon.com as well as any future actions. Weber Decl. ¶ 3. Audible has never identified any feature on Amazon.com (e.g., a pop-up notice or other affirmative disclosure) that Amazon used to notify Weber and other consumers *of the modified terms* and *new arbitration clause*. *See Plazza*, 2018 WL 583122, at *7-8 (pop-up scrollwrap notices of modified terms); Soderstrom Decl. ¶ 6, Ex. 6.

There simply is no evidence that Amazon ever gave Weber any affirmative notice of the new arbitration clause and related waivers—or notice of any other modifications to the conditions of use for that matter—on or after August 19, 2011. "This defect weighs all the more heavily because it could so easily have been remedied." *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 556 (1st Cir. 2005) (affirming denial of motion to compel arbitration where company could have easily used other means to give reasonable notice and secure assent to an arbitration clause); *see also* Dkt. 37 (noting that there is nothing preventing website owners from carefully designing their websites to ensure that proper notice and unambiguous consent are given, particularly where the terms give up a consumers' access to the courts).

## 2. Weber did not agree to arbitration by making purchases or by being charged for a new Amazon Prime membership.

Audible argues that Weber nevertheless agreed to Amazon's arbitration clause simply by making purchases on Amazon.com after August 19, 2011. But there is no "repeat customer" exception to generally applicable contract formation, modification, and notice principles that shifts the burden to Weber to proactively check to see whether any unilateral modifications were made. Even if there was "repeat customer" exception, Audible has never submitted evidence showing that Weber ever clicked on a "Place your order" button that had a sufficient disclosure of Amazon's modified conditions of use next to it. Weber Decl. ¶ 4; Soderstrom Decl. ¶ 4, Ex. 2-3.

Additionally, Weber's circumstances related to Amazon Prime are different than McKee's circumstances and merit a different result. Weber did not sign up for a new

8

Amazon Prime membership on October 26, 2017 and he is not sure why he was charged on October 26, 2017. Weber Decl. ¶ 5. Based on Weber's testimony that he did not intentionally go through the formal process of signing up and paying for a new Amazon Prime annual membership on October 26, 2017, a reasonable inference can be drawn that Amazon automatically charged one of Weber's payment methods for an Amazon Prime membership on October 26, 2017 without his express authorization. Alternatively, because he purchased a single product exactly one month earlier on September 26, 2017, Amazon may have caused him to sign up unintentionally for a free trial he did not need, which then triggered an automatic charge to his account 30 days later. Weber Decl. ¶ 4; Soderstrom Decl. ¶ 5, Exs. 4-5 (screenshots of the current Amazon Prime standard and mobile sign-up webpages for a free trial). The automatic nature of such a charge would not support an argument that Weber knowingly and unambiguously agreed to the Amazon Prime Terms on October 26, 2017.

Even if Weber had signed up for a new Amazon Prime free trial membership on September 26, 2017 (he says he did not do so intentionally), Audible has not submitted any evidence concerning what webpages he would have seen on September 26, 2017 or showing what conditions of use were operative on September 26, 2017. Even accepting for the sake of argument only that Weber intentionally signed up for a new Amazon Prime membership on either October 26, 2017 or September 26, 2017, the designs of Amazon's standard and mobile websites do not ensure that consumers automatically and necessarily see the "Amazon Prime Terms" disclosure when they sign up for Amazon Prime. Soderstrom Decl. ¶ 5, Exs. 4-5. Both of the Amazon Prime sign up webpages display the relevant disclosure *below* the operative buttons and consumers must proactively scroll below the buttons (without being prompted to do so) to actually see the disclosure and learn that by clicking the button they are ostensibly agreeing to contract terms (including numerous hyperlinked terms). Soderstrom Decl. ¶ 5, Exs. 4-5; *see* Weber Decl. ¶ 5.

Finally, the Amazon Prime Terms disclosure itself does not satisfy the generally applicable contract formation, modification, and notice requirements and it could not

9

1  have given Weber reasonable notice of and secured his knowing and unambiguous
2  consent *to the modified terms and new arbitration clause* contained in the separate
3  Amazon conditions of use. Consumers must navigate through multiple hyperlinks to ever
4  learn whether there is an arbitration clause and jury trial and class action waivers, and
5  none of the terms ever mention whether Amazon's original conditions of use from before
6  August 19, 2011 had been modified to include a new arbitration clause.

7       For each of these reasons, as spelled out more fully in the briefing on these same
8  issues and the same evidence in the related *Amazon* case, the Court should not compel
9  claims against Audible to arbitration based on Amazon's conditions of use and arbitration
10 clause because Weber never agreed to arbitrate claims against Amazon.

11 **II.   Audible's knowing and intentional waiver of its right to rely on recent
12       revisions to compel arbitration <u>strengthens</u> the case for corrective action.**

13      Audible strategically decided not to rely on and submit evidence related to its
14 revised disclosures in its reply brief, apparently hoping that its waiver of the right to try
15 to compel arbitration based on the recently revised disclosures will help it avoid
16 corrective action. *See* Reply at 14 n.5. The opposite should be true. Audible's effort to
17 avoid implicating any "revised disclosures" in its reply actually ***strengthens*** Plaintiffs'
18 argument that corrective action is appropriate and will not result in the harm Audible has
19 predicted.

20      <u>First</u>, Audible's attempt to "un-rely" on its revised disclosures does not change the
21 relevant analysis and should not change the result. Audible has already tried to use its
22 revisions against both Rogawski and Weber. *See* Motion at 7-8, 14-15; Dkt. 73-7; Dkt.
23 73-8. It has also indicated that it will do the same against Fisse in connection with a future
24 motion. Thus, belatedly choosing not to submit *additional* evidence concerning revised
25 disclosures with its reply brief does not turn back time and make Plaintiffs' request for
26 corrective action "unripe" or premature.

27      <u>Second</u>, Audible's new tactic of strategically choosing not to submit evidence
28 showing the revised credit redemption webpages Weber visited in 2017 proves that

10

Audible is perfectly capable of defending itself based on the status quo, i.e., based on whatever webpages, disclosures, and terms—and whatever procedural and substantive defenses—existed on the date this action was filed. Gaining an unfair procedural advantage while a class action is pending is precisely what Rule 23(d) is designed to prevent and, at least with respect to Audible's reply brief directed at Weber, Audible has voluntarily returned to the status quo by deciding not to try to rely on any webpages, disclosures, or terms that were revised after March 10, 2017 *for Weber*. This is exactly the result Plaintiffs' motion for corrective action seeks (preventing Audible from unfairly relying on *new* arbitration agreements), simply on a wider scale.

   Third, Audible's new tactic also proves that Audible's business operations and freedom of contract will not be meaningfully disturbed if the Court enters an order that prevents Audible from seeking to enforce against Plaintiffs or putative class members any arbitration agreement that is based on webpages, disclosures, and terms that were revised after this action was filed. Indeed, with the advice of sophisticated outside and house counsel, Audible has now knowingly and intelligently *waived* what it considers to be a contractual right to require Weber to arbitrate his individual and representative claims based on his visits to recently revised webpages. *See* Dkt. 73; *see also Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694-98 (9th Cir. 1986) (describing waiver of a contractual right to arbitrate). Audible's new waiver strategy is the best proof Plaintiffs have that preserving the status quo is fair to all parties and that corrective action will not create the parade of horribles that Audible has predicted. *See* Dkt. 78.

   Indeed, if being prevented from enforcing an arbitration agreement that is based on recently revised webpages, disclosures, and terms would truly and unfairly restrict Audible's business operations and freedom of contract, Audible would not have adopted a strategy of voluntarily waiving what it believes is a contractual right to rely on and enforce such terms against Weber.

11

**Fourth,** it would unfairly prejudice Plaintiffs[4] if the Court let Audible manipulate its arguments in each new motion and pick some consumers to try to compel to arbitration based on its recent revisions, and then pick other consumers for whom it will strategically waive the same right simply to avoid corrective action under Rule 23(d). It would be unfair if Audible strategically waive the right to try to enforce its revised disclosures *against named plaintiffs* while at the same time reserving that same right *against unnamed putative class members* who likely have no knowledge of this action, the underlying disputes, and their related rights and options. Such a result would directly conflict with the core purposes of Rule 23(d) which are to ensure that class proceedings are fair to all *actual and potential parties* and to prevent *potential interference* with the parties' and putative class members' rights. It would also give Audible the exact result it originally wanted—shrinking the size of the putative class and limiting its potential liability based on its exclusive ability to communicate directly with putative class members before class certification issues can be decided.

Ultimately, Plaintiffs' motion for corrective action simply seeks for all Plaintiffs and putative class members the same thing Audible strategically chose to give Weber— the ability not to have to dispute and argue against an arbitration agreement that is based on revisions made after March 10, 2017.[5] An order preventing Audible from relying on

---

[4] All five Plaintiffs seek corrective action – McKee as the original named plaintiff who unquestionably has standing under Rule 23(d) to ensure the fairness of class proceedings; Weber and Rogawski as new named plaintiffs who have standing because Audible originally tried to compel arbitration *based on the revised disclosures*; and Fisse and Rees who are new named plaintiffs who Audible has also threatened to try to compel to arbitration. Even if McKee was the only named plaintiff, corrective action would still be appropriate because he has an independent right to fair proceedings under Rule 23(d).

[5] Corrective action should also cover consumers who signed up after the revisions were made. Such consumers will be subject to Audible's same policies and practices, and the Court's power to prevent potential interference with potential parties' rights extends to both current and future putative class members. *O'Connor v. Uber Technologies, Inc.,* 2014 WL 1760314, at *3-6 (N.D. Cal. May 2, 2014) (rejecting Uber's attempt to limit corrective action to only current putative class members); *Rodriguez v. Hayes,* 591 F.3d

12

any *new* arbitration agreements it secured based on its recent revisions would have the same result Audible voluntarily gave to Weber, simply on a wider scale. Audible's reply and strategic waiver demonstrate that Plaintiffs' requested relief is not particularly objectionable or harmful to Audible. It is also easy to enforce and does not implicate any First Amendment rights. Audible thus has essentially offered the Court a real-time example of what corrective action under Rule 23(d) would look like in practice.

## III.   The parties are continuing to meet and confer concerning whether Rogawski necessarily saw the 2015 webpage on which Audible relies.

In its tentative ruling on two other motions, the Court ordered Plaintiffs' counsel and Audible's counsel to meet and confer concerning the standard Amazon.com webpage and disclosure from 2015 on which Audible is relying to try to compel Rogawski's claims to arbitration. *See* Dkt. 87 at 32; Dkt. 73-3 (undated "Buy with 1 Audible Credit" screenshot). During the March 12, 2018 hearing, the Court further ordered Audible to provide Plaintiffs' counsel with *records* that show (i) what dates the relevant "Buy with 1 Audible Credit" webpage was active, and (ii) how Audible determined that Rogawski *necessarily* saw that specific version of the webpage on September 30, 2015 or October 1, 2015, as opposed to the revised webpage which deleted the relevant disclosure or an alternative view of the same webpage used for "pre-ordering" audiobooks.[6] Plaintiffs'

---

1105, 1118 (9th Cir. 2010) ("The inclusion of future class members in a class is not itself unusual or objectionable."). Consumers who did or will sign up or redeem credits *after* revisions were made may not have made the same choices (i.e. to agree to arbitrate already pending claims against Audible) had they been provided with all relevant information.

[6] Audible admitted that Rogawski was "pre-ordering" a title that was not yet available. Dkt. 73-1 ¶ 11. Plaintiffs' counsel has requested a confirmation that none of the information shown on the 2015 webpage would have been different based on the "pre-order" instead of an immediate purchase. *See* Soderstrom Decl. ¶ 8, Ex. 7 (showing, at least on Audible's recently revised mobile website credit redemption webpage, a different button used for pre-ordering an audiobook).

counsel's core concern is that Audible was relying on *testimony* that indicated when Audible believed the relevant version of the webpage was active and would have been seen by Rogawski, but that Audible had been unwilling to produce any *records* that supported such testimony.

Plaintiffs' counsel and Audible's counsel met and conferred telephonically on March 20, 2018, and Audible's counsel agreed to (i) search for and produce records showing the first date a "test group" was used on a revised version of the relevant webpage that deleted the disclosure, (ii) search for and produce records showing the end date of any "test group" for the relevant webpage (i.e., when the revised webpage when "live" to all users), (iii) confirm that the relevant webpage was live to all users as of February 4, 2015 (the first date identified in the related stipulation concerning Beals, *see* Dkt. 52 at 3), and (iv) confirm that there was no alternative view of the relevant webpage for users who "pre-ordered" a book using a credit as opposed to purchasing a book that is already available using a credit. Soderstrom Decl. ¶ 8.

As of noon on March 22, 2018, Plaintiffs' counsel had not yet received any records or confirmation of the requested information from Audible's counsel. Plaintiffs' counsel has agreed to accept such records and information *provided that* it is sent prior to April 2, 2018 hearing, and has agreed to stipulate that Rogawski necessarily saw the relevant 2015 webpage on which Audible's motion relies *provided that* the records and information leaves no room for a reasonable dispute. *Id.*

In the event Audible does not provide records and information before the April 2, 2018 hearing, or in the event the records and information do not conclusively show that Rogawski necessarily saw the specific version of the 2015 webpage on which Audible's motion relies, Rogawski will ask that the Court deny Audible's motion to compel his claims to arbitration without prejudice. If Audible later renews its motion after sufficient discovery has occurred and contract formation issues are still inconclusive, Rogawski will ask the Court to conduct a summary jury trial under 9 U.S.C. § 4.

///

1 | Dated: March 22, 2018                    SODERSTROM LAW PC

2 |                                          By: */s/ Jamin S. Soderstrom*

3 |                                                Jamin S. Soderstrom

4 |                                          *Counsel for Plaintiffs and the Proposed Class*

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on March 22, 2018, I caused the foregoing document to be served on all counsel of record by the Court's CM/ECF electronic filing system.

By: */s/ Jamin S. Soderstrom*
Jamin S. Soderstrom

16