# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 17-1941-GW(Ex) | Date | April 2, 2018 |
|---|---|---|---|
| Title | *Grant McKee v. Audible, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jamin Samuel Soderstrom | Jedediah Wakefield |

**PROCEEDINGS:**      **AUDIBLE'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT AS TO PLAINTIFFS TAYLOR FISSE AND BRYAN REES FOR LACK OF PERSONAL JURISDICTION [70];**

**AUDIBLE'S MOTION TO DISMISS SECOND AMENDED COMPLAINT AS TO PLAINTIFF GRANT MCKEE [71];**

**PLAINTIFFS' MOTION FOR CORRECTIVE ACTION [72];**

**AUDIBLE'S MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS AS TO PLAINTIFFS ERIC WEBER AND MICHAEL ROGAWSKI [73]**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the above-entitled motions are TAKEN UNDER SUBMISSION. Counsel are to provide the Court with proposed language to be included in the final ruling. Order to issue.

|  | : | 35 |
|---|---|---|
| Initials of Preparer | JG | |

**_McKee, et al. v. Audible, Inc. et al_**., Case No. CV-17-1941-GW-(Ex)
Tentative Rulings on: (1) Audible's Motion to Dismiss Plaintiff McKee's SAC Claims, (2) Audible's Motion to Dismiss for Lack of Personal Jurisdiction as to Plaintiffs Reese and Fisse, (3) Audible's Motion to Compel Arbitration as to Plaintiffs' Weber and Rogawski, and (4) Plaintiffs' Motion for Corrective Action

## I.  Background

Plaintiffs Grant McKee ("McKee"), Eric Weber ("Weber"), Michael Rogawski ("Rogawski" and together with McKee and Weber "the California Plaintiffs"); Taylor Fisse ("Fisse"); and Bryan Rees ("Rees" and together with Fisse "the Out of State Plaintiffs") (collectively, "Plaintiffs") sue Defendant Audible, Inc. ("Audible") on behalf of a proposed nationwide class of consumers for: (1) violation of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (2) Common Law Fraud and Misrepresentation; (3) violation of Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD") and Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693*l*-1(a)(2)(B); (4) violation of the California Gift Certificate Law ("GCL"), Cal. Civ. Code §§ 1749.45 *et seq.*; (5) Violation of EFTA, 15 U.S.C. § 1693; (6) Common Law Conversion; (7) violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (8) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* − Violation of California's Automatic Purchase Renewals Law, Cal. Bus. & Prof. Code § 17600 *et seq.*; (9) Violation of North Carolina's Unfair Competition Law; and (10) Restitution, Unjust Enrichment, and Money Had and Received.[1]  *See generally* Second Amended Class Action Complaint ("SAC"), Docket No. 65.

### A.  Allegations Common to All Named Plaintiffs

Audible, an affiliate of Amazon, Inc., advertises and sells audiobooks and other related products and services mainly on its websites, www.audible.com and www.amazon.com.  *See* SAC ¶ 24.  Plaintiffs allege that upon signing up for an Audible account or free trial, each of them viewed representations made by Audible that, in connection with membership: (1) "one credit equals one audiobook;" (2) "consumers 'get 1 book each month;'" (3) "credits 'do not

---

[1] Plaintiff Seth Beals' claims were dismissed and/or transferred to New York per the Court's granting of Defendant's Motion to Compel Arbitration as to Seth Beals.  *See* Docket No. 61 (finalizing the Court's October 26, 2017 Tentative Ruling ("Ruling II"), Docket No. 53).

expire;'" and (4) "members can 'cancel anytime' with 'no strings attached' while getting to "keep all your books." *Id.* ¶¶ 5, 8, 13, 16, 20, 26.  In addition, in order to sign up for Audible, a consumer must, and each Plaintiff (with the exception of Rees) did, designate a specific credit card for Audible to charge automatically each month or year, depending on the recurring payment plan. *Id.* ¶¶ 6,  9, 17, 21.  Plaintiff further aver that Audible will charge, automatically and without notice, a different credit or debit card linked to an Audible member's Amazon account if the card designated during the Audible sign up is declined.  *Id.*; *see also*, *id.* ¶¶ 50-51.

Plaintiffs allege that Audible's "so called" memberships, are not memberships in the traditional sense.  *Id.* ¶ 29.  Plaintiffs allege that customers sign up for memberships based on representations that (1) "one credit equals one audiobook;" (2) "consumers 'get 1 book each month;'" (3) "credits 'do not expire;'" and (4) "members can 'cancel anytime' with 'no strings attached' while getting to "keep all your books." *Id.* ¶¶ 5, 8, 13, 16, 20, 26.  Plaintiffs allege that, upon signing up and designating a credit or debit card for payment, members receive one Audible Credit ("Credit").  *Id.* ¶ 29.  Plaintiffs allege that each Credit may be exchanged for an audiobook within thirty days of receiving the Credit.  *Id.*  Plaintiffs also allege that all Credits are cancelled immediately if a member cancels their account with Audible or if the Credit is not used during a specific amount of time pursuant to Audible's rollover policy.  *Id.* ¶ 27.  Plaintiffs further allege that, at the end of a thirty day "free" trial period, customers are automatically enrolled in an Audible Membership and begin to incur a monthly membership fee of $14.95, charged automatically to their designated method of payment, or a payment method linked to that customer's Amazon account.  *Id.* ¶¶ 29, 50-51.  In exchange for this fee, Plaintiffs allege that members receive more Credits that expire if they are not used in a certain amount of time pursuant to Audible's Rollover Policies or upon cancellation.  *Id.*

Plaintiffs allege that, at the sign up stage, Audible fails to disclose certain membership and payment terms, including: (1) that Credits expire if not used within a certain period of time; (2) that Credits expire upon cancellation; (3) that Audible will begin automatically charging the designated card after 30 days; and (4) that Audible will charge any card on a customer's Amazon account in the event the card designated as part of the Audible signup is declined.  *Id.* ¶¶ 27-29.  Plaintiffs also aver that Audible fails to adequately disclose this information.  *See id.* ¶ 50.[2]

---

[2] Specifically, Plaintiffs allege the following:

Plaintiffs also claim that Audible fails to include additional disclosures required by law.  *See id.* ¶ 51.  Plaintiffs further allege that, had they known the truth about Audible's policies and practices concerning Credits, expiration terms, cancellation, and automatic payments, they would not have signed up for Audible, purchased as many Credits as they did, continued to make payments for as long as they did, or paid as much for each Credit as they did.  *Id.* ¶¶ 30, 52.

Many of Audible's audiobooks may be purchased by redeeming one Credit, but Audible also sells audiobooks and other goods and services which require consumers to redeem two or more Credits for purchase.  *Id.* ¶¶ 37-38.  Audible prices its audiobooks and related products and services in different increments, consumers may combine Credits to purchase audiobooks and related products and services that are priced at more than one credit.  *Id.*   Audible holds sales promotions where Credits may be combined (*e.g.* "buy 3 audiobooks for 2 credits").  *Id.* ¶ 38.

Consumers are only able to redeem a Credit for an audiobook, product, or service up to the value fixed by Audible.  *Id.*   This Credit pricing scheme allows for both "good" and "bad" deals.  *Id.* ¶ 40.  A consumer may be able to use a Credit to get an audiobook that is worth more than what the consumer paid for the membership and Credit, but at the same time a consumer may use a Credit to receive an audiobook that is worth less than what a consumer paid for the membership and Credit.  *Id.*  Consumers may also buy "extra Credits" that are separate from the Membership Credits they receive monthly; those extra credits are subject to the same terms and practices as Membership Credits.  *Id.* ¶ 39.

In addition, until April 2017, Audible also let members send Membership Credits as gifts to other consumers.  *Id.* ¶ 44.  Now, Audible continues to sell what it calls "Gift Memberships" that include Gift Credits, which are sold in sets of three, six, or twelve.  *Id.*   Gift Credits and

---

Audible fails to disclose to consumers at sign up or at the point of sale all of the information required by law concerning automatically renewed payments and the related cancellation policies and requirements.  The limited, incomplete information Audible does disclose to consumers when they sign up—e.g., "After 30 days, Audible is $14.95/month" and "cancel anytime"—is not presented clearly and conspicuously next to the "Start Now" or similar button as required by law.  The text of the limited disclosures that Audible does make is in small font and is not contrasted or set off from the surrounding text in a manner that clearly calls attention to the language.  None of Audible's limited disclosures contain an email address, phone number, or hyperlink to the cancellation policy, and they do not inform consumers that cancellation must be done on Audible's standard website even if the consumer signed up on a mobile device and/or on Amazon.com.

*Id.* ¶ 50.

Membership Credits are essentially the same except Membership Credits have varying expiration dates based on Audible's rollover and cancellation policies, while Gift Credits automatically expire six months after the Gift Membership ends. *Id.* When an Audible member receives a Gift Credit, it is intermingled with the Membership Credits in his or her account, and a member cannot choose whether to redeem a Membership Credit as opposed to a Gift Credit. *Id.* ¶ 45. If a consumer has a twelve-month Gift Membership, the Gift Credits expire exactly six months after the Gift Membership ends. *Id.*

As a result of Audible's policies and procedures, including its cancellation, expiration, and rollover policies in combination with the automatic payment feature of its membership terms, Plaintiffs allege that Audible receives a substantial windfall each time a member Credit expires. *See id.* ¶ 47. Plaintiffs allege that this windfall occurs because Audible fails to disclose its various policies upfront. *Id.* ¶¶ 47-48. Plaintiffs also allege that Audible's "free trial" acts as a conduit to this system because, in failing to disclose cancellation and rollover policies upfront, it anticipates that customers will not cancel their membership within the 30 day period, at which point they can only cancel if they are willing to forfeit a Credit that cost them $14.95. *Id.* ¶ 49.

### B. Plaintiff McKee's Experience

McKee is a citizen and resident of Los Angeles County, California. *Id.* ¶ 15. In June 2016, McKee signed up for a free thirty day trial with Audible after viewing Audible's advertisements and received one free credit. *Id.* During the Audible sign-up process, McKee saw that: (1) "one credit equals one audiobook;" (2) "consumers will 'get 1 book each month;'" and (3) "credits 'do not expire.'" *Id.* Audible also advertised that "consumers can 'cancel anytime' with 'no strings attached' while getting to 'keep all your books.'" *Id.* ¶¶ 5-6. McKee was required to, and did designate a credit card as part of the sign up process. *Id.* ¶ 6. He did not see any information related to the credit card apart from two disclosures: (1) that Audible cost $14.95 per month and (2) that he could cancel anytime. *Id.* McKee relied on the above representations when he signed up for his trial. *Id.* ¶ 5. Following McKee's initial thirty day trial, Audible began to automatically charge his designated credit card each month, giving him one Credit each month in exchange. *Id.* ¶ 6. In December 2016, McKee cancelled his recurring payments for the subscription. *Id.* ¶ 7. Prior to cancelling, McKee saw, for the first time, that his remaining Credits would expire immediately without a refund if he completed his cancellation, but he still cancelled. *Id.* ¶ 7. When McKee cancelled, his two remaining Credits expired and he

4

did not receive a refund from Audible or an audiobook.  *Id.*

### C.  The Experience of Plaintiffs Fisse and Rees (The Out of State Plaintiffs)

Plaintiff Fisse is a citizen and resident of North Carolina.  *Id.* ¶ 8.  In October 2013, after viewing the same Audible's advertisements that McKee did, Fisse signed up for a free thirty day trial membership, and like McKee, received a Credit.  *Id.*  Fisse designated a debit card as her required method of payment.  *Id.* ¶ 9.  She also did not see any disclosures about automatic payments and/or Audible's cancellation policies when she signed up, other than that Audible cost $14.95 a month, and that she could "cancel anytime."  *Id.*  Following Fisse's initial thirty day trial, Audible began to automatically charge her designated debit card each month, giving her one Credit each month in exchange.  *Id.* ¶ 10.  Over the next few years Fisse purchased and redeemed Credits occasionally, and cancelled and reinstated her membership several times.  *Id.* During this time Fisse never learned that unredeemed Credits would expire upon cancellation and was never informed of Audible's rollover policies.  *Id.*

In September 2017, Fisse learned that Audible had charged her boyfriend, Plaintiff Rees' debit card on two occasions, apparently in connection with Fisse's Audible account.  *See id.* ¶ 11.[3]  Upon receiving this information, Fisse cancelled her Audible account, and lost one unredeemed Credit.  *Id.*  That cancellation was the first time Fisse learned that cancellation would cause her to forfeit her unredeemed Credits, because on every other occasion she had cancelled after redeeming all of her available Credits.  *Id.*  Fisse further alleges that, starting in 2015, Audible increased her monthly charge from $14.95 to $15.96, without informing her.  *Id.* ¶ 12.

Plaintiff Rees is also a resident and citizen of North Carolina.  *Id.* ¶ 13.  Rees has never signed up for Audible or knowingly purchased any product from Audible.  *Id.*  Sometime prior to 2017, Rees used his debit card on Fisse's Amazon account to make a single purchase.  *Id.* ¶ 14. Amazon automatically stored Rees' payment information on Fisse's account and did so without informing Rees.  *Id.*  Amazon also did not disclose that in providing his debit card on Fisse's Amazon account, Rees could incur charges related to Fisse's Audible account.  *Id.*

In August 2017 and again in September 2017, Audible charged Rees' debit card in the amount of $15.96 without any authorization.  *Id.* ¶ 15.  Rees subsequently determined that these

---

[3] Plaintiffs allege that Rees never signed up for an Audible account, and had designated the card in question in connection with his use of Fisse's Amazon account.  *Id.* ¶ 11.

5

charges were for Fisse's Audible membership.  *Id.*

### D.  Plaintiff Weber's Experience

Weber is a citizen and resident of Los Angeles County, California.  *Id.* ¶ 16.  In May 2017, Weber signed up for a free thirty day trial with Audible using his smartphone, after viewing Audible's advertisements and received one free credit.  *Id.*  During the Audible sign-up process, Weber saw that: (1) "one credit equals one audiobook;" (2) "consumers will 'get 1 book each month;'" and (3) "credits 'do not expire.'"  *Id.*  Audible also advertised that "consumers can 'cancel anytime' with 'no strings attached' while getting to 'keep all your books.'"  *Id*.  Weber was required to, and did designate a credit card as part of the sign up process.  *Id.* ¶ 17.  He did not see any information relating to the credit card apart from two disclosures: (1) that Audible cost $14.95 per month and (2) that he could cancel anytime.  *Id.*  Weber relied on the above representations when he signed up for his trial.  *Id.* ¶ 16.  Following Weber's initial thirty day trial, Audible began to automatically charge a corporate credit stored on his Amazon account, not the credit card he designated at sign up.  *Id.* ¶ 18.  As a result, Weber's boss asked him why he was making purchases on his corporate credit card.  *Id.*  Weber was able to get the charges reversed but it took several hours and caused him embarrassment at work.  *Id.* ¶ 19.  It also caused Weber to delete his corporate card entirely from his Amazon account out of fear that Audible and/or Amazon would charge it again without notice.  *Id.*

### D.  Plaintiff Rogawski's Experience

Plaintiff Rogwaski is a citizen and resident of California.  *Id.* ¶ 20.  In September 2014, after viewing the same Audible advertisements that McKee did, Rogawski signed up for a free thirty day trial membership, and like McKee, received a Credit.  *Id.*  Rogawski designated a debit card as his required method of payment.  *Id.* ¶ 21.  He also did not see any disclosures about automatic payments and/or Audible's cancellation policies when he signed up, other than that Audible cost $14.95 a month, and that he could "cancel anytime."  *Id.*  Following Rogawski's initial thirty day trial, Audible began to automatically charge his designated debit card each month, giving him one Credit each month in exchange.  *Id.* ¶ 22.  Over the next few years Rogawski purchased and redeemed Credits occasionally.  *Id.*  Rogawski never learned that unredeemed Credits would expire upon cancellation and was never informed of Audible's rollover policies until he sought to cancel his membership.  *Id.*  Upon learning that cancellation would require surrendering his unused Credits, Rogawski chose not to cancel, feeling "trapped"

by the undisclosed cancellation policy. *Id.* ¶ 23. He estimates that he has lost $179.40 in Credits due to Audible's rollover policies over the years. *Id.*

### E. Procedural History

Plaintiff McKee originally sued both Audible and Amazon. *See* Docket No. 1. Both Defendants moved to compel him into arbitration. *See* Docket No. 18. The Court granted-in-part and denied-in-part the Defendants' motions to compel. *See* Final Ruling on Defendants' Motion to Compel Arbitration and Dismiss Claims ("Ruling I"), Docket No. 37. The Court granted Amazon's motion to compel because it found that McKee had entered into a binding, click-wrap agreement to arbitrate his claims against Amazon. *See* Ruling I at 17-18 (concluding that Amazon's checkout page provided McKee with sufficient notice of Amazon's COU and the arbitration provision contained therein). The Court denied Audible's motion to compel because it found that McKee never agreed to arbitrate claims against Audible. *Id.* at 11-17. The Court found that Audible's mobile online sign up process and Audible's mobile Credit Redemption Flow did not afford McKee sufficient notice of Audible's COU and, for that reason, McKee never agreed to the Audible COU. *See id.* 11-14. The Court also found that McKee's agreement to Amazon's COU and his subsequent activation of his Amazon Echo did not bind him to Audible's COU. *Id.* at 15-17.

Plaintiff filed a First Amended Complaint ("FAC") on August 11, 2017, adding Seth Beals as a second named Plaintiff. *See* Docket No. 40. Audible successfully moved to compel many of Beals' claims to arbitration because the process by which Beals signed up for Audible was different from McKee such that it provided Beals with notice of the Audible COU containing the arbitration provision. *See* Final Ruling on Audible's Motion to Compel Arbitration and Dismiss Claims as to Seth Beals, Docket No. 61 (adopting the Court's October 26, 2017 Tentative Ruling ("Ruling II"), Docket No. 53, as its final decision). The Court also transferred the rest of Beals' claims to New York pursuant to a venue selection clause contained in Audible's Gift Membership Terms. *See* Docket No. 64.[4]

Audible also moved to dismiss McKee's claims as alleged in the FAC. *See* Docket No. 42. The Court granted in part and denied in part that motion. *See* Ruling II at 38. The Court granted the motion with respect to McKee's Lanham Act claim with prejudice. *Id.* The Court

---

[4] The Court transferred Beals' claims after granting Audible's Motion to Change Venue. *See* Docket No. 62.

also granted the MTD with respect to McKee's claims for CAPRL, Conversion, and Restitution without prejudice.  *Id.*[5]  McKee was given leave to amend and filed the now operative Second Amended Complaint ("SAC") on December 15, 2017.  *See* SAC.  Plaintiffs Rogawski, Weber, Fisse, and Rees joined the suit at that time.[6]  Since the filing of the SAC, Audible has filed three motions:

> (1) Audible's Partial Motion to Dismiss the SAC as to Plaintiff McKee ("MTD SAC"), Docket No. 71.
> (2) Audible's Motion to Dismiss the SAC as to Fisse and Rees for Lack of Personal Jurisdiction ("MTD Fisse & Rees"), Docket No. 70;
> (3) Audible's Motion to Compel Arbitration as to Plaintiffs' Weber and Rogawski ("MTC"), Docket No. 73.

Plaintiffs have filed a Motion For Corrective Action ("Pl. Mot.") that is also now pending before the Court.[7]  *See* Docket No.  72.  The Court will address each motion in turn.[8]

## II.  Audible's Motion to Dismiss Plaintiffs' Fisse and Rees For Lack of Personal Jurisdiction

Audible moves to dismiss out of state Plaintiffs Fisse and Rees for lack of personal jurisdiction.  *See generally* MTD Fisse & Rees.  Plaintiffs have opposed the motion.  *See* Opposition to MTD Fisse & Rees ("Fisse & Rees Opp'n"), Docket No. 76.  Defendant has filed a

---

[5] The Court found that McKee lacked standing to assert his CAPRL claim based on Audible's alleged charging of non-designated credit cards because Audible never charged a non-designated credit card of McKee.  *See id.* at 28. The Court also found that, even if McKee had standing to assert such a claim, the FAC's allegations were insufficient for the purposes of Rule 12(b)(6) because Plaintiff did not allege the specific disclosures Audible made at the point of sale in connection with its policy of automatic charges.  *Id.* at 36-37.  The Court also dismissed Plaintiff's CLRA claim (based on unconscionable terms), his UCL claim (also based on unconscionable contract terms), and his claim for Restitution, Unjust Enrichment, and Money Had and Received.  *Id.* at 37-38.

[6] Weber has also sued Amazon in a related case also before this Court.

[7] The "corrective action" (which Plaintiffs seek) is:

> an order  . . . concerning Defendant Audible, Inc.'s attempt to revise its relevant webpages, disclosures, and terms in order to secure new arbitration agreements from putative class members without providing complete information that enables such putative class members to make fully informed decisions about their rights and options. This Motion . . . seeks an order declaring that any arbitration agreements secured by Audible using webpages, disclosures, or terms that were revised during the pendency of this action are invalid and unenforceable.

 *See* Docket No. 72 at 2 of 3.

[8] As explained in more detail below, the Court would continue Defendants' MTC to April 2, 2018 and permit Plaintiffs to file a Sur-Reply by March 22, 2018.  The Court would also defer consideration of the Plaintiff's Motion for Corrective Action until that time.

8

Reply.  *See* Reply in Support of MTD Fisse & Rees ("Reply Fisse & Rees"), Docket No. 79.  In short, Defendant argues that the Court lacks personal jurisdiction over it with respect to Fisse and Rees' claims because (1) Audible is not at home in California and (2) Fisse and Rees' claims do not arise from Audible's activities within California.  *Id.* at 2:12-26.

Plaintiffs oppose the motion on three grounds.  First, Plaintiffs argue that Audible waived its 12(b)(2) argument by failing to raise it in response to the FAC.  *See* Fisse & Rees Opp'n at 1:13-26.  Second, Plaintiffs argue that the Court has personal jurisdiction over Audible because Fisse and Rees' claims are based on the same "core set of facts" as those of the California Plaintiffs.  *Id.* at 2:1-19.  Finally, Plaintiffs argue that the Court can, and should exercise Pendent Jurisdiction over Fisse and Rees' claims.  *Id.* at 2:20-3:5.

### A.  Legal Standard-Federal Rule of Civil Procedure 12(b)(2)

"In personam jurisdiction, simply stated, is the power of a court to enter judgment against a person."  *SEC v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007).  In filing a complaint, the plaintiff bears the burden of establishing the court's personal jurisdiction over a defendant.  *See Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  The defendant may move to dismiss the case for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  When a district court acts on a defendant's motion to dismiss without holding an evidentiary hearing, the plaintiff "need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  *See Doe*, 248 F.3d at 922 (citing *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995)); *see also Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2002).  Where not directly controverted, the plaintiff's version of the facts is taken as true, and any conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor.  *See Doe*, 248 F.3d at 922.  However, the court "may not assume the truth of allegations in a pleading which are contradicted by affidavit."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).

Where there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits.  *See id.*  California permits "[a] court of [the] state [to] exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."  Cal. Civ. Proc. Code § 410.10.

"Due process permits the exercise of personal jurisdiction over a nonresident defendant in the following four situations: (1) where the defendant is domiciled in the forum state when the

lawsuit is commenced; (2) where the defendant is personally served with process while physically present in the forum state; (3) where the defendant consents to jurisdiction; or (4) where the defendant has sufficient 'minimum contacts' with the forum state, such that the exercise of jurisdiction would not 'offend traditional notions of fair play and substantial justice.'" *Dole Food Co., Inc. v. Gutierrez*, No. CV039416 NM(PJWX), 2004 WL 3737123, *3 (C.D. Cal. July 13, 2004) (citing *Fitzgerald v. Wilson,* 39 Cal.App.4th 1419, 1425-26 (1995)). "With respect to the fourth situation, courts may exercise either: (1) general jurisdiction, which arises out of a defendant's 'continuous and systematic' contacts with the forum; or (2) specific jurisdiction, which arises where a defendant's specific contacts with the forum have given rise to the claim at issue." *Id.* (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984)).

General personal jurisdiction exists where a nonresident defendant's affiliations with the forum state are so "continuous and systematic as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A., et al. v. Brown*, 594 U.S. 915, 919 (2011) (citing *Int'l Shoe Co.,* 326 U.S. at 317); *see also Daimler AG v. Bauman*, 134 S.Ct. 746, 749 (2014). Where general jurisdiction does not exist, the Ninth Circuit has established a three-factor test to determine whether the exercise of specific jurisdiction is appropriate:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)); *see also Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). The plaintiff bears the burden on the first two prongs, *see Sher v. Johnson,* 911 F.2d 1357, 1361 (9th Cir. 1990), but the burden then shifts to the defendant to make a "compelling case" that the exercise of jurisdiction would not be reasonable. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-78 (1985). The "reasonableness" prong of the test for specific jurisdiction is examined according to the following factors:

(1) the extent of purposeful interjection, (2) the burden on the defendant to defend the suit in the chosen forum, (3) the extent of conflict with the sovereignty of the defendant's state, (4) the forum state's interest in the dispute; (5) the most efficient forum for judicial resolution of the dispute; (6) the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 (9th Cir. 1993).

In the context of class actions, "it is…well settled that [the] requirements [of personal jurisdiction and venue] must be satisfied *for each and every named plaintiff* for the suit to go forward." *Shell v. Shell Oil Co.*, 165 F.Supp.2d 1096, 1107 n.5 (C.D. Cal. 2001) (emphasis in original); *see also*, *Alvarez v. NBTY, Inc.*, No. 17-CV-00567-BAS-BGS, 2017 WL 6059159, *5 (S.D. Cal Dec. 6, 2017) ("[I]t is well settled law that a defendant can challenge personal jurisdiction relating to each named plaintiff in a class action.").

**B. Analysis**

Plaintiffs argue that Audible's motion fails because: (1) Audible waived the defense of personal jurisdiction, (2) the Court has specific personal jurisdiction over Audible, and (3) the Court can, and should exercise Pendent Jurisdiction over Audible for the purposes of Risse and Fees' claims.  The Court first examines the substantive question of whether it has personal jurisdiction over Audible with respect to the claims brought by the Out of State Plaintiffs.

1. General Jurisdiction

Plaintiffs concedes that the Court lacks general jurisdiction over Audible.  *See* Opp'n at 5:11-12.

2. Specific Jurisdiction

As discussed *supra*, the Ninth Circuit utilizes a three-prong test to analyze specific jurisdiction; Plaintiffs bear the burden of establishing the first two prongs.  The three prongs include: (1) whether Audible purposefully directed its activities at California or purposefully availed itself of the privilege of conducting activities in California; (2) whether Plaintiffs' claims arise out of Audible's forum-related activities; and (3) whether the exercise of jurisdiction is reasonable.  *See Schwarzenegger*, 374 F.3d at 802.

*a. Purposeful Direction*

Defendant's motion does not address this element, and as such, concedes it.

*b. Whether Out of State Plaintiffs' Claims "Arise Out of" Audible's*

11

*California-Related Activities*

"The Ninth Circuit uses the 'but for' test in determining whether a plaintiff's claim 'arises out of or relates to the defendant's forum-related activities.'" *Harter v. Ascension Health*, No. CV-15-00343-TUC-RM, 2018 WL 496911, *5 (D. Ariz. Jan. 19, 2018) (quoting *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007)).   Under this test, the question is: but for Audible's conduct in California, would the Out of State Plaintiffs' claims have arisen?   *See Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995).   Under this test, "[a]ny event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction." *Feller v. Transamerica Life Ins. Co.*, 2:16-CV-01378-CAS(AJWx), 2017 U.S. Dist. LEXIS 206764, *17 (C.D. Cal. Dec. 11, 2017) (quoting *Dubose v. Briston-Myers Squibb Co.*, No. 17-CV-00244-JST, 2017 WL 2775034, *3 (N.D. Cal. June 27, 2017)).

Here, it is undisputed that Fisse and Rees signed up for and used Audible in North Carolina.   It is further undisputed that Audible is based in New Jersey, the payments Fisse and Rees made to Audible were processed in Washington, and that all decision-making about Audible's policies, advertising, and discloures occurred outside of California.   *See* MTD Fisse & Rees at 13 (citing Declaration of Jason Massello In Support of Audible's MTD Fisse & Rees ("Massello Decl."), Docket No. 70-1 at ¶¶ 5-11).   Given the above facts, the Court finds that Fisse and Rees' claims fail the Ninth Circuit's but for test.[9]   Indeed, Plaintiffs themselves concede that, were Fisse and Rees the *only* named Plaintiffs in this action, that there would be no personal jurisdiction in California.   *See* Fisse & Rees Opp'n at 15.[10]

---

[9] Plaintiffs also request jurisdictional discovery based on their apparent belief that some of Audible's web-design and/or online presence arises from its employees working in California.  *See* Fisse & Rees Opp'n at 4-5.  However, even if that is the case, Fisse and Rees' claims still did not arise out of that activity, they arise out of the substance of Audible's advertisements and policies, not the computer code underneath its online platform, no more than a contract claim would give rise to specific jurisdiction merely because the paper on which it was printed was produced in a different state than where it was drafted and executed.  Moreover, as stated above, Plaintiffs concede that, without the claims of the California Plaintiffs, the Out of State Plaintiffs cannot establish personal jurisdiction.  *See id.* at 15:23-25.  Given that concession, the Court would find that any jurisdictional discovery on the specifics of Audible's in state presence would be futile.

Also, Plaintiffs object to Defendant's declaration testimony to the extent it summarizes certain business records yet fails to produce those records.  *See id.* at 4 n.1.  The Court already rejected a similar argument brought in opposition to Defendant's motion to compel Plaintiff Beals to arbitration.  *See* Ruling II at 4-7.  Plaintiffs' argument fails here as well.  First, Plaintiffs again cite to the evidentiary standards applied at the Fed. R. Civ. Proc. 56 stage as those that control here.  As it found previously, those standards are not so rigorous as to require compliance with the Best Evidence, Authentication, and Hearsay rules.  *Id.* (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003)).

Plaintiffs' argument in opposition to Defendant's motion largely ignores settled law. For example, Plaintiffs argue that because unnamed out of state plaintiffs would not need to establish personal jurisdiction, "it makes no sense" that named plaintiffs should have to. *See* Fisse & Rees Opp'n at 11:9-19. However, that is the law. *See Shell*, 165 F.Supp.2d at 1107 n.5 (emphasis in original); *see also*, *Alvarez*, 2017 WL 6059159 at *5 ("[I]t is well settled law that a defendant can challenge personal jurisdiction relating to each named plaintiff in a class action.").

Plaintiffs also painstakingly attempt to distinguish the present case from *BMS* by citing recent district court cases that have declined to apply *BMS* to class actions. *See* Fisse & Rees Opp'n at 11-12 (discussing *In Re Chinese-Manufactured Drywall Products Liability Litigation*, No. 09-2047, 2017 WL 5971622, *13-21 (E.D. La. Nov. 30, 2017). As Defendant points out, *In Re Chinese-Manufactured Drywall* did not address personal jurisdiction for *named* out of state plaintiffs asserting claims against an out of state defendant. Like many of the cases that it cites to, *In Re Chinese-Manufactured Drywall* simply confirmed what the Supreme Court said in *BMS*: that the Majority's holding did not necessarily apply to actions brought in federal courts. *See* 2017 WL 5971622 at 11 ("The *BMS* Court, nonetheless, made its analytical due process framework clear: 'Our settled principles regarding specific jurisdiction control this case,' and '[o]ur straightforward application in this case of settled principles of personal jurisdiction will not result in the parade of horribles that respondents conjure up.'") (quoting *BMS*, 137 S. Ct. at

---

[10]  Defendant also cites to the Supreme Court's recent decision in *Bristol-Meyers Squibb Co. v. Superior Court* (*"BMS"*), 137 S. Ct. 1773 (2017) for additional support. *BMS* concerned a mass tort action in California state court in which plaintiffs alleged state-law claims based on injuries allegedly caused by a BMS drug called Plavix. 137 S. Ct. 1773 at 1778. BMS, a citizen of Delaware and New York, challenged the Superior Court's personal jurisdiction over it. *Id.* at 1777-78. The United States Supreme Court rejected the California Supreme Court's endorsement and application of California's "sliding scale approach to specific jurisdiction," in which the California Supreme Court "permitted the exercise of specific jurisdiction based on a less direct connection between BMS's forum activities and plaintiffs' claims than might otherwise be required." *Id.* at 1778-79 (citations and quotations omitted). The Court determined that its "settled principles" regarding specific jurisdiction controlled and required an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Id.* at 1780-81. The Court reasoned that the nonresident plaintiffs in *BMS* failed to allege that they obtained, ingested, or were prescribed Plavix in California, and therefore these plaintiffs failed to identify an "adequate link" between California and their claims. *Id.* at 1781. The Court also reasoned that "all the conduct giving rise to the nonresidents' claims occurred elsewhere." *Id.* at 1782. The Court left open the question as to whether "the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1783-84 (citations omitted).

Here, Defendant contends that the principles announced in *BMS* foreclose the Out of State Plaintiffs' claims because those claims are not affiliated with Audible's activities within California. While the Court would agree, it finds sufficient support for that conclusion within the Ninth Circuit's current "but for" approach to specific jurisdiction. The Court notes that *BMS* expressly limited its holding to state court actions. *Id.* at 1784. *BMS* did not address federal courts or nationwide class actions filed in federal court. *Id.*

1781-83); *see also*, *id.* at 16 ("*BMS* does not speak to or alter class action jurisprudence."); *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, No. 17-CV-000564-NC, 2017 WL 4224723, *5 (N.D. Cal. Oct. 26, 2017) ("Based on the parties' arguments, the Court is not persuaded to extend *Bristol-Myers* to the class action context on these facts.").  Thus, although both parties' discussion of *BMS* and its aftermath is informative, it has of limited importance here.

As *named* Plaintiffs in this action, Fisse and Rees must establish personal jurisdiction under the Ninth Circuit's test.  *See Shell*, 165 F.Supp.2d at 1107 n.5; *Alvarez*, 2017 WL 6059159 at *5.  They cannot do so given their claims do not arise from Audible's California activities. *See Menken*, 503 F.3d at 1058; *Ballard*, 65 F.3d at 150; *cf. Feller*, 2017 U.S. Dist. LEXIS 206764 at *20 (denying motion to dismiss for lack of personal jurisdiction where "but-for…the work of [defendant's California] employees…. the plaintiff's claims for breach of contract would not have arisen).

Plaintiffs also argue that Fisse and Rees' claims have the requisite connection to California because Audible engages in the same activity in California as it does in North Carolina.  *See* Fisse & Rees Opp'n at 13:14-14:10.  Plaintiffs essentially argue that the specific jurisdiction requirements are met "collectively" amongst the different named plaintiffs.  *See id.* While Plaintiffs' argument sounds reasonable enough, there is no case authority endorsing such an approach.  Moreover, the Court agrees with Defendant that such a liberalization of specific jurisdiction would appear to run counter to the "well established" principles of Due Process extrapolated in *BMS*:

> The mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California − and allegedly sustained the same injuries as did the nonresidents − does not allow the State to assert specific jurisdiction over the nonresidents' claims . . . . [A] defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.  This remains true even when third parties (here, the plaintiffs who reside in California) can bring claims similar to those brought by the nonresidents . . . . What is needed − and what is missing here − is a connection between the forum and the *specific claims at issue*.

*See* 137 S. Ct. at 1781 (emphasis added).

Further, Plaintiffs' "collective" theory of specific jurisdiction runs counter to the rule that

14

personal jurisdiction, like venue, must be assessed for each named Plaintiff.   Plaintiffs' argument is essentially the rule Justice Sotomayor endorsed as the lone dissenting voice in *BMS*:

> Respondents' claims against Bristol-Myers concern conduct materially identical to acts the company took in California: its marketing and distribution of Plavix, which it undertook on a nationwide basis in all 50 States.  That respondents were allegedly injured by this nationwide course of conduct in Indiana, Oklahoma, and Texas, and not California, does not mean that their claims do not "relate to" the advertising and distribution efforts that Bristol-Myers undertook in that State.  All of the plaintiffs − residents and nonresidents alike − allege that they were injured by the same essential acts.  Our cases require no connection more direct than that.

*BMS*, 137 S. Ct. at 1786 (Sotomayor, S. dissenting).  Unfortunately for Plaintiffs, the eight other Justices found otherwise.

### c. Conclusion

In sum, the Court would find that Plaintiffs Fisse and Rees cannot establish the required elements for specific jurisdiction.  Because they concede that this Court lacks general jurisdiction over Defendant, they have failed to establish a prima facie case for personal jurisdiction.

### 2. Audible Did Not Waive Its 12(b)(2) Defense

"[U]nder Federal Rule of Civil Procedure 12(h), it is black letter law that a defendant waives a lack of personal jurisdiction defense when it fails to raise this defense in an initial motion to dismiss."  *Alvarez*, 2017 WL 6059159 at 4 (citing Fed. R. Civ. Pro. 12(h)(1)); *see also*, *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1st Cir. 1983) ("[Rule 12(h)(1)] provide[s] a strict waiver rule with respect to [the lack of personal jurisdiction] defense. . . .  It is clear under this rule that defendants wishing to raise [this] defense must do so in their first defensive move, be it a Rule 12 motion or a responsive pleading.").  An exception to this strict rule is when such a defense was unavailable to defendants at the time they filed their initial motion.  *See* Fed. R. Civ. Pro. 12(g); *Glater*, 712 F.2d at 738.

Plaintiffs argue that Defendant waived personal jurisdiction by failing to assert the defense when it responded to the FAC, which included similar claims brought by Michigan resident, then Plaintiff Seth Beals.  *See* Fisse & Rees Opp'n at 5:18-7:2; *see also generally* FAC. Defendant counters that its decision to attempt to force Beals to arbitrate his claims, as opposed to seek dismissal on Rule 12(b)(2) grounds, has no effect on Defendant's ability to assert the

same defense against Fisse and Rees, both of whom first appeared in the SAC.  *See* Reply Fisse & Rees at 11:5-14.

The Court would agree with Defendant.  Plaintiffs do not cite a single case standing for the proposition that a defendant that participates in litigation against one party waives defenses as to a yet to be named party.  *See id.*  This is not surprising given Rule 12(g) limits waiver in situations where the defense was unavailable when the first responsive pleading was filed.  *See Glater*, 712 F.2d at 738.  Defendant could not have moved to dismiss Fisse and Rees' claims for lack of personal jurisdiction when it filed its first responsive pleading to the FAC *because Fisse and Rees had not yet brought claims against Defendant.  See Sloan v. GM, LLC*, No. 16-CV-07244, 2018 U.S. Dist. LEXIS 22176, * 17-18 (N.D. Cal. Feb. 7, 2018) (finding that defendant's failure to raise personal jurisdiction in its motion to dismiss the FAC waived that defense as to the "original named plaintiffs" but not "with respect to the plaintiffs newly named in the SAC").

Further, even if some combination of procedural and factual circumstances could conceivably justify Plaintiffs' "waiver as to one equals waiver as to all" approach, that is not the case here.   Here, Defendant successfully moved to compel Beals, a Michigan resident, to arbitration.  *See* Ruling II.   Soon thereafter, the SAC was filed, at which point the parties stipulated to extend the date by which Defendant was to "answer or *otherwise respond* to the second amended complaint."  *See* Docket No. 68 (emphasis added).  Finally, as Defendant notes in its Reply, there are significant differences between the claims Fisse and Rees allege in the SAC and those alleged by Beals in the FAC.  *See* Reply Fisse & Rees at 12:2-15.

In sum, Defendant did not waive its 12(b)(2) defense.

### 3.   Pendent Jurisdiction

Plaintiffs' third and final argument in opposition relies on the doctrine of "Pendent Personal Jurisdiction."  *See* Fisse & Rees Opp'n at 17:19-19:4.

Under the doctrine of pendent personal jurisdiction "a court may assert…personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction."  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citing and endorsing sister-circuit

decisions).[11]   Such jurisdiction is typically exercised where "one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction."  *Id.*  "Whether to exercise pendent personal jurisdiction is afforded to the discretion of the district court."  *Sloan*, 2018 U.S. Dist. LEXIS 21176 at *29 (citing *Action Embroidery*, 368 F.3d at 1180).

Plaintiffs argue that the Court should assert pendent personal jurisdiction over the Out of State Plaintiffs' claims because those claims arise out of the same common nucleus of operative facts as those of the California Plaintiffs, *i.e.* Audible's disclosures and various cancellation/ rollover policies.  *See* Fisse & Rees Opp'n at 18.  According to Plaintiffs, this would avoid unnecessary piecemeal litigation where California named Plaintiffs would litigate their claims here, while representing unnamed North Carolina plaintiffs at the same time that Plaintiffs Fisse and Rees would litigate their claims in North Carolina, while representing unnamed California residents.  *Id.*  In essence, Plaintiffs advocate for pendent personal jurisdiction as a solution to the "parade of horribles" prophesized in Sotomayor's *BMS* Dissent and dismissed by the Majority.  *See BMS*, 137 S. Ct. at 1783 ("Our straightforward application in this case of settled principles of personal jurisdiction will not result in the parade of horribles that respondents conjure up."; *id.* at 1789 ("The majority chides respondents for conjuring a "parade of horribles,"…but says nothing about how suits like those described here will survive its opinion in this case.  The answer is simple: They will not.") (Sotomayor, S. dissenting).  A popular treatise on class actions has noted that such an approach may represent a solution to the problems presented by the principles discussed in *BMS* to nationwide class actions litigation brought

---

[11] In *Action Embroidery*, the district court had dismissed the plaintiffs' California Cartwright Act claims against out-of-state defendants in the absence of any related contacts with California.  The plaintiffs' federal Sherman Act claims were permitted to proceed because that statute creates nationwide personal jurisdiction through a provision that permits nationwide service of process.  *See* 15 U.S.C. § 22.  On appeal, the Ninth Circuit reversed, reaffirming the principle that "[p]ersonal jurisdiction must exist for each claim asserted against a defendant," and recognized that California's long-arm statute "would not allow the exercise of personal jurisdiction over the[] state-law claims if they were standing alone." *Id.*  However, the Ninth Circuit observed that several other circuits had adopted the doctrine of "pendent personal jurisdiction" in which "a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id.*  Adopting the doctrine, the Ninth Circuit held that "[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts." *Id.* at 1181.  It found that "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties is best served by adopting this doctrine." *Id.*

against defendants outside of their home states.  *See* William B. Rubenstein, 2 Newberg on Class Actions ¶ 6:26 (5th Ed.) ("[S]ome commentators have developed an idea of 'pendent' personal jurisdiction….  According to this theory, by virtue of the fact that [a state] would have personal jurisdiction over [an out of state defendant] to adjudicate…claims [brought by its own citizens] it could then adjudicate the…claims of the rest of the nationwide class using pendent personal jurisdiction.").[12]

Defendant counters that pendent personal jurisdiction "can provide a basis for hearing additional claims between the same parties already properly before a court, [but] it does not create jurisdiction as to additional *parties*."  *See* Reply Fisse & Rees at 9 (citing *Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F.Supp.3d 173, 194 (D. Mass. 2016)).  According to Defendant, pendent jurisdiction only operates to extend personal jurisdiction over additional claims between the same parties.  This appears to be a limitation recognized by several district courts outside the Ninth Circuit.  *See, e.g.*, *Get In Shape*, 167 F.Supp.3d at 194 (finding that "doctrine of pendent personal jurisdiction allows a court to exercise personal jurisdiction over additional claims against a single defendant, not over additional defendants."); *Spratley v. FCA US LLC*, 3:17-CV-0062, 2017 WL 4023348, *7 (N.D.N.Y. Sep. 12, 2017) (rejecting theory of "pendent personal jurisdiction" and dismissing claims against of out-of-state plaintiffs' state-law claims against Chrysler alleging concealing of a known safety defect); *DeMaria v. Nissan N. Am., Inc.*, No. 15-C-3321, 2016 WL 374145, *8 (S.D. Ill. Feb. 1, 2016) (rejecting theory of pendent personal jurisdiction for out-of-state plaintiffs "where each plaintiff's claim is predicated on the law of the particular state where he or she purchased a car and the claims of the other plaintiffs as alleged remain unrelated to anything that transpired in Illinois").

---

[12] Rubenstein discusses this approach through a hypothetical class action brought against a drug manufacturer Merck, arising out of its sale of a drug Vioxx, to examine the personal jurisdiction problems unique to this setting:

> Finally, the most interesting situation for class action practice arises out of the possibility that a nationwide class action is filed against Merck in a forum (Louisiana) that is neither Merck's headquarters nor place of incorporation (New Jersey).  Louisiana's long-arm statute authorizes jurisdiction so long as its assertion is constitutional, so the constitutional issue presents the sole concern.  Specifically, the precise question is whether the Louisiana forum has sufficient jurisdiction arising out of Merck's local sale of Vioxx − and its other contacts with Louisiana − to adjudicate claims against Merck arising out of Merck's sale of Vioxx to consumers, and their use of the drug, in other states.

*See id.*

Plaintiffs fail to cite to a single case applying pendent jurisdiction in the manner they advocate. Instead they cite more traditional pendent jurisdiction cases involving state law claims brought alongside federal claims. *See* Fisse & Rees Opp'n at 18 (citing cases). The Court was able to locate a recent example in the Northern District of California where a court exercised pendent personal jurisdiction in the manner advocated here and described in <u>Newberg</u>: to keep claims brought by out of state, named plaintiffs as part of a nationwide class action brought in California, against an out of state defendant. *See Sloan*, 2018 U.S. Dist. LEXIS at 32-33.

*Sloan* is a product defect case brought in California on behalf of a nationwide class. *See id.* at 6. The named plaintiffs in the action included both California residents and non-California residents. *Id.* Following the Supreme Court's ruling in *BMS* the defendant moved to dismiss the out of state Plaintiffs on personal jurisdiction grounds. *Id.* at 11-12. The court first ruled that the defendant had waived its personal jurisdiction defense as to those named plaintiffs that appeared in the first two renditions of the complaint. *Id.* at 12-17. However, the Court addressed the merits of the personal jurisdiction defense as to those out of state plaintiffs first named in the SAC. *Id.* at 17-18.

The plaintiffs in *Sloan* conceded that they could not establish personal jurisdiction under the traditional specific jurisdiction approach for the same reason Fisse and Rees cannot do so here: the specific disputes did not arise out of GM's activities in California. *See id.* at 27-28. However, the plaintiffs argued that the court should use its discretion under *Action Embroidery* to exercise "pendent" jurisdiction over the out of state plaintiffs' claims. *Id.*

After providing a detailed analysis of both *BMS* and *Action Embroidery*, Judge Chen accepted plaintiffs' argument and denied the motion to dismiss. *Id.* at 37-38. In doing so, he noted that "the Ninth Circuit has not limited the doctrine of pendent personal jurisdiction to when a relationship is shown to 'other claims by the same plaintiff' but rather to 'other claims in the same suit.'" *Id.* at 30. However, Judge Chen also noted that, at least in his view, "it is by no means clear whether *Action Embroidery's* pendent personal jurisdiction doctrine extends categorically to claims brought by different plaintiffs." *Id.* at 31. Nonetheless, he concluded that several "case specific" factors weighed in favor of extending pendent personal jurisdiction in that case. *Id.* at 31. One such consideration was the representative nature of the action, and, the fact that the court would retain jurisdiction over claims brought on behalf of unnamed, out of state plaintiffs. *Id.* at 31-32. Another important, case specific consideration in *Sloan* was the fact that

the defendant had waived its personal jurisdiction defense with respect to several other named, out of state plaintiffs. *Id.* at 32. As a result, those claims would proceed anyways. *Id.* The court's final consideration was the potential for unnecessary piecemeal litigation. *Id.* at 33.

Here, the Court would decline to exercise its discretion to assert pendent personal jurisdiction in the manner advocated by Plaintiff, and done in *Sloan*. The Court does not disagree with *Sloan's* broad reading of *Action Embroidery* to potentially cover claims brought by additional plaintiffs against the same party. As Judge Chen accurately points out, the Ninth Circuit does not foreclose this possibility. *See id.* at 30 (citing *Action Embroidery*, 368 F.3d at 1181 ("[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts); *id.* ("a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction")). Furthermore, as detailed earlier, the Court also agrees that *BMS* is not determinative here because its holding was expressly limited to state courts and did not involve a representative action. *See supra* at 13 n.8.

However, one key fact in *Sloan* is missing here: there are no other out of state named plaintiffs in this action apart from Fisse and Rees. *See* Ruling II (compelling Beals' claims to arbitration). For that reason, unlike in *Sloan*, extending jurisdiction over Fisse and Rees would have the effect of requiring Defendant to litigate claims under both California and North Carolina law against named Plaintiffs from both states. It would also result in this Court, as opposed to a court more familiar with the law of North Carolina, to preside over Plaintiffs' North Carolina law claims. Moreover, the Court is skeptical that Plaintiffs will be able to certify a nationwide class anyways, given the choice of law issues that are likely to arise in a 50 state action. As a result of these considerations, keeping Fisse and Rees' claims would not promote efficiency or preserve resources in the same manner it would were this case procedurally identical to *Sloan*.

### C. Conclusion

For the reasons stated above, the Court would grant Defendant's motion to dismiss Fisse and Rees' claims for lack of personal jurisdiction. The Court would dismiss their claims WITHOUT prejudice.

### III. Audible's Partial Motion to Dismiss As to Plaintiff McKee

Defendant moves to dismiss Plaintiff McKee's Fifth (Violation of the EFTA), Seventh (CLRA violation based on unconscionable conduct), Eighth (Cal. Bus. & Prof. Code § 17200 claim based on violation of CAPRL), and Tenth (Restitution, Unjust Enrichment, and Money Had and Received) causes of action under Rule 12(b)(6). *See* MTD SAC at 1. The Court dismissed three of these claims as pled in the FAC without prejudice on December 6, 2017. *See* Ruling II at 38. The exception is Plaintiffs' newly asserted EFTA claim. Plaintiff McKee opposes the motion. *See* Plaintiff McKee's Opposition to Defendant's Motion to Dismiss ("McKee Opp'n"), Docket No. 75. Defendant has filed a reply. *See* Reply Brief In Support of Audible's Motion to Dismiss Second Amended Complaint As To Plaintiff McKee ("MTD Reply"), Docket No. 81.

#### A. Legal Standard-Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). Further, in deciding a 12(b)(6) motion the court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).

A court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia*

*Landfield Trust v. City of L.A.*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief." *Ashcroft*, 556 U.S. 662, 679 (2009) (citations omitted). Rule 12(b)(6) dismissals are "especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (citations omitted).

### B. Analysis

#### 1. McKee's EFTA Claim Fails

McKee's fifth cause of action is brought under EFTA and is based on the fact that Defendant automatically charged his credit card each month without authorization. *See* SAC ¶¶ 6, 97-113. Defendant argues that McKee's claim fails as a matter of law because the EFTA does not cover credit card transactions. *See* MTD SAC at 6:2-7:9.

"The EFTA creates a 'framework [of] rights, liabilities, and responsibilities of participants in electronic fund transfer systems.'" *Sanford v. Memberworks, Inc.*, 625 F.3d 550, 560 (9th Cir. 2012) (quoting 15 U.S.C. § 1693(b)). "The Act applies to electronic fund transfers from a 'consumer account,' which is defined as a 'demand deposit, savings deposit, or other asset account.'" *Id.* (quoting § 1693a(2)). The EFTA "does not apply to credit-based transactions." *Id.*; *Cf. Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1328 (7th Cir. 1997) (noting that the EFTA governs "electronic cash transactions" and is "void of any credit reference or requirement"); *Pelletier v. Pac. Webworks Inc.*, No. CIV-S-09-3503-KJM-KJN, 2012 WL 43281, *7 (E.D. Cal. Jan. 9, 2012) (relying on *Sanford* and finding that use of a credit card as opposed to a debit card was an "operative fact" that prevented the application of the relation back doctrine to the plaintiff's EFTA claim); *WineStyles, Inc., v. GoDaddy.com, LLC*, No. CV 12-583-PHX-SRB, 2012 WL 8254047, at *4 n.2 (D. Ariz. Aug. 15, 2012) (identifying plaintiff's use of a credit card as opposed to a debit card as an alternative basis for granting motion to dismiss EFTA claim).

Here, McKee concedes Audible only charged the credit card he designated when he signed up for Audible. *See* McKee Opp'n at 13:1-6; SAC ¶ 6. He nonetheless argues that the EFTA covers credit card transactions. *See id.* at 13:7-14:9. McKee fails to address the outcome determinative Ninth Circuit holding in *Sanford* that the EFTA "does not apply to credit-based

transactions."  625 F.3d at 560.  As such, the Court would find that his EFTA claim is precluded by *Sanford*.  *Id.*; *see, e.g.*, *WineStyles*, 2012 WL 8254047, at *4 n.2.[13]

In sum, the Court would dismiss McKee's EFTA claim with prejudice.  The Court would not permit amendment given McKee's admission that he did not use a debit card in connection with his Audible use.  *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) ("[A] district court may dismiss without leave where…amendment would be futile.").

## 2.  McKee States a CLRA Claim Based On Unconscionability

McKee's seventh cause of action is brought under the CLRA based on multiple theories, including that Defendant's Credit expiration policies are unconscionable.  *See* SAC ¶¶ 127-134.  Defendant moves to dismiss McKee's claim to the extent it is based on this theory.  *See* MTD SAC at 8-9.  The Court previously held that McKee's FAC stated a CLRA claim based on another theory: that Defendant made misrepresentations to McKee and other users.  *See* Ruling II at 33-35.  Alternatively, the Court dismissed McKee's CLRA claim to the extent it was based on alleged unconscionable contract terms.  *See id.* at 35.  The Court concluded as such because the FAC did not specifically allege that Audible's cancellation terms were both procedurally and substantively unconscionable.  *Id.*

The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services."  Cal. Civ. Code § 1770.  McKee identifies two relevant provisions:

> (1) Cal. Civ. Code § 1770(a)(14) which prohibits: "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and
> (2) Cal. Civ. Code § 1770(a)(19) which prohibits: "Inserting an unconscionable provision in the contract."

---

[13] McKee's arguments are unavailing in the face of *Sanford*.  He argues that the statute should be construed broadly and that the text and implementing regulations do not foreclose the possibility that credit transactions could qualify.  He also cites, misleadingly to a string of EFTA cases that reference credit cards.  However, as Defendant rightly notes in its Reply, none of those cases actually recognized an EFTA claim based exclusively on credit card transactions.  Further, none of these cases would get around *Sanford*.  That being said, because Defendant did not include any reference to *Sanford* until its Reply, the Court would entertain a *brief* oral argument from Plaintiff as to why *Sanford* is not determinative on this issue.

*See* SAC ¶ 127.

Defendant's MTD only targets the second provision here, that Audible's credit expiration policy is unconscionable.[14]   As the Court noted in its previous ruling, a court may deem a contract provision unconscionable if it is both procedurally and substantively unconscionable. *Byler v. Deluxe Corp.*, 222 F. Supp. 3d 885, 903 (S.D. Cal. 2016).

"[A] finding of unconscionability requires 'a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results.'"   *AT&T Mobility LLC*, 131 S.Ct. at 1746 (quoting *Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114 (2000)).   Both procedural and substantive unconscionability must be present, but "they need not be present in the same degree." *Armendariz*, 24 Cal.4th at 114.

### a.  Procedural Unconscionability

Procedural unconscionability focuses on two elements: oppression and surprise. "'Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice,' while '[s]urprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them.'"   *Nagrampa*, 469 F.3d at 1280 (quoting *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal.App.4th 846, 853 (2001)) (alteration in original).

Here, McKee argues that Audible's credit cancellation policies constitute surprise because they are not disclosed before consumers sign up and start paying for Credits.  *See* SAC ¶ 128; McKee Opp'n at 10:12-20.  McKee further argues that Audible's policies are substantively unconscionable because they violate federal and state gift certificate and gift card laws.  *Id.* McKee fails to specifically allege the second element required for procedural unconscionability: that of oppression.  However, the Court would find that Audible's policies have some procedural unconscionability given the alleged lack of disclosure, Audible's superior bargaining power, and the fact the terms are offered on a take it or leave it basis.  *See Gatton v. T-Mobile*, 152 Cal.App.4th 571, 582 (2007) (finding procedural unconscionability in the consumer law context where contract was one of adhesion, drafted by T-Mobile, T-Mobile had superior bargaining

---

[14] The Court has already found that Plaintiff's Gift Card law claims survive the pleading stage.  *See* Ruling II.  As a result, it is at least possible that Defendant's policies are "prohibited by law," thereby triggering CLRA liability under Cal. Civ. Code § 1770(a)(14).

power, and consumers were required to accept all terms or forgo the service entirely).  Moreover, Defendant does not appear to contest procedural unconscionability.

### b. Substantive Unconscionability

A contract term is substantively unconscionable "when it is unjustifiably one-sided to such an extent that it 'shocks the conscience.'"  *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 923 (9th Cir. 2013).  However, California law does not limit substantive unconscionability to conduct that "shocks the conscience."  *See Hahn v. Massage Envy Franchising, LLC*, No. 12-CV-153-DMS(BGS), 2014 U.S. Dist. LEXIS 147899, *25-26 (S.D. Cal. Sept. 25, 2014) ("Defendant suggests that substantive unconscionability requires the degree of one-sidedness that shocks the conscience.  Although some California appellate decisions frame the issue in these terms, this is not required.") (citing *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1145 (2013)).  As the California Supreme Court explained in *Sonic-Calabasas*:

> The unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as "overly harsh," "unduly oppressive," "so one-sided as to shock the conscience," or "unfairly one-sided."  All of these formulations point to the central idea that the unconscionability doctrine is concerned not with a simple old-fashioned bad bargain but with terms that are unreasonably favorable to the more powerful party.  These include terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price  or other central aspects of the transaction.

57 Cal.4th at 1145 (citations omitted).

Here, McKee argues that Audible's Credit cancellation policies are substantively unconscionable because they cause consumers to forfeit Credits they have already paid for, creating windfall profits for Defendant.  *See* SAC ¶ 128.  McKee also argues that the terms are substantively unconscionable because they violate federal and state gift card laws.  *See* McKee Opp'n at 10.

Defendant counters that the terms of Audible's policies do not "shock the conscience"

because users like McKee only forfeit what they have paid for if they cancel without redeeming their Credits, or fail to redeem their Credits during the allotted time for use. *See* MTD SAC at 9. Defendant does not explain what purpose its cancellation and rollover policies serve apart from producing windfalls. As stated above, substantive unconscionability is not constrained by the legal buzzwords "shocks the conscience." *Sonic-Calabasas*, 57 Cal.4th at 1145; *see also, e.g.*, *Hahn*, 2014 U.S. Dist. LEXIS at 25-26 (finding defendant's membership terms were substantively unconscionable because they required forfeiting prepaid massages upon cancellation of membership). Moreover, Defendant contends that its policies are not unconscionable as a matter of law, but fails to provide relevant authority from the consumer law context in support of its motion. As McKee points out, the only case Defendant cites, *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 473-474 (N.D. Cal. 2014), did not find that Apple's "all sales are final" policy was not unconscionable as a matter of law. *Herskowitz* only discussed substantive unconscionability of that policy in the context of class certification. *Id.*

To be fair, Plaintiff's opposition also fails to cite any relevant case law analyzing the substantive unconscionability outside of the arbitration context. Nevertheless, based on the Court's own research it appears that, when read in the light most favorable to McKee, McKee's allegations concerning Audible's cancellation and rollover terms are sufficient at the pleading stage. *See, e.g.*, *Hahn*, 2014 U.S. Dist. LEXIS at 25-26 (finding defendant's membership terms were substantively unconscionable because they required forfeiting prepaid massages upon cancellation of membership); *Free Range Content, Inc. v. Google Inc.*, No. 14-CV-02329-BLF, 2016 U.S. Dist. LEXIS 64365, *23-25 (N.D. Cal. Mar. 1, 2016) (finding that plaintiff sufficiently alleged unconscionability based on a GoogleAdSense contract term that permitted Google to withhold a customer's funds for up to two months in the event a customer breached the agreement); *Bayol v. Zipcar, Inc.*, 78 F.Supp.3d 1252, 1261-62 (N.D. Cal. 2015) (finding that plaintiff sufficiently alleged unconscionability based on Zipcar's late fee provisions).

In light of the cases cited above, and the fact that this case is still at the pleading stage, the Court would deny Defendant's motion with respect to McKee's unconscionability claim.

3.  McKee States a Claim for Unlawful Conduct under the UCL Based on CAPRL

The eighth cause of action is brought under the theory that Defendant violated CAPRL, and thus UCL, by utilizing unlawful automatic renewal payment policies and providing

26

incomplete disclosures.   SAC ¶¶ 135-144.   The UCL prohibits any "unlawful, unfair or fraudulent business act or business."   Cal. Bus. & Prof. Code § 17200.   "By proscribing any unlawful business practice, the UCL borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."   *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 n.8 (9th Cir. 2011) (alteration and internal quotation marks omitted).   The UCL allows private plaintiffs to bring a UCL action when the conduct alleged violates a statute that does not give a private right of action.   *Marilao*, 2009 WL 3007368, at *2. However, "'[i]f a plaintiff cannot state a claim under the predicate law, however, [the UCL] claim also fails.'"   *Hadley v. Kellogg Sales Co.*, 243 F.Supp.3d 1074, 1094 (N.D. Cal. 2017) (quoting *Stokes v. CitiMortgage, Inc.*, No. CV 14-02278 BRO (SHx), 2014 WL 4359193, *11 (C.D. Cal. Sept. 3, 2011)).

CAPRL makes it unlawful for a business making an automatic renewal offer to California consumers to:

(1) Fail to present automatic renewal offer terms in a clear and conspicuous manner before the subscription agreement is fulfilled, and in visual proximity to the request for consent to the offer.   Cal. Bus. & Prof. Code §17602(a)(1).

(2) Charge the consumer's credit, debit, or third party payment account without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms.   Cal. Bus. & Prof. Code §17602(a)(2).

(3) Fail to provide an acknowledgement that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.   Cal. Bus. & Prof. Code § 17602(a)(3).

Further, "clear and conspicuous" means "in large type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c).

The Court dismissed this claim as alleged in the FAC because Plaintiff failed to detail the content of the disclosures that Audible did include during the sign-up process.   *See* Ruling II at 36-37.   The Court also found that Plaintiff *had* standing to bring claims under the UCL (for violations of CAPRL) because he alleged that he made more payments to Defendant than he would have but for Defendant's failure to disclose all the information required under CAPRL.

*Id.* at 29 (citing cases).

Defendant moves for dismissal of Plaintiff's eighth cause of action on two grounds. First, Defendant argues that Plaintiff still fails to detail the precise disclosures that he viewed upon sign up related to automatic payments. *See* MTD SAC at 10:2-24. Second, Defendant argues that McKee fails to allege that he suffered any harm as a result of Defendant's failure to comply with CAPRL because McKee admits that he knew he would incur monthly charges on his credit card. *Id.* at 11:18-13:23.

McKee counters that the SAC details the disclosures that he recalls seeing when he signed up for Audible and identifies several deficiencies. *See* McKee Opp'n at 1:12-17. McKee further argues that Defendant's injury-in-fact argument was already considered and rejected by the Court. *Id.* at 2:1-13.

The Court would find that McKee's allegations in the SAC are sufficient to state a UCL claim based on CAPRL violations. This is because the SAC contains more detail than FAC, and includes the sum of the representations that McKee recalls seeing upon sign up. *See* SAC ¶ 139. These include representations that Audible costs $14.95 a month and that consumers can cancel at any time. *Id.* McKee also alleges several deficiencies in the disclosures, including: (1) that there is no clear reference that those monthly charges will be automatically charged to the designated credit card without additional notice; (2) that non-designated cards associated with Amazon accounts may be charged; (3) that Credits will expire upon cancellation; (4) that Audible does not specifically require consumers to agree to additional automatic charges; (5) that no mention is made that Audible may increase its monthly rates without notice; and (6) that no information concerning steps require to cancel appears. *Id.* Plaintiff also alleges that what disclosures did appear, appeared in small, inconspicuous font. *Id.* These allegations are enough to survive the pleading stage. *See, e.g.*, *Price v. Synapse Group, Inc.*, No. 16-CV-01524-BAS-BLM, 2017 WL 3131700, *6 (S.D. Cal. July 24, 2017) (denying motion to dismiss UCL claim where automatic renewal disclosures were not necessarily clear and conspicuous); *Lopez v. Stages of Beauty, LLC*, No. 17-CV-1888-MMA(KSC), 2018 WL 828127, *9-10 (same). This is particularly true given that Audible is plainly aware of the contents of its own webpages. It would hardly serve the purposes of Rule 12(b)(6) to require a complete recitation of information that Defendant already knows.

As to Defendant's standing argument, the Court would *again* find that McKee's

allegation that he would not have signed up for Audible and/or continued to pay monthly fees but for the CAPRL violations is sufficient to establish standing. *See* Ruling II at 29. Contrary to Defendant's briefing the Court found that Plaintiff had standing to assert CAPRL claims under the UCL. *See id.* ("Defendant started automatically charging McKee after his thirty-day trial end and McKee alleged he suffered harm by this action by making more payments than he would have made if there had been adequate disclosures of Defendant's automatic charging practices during sign up."). This conclusion remains consistent with most of the district courts that have considered similar motions to dismiss CAPRL claims. *See Ingalls v. Spotify USA, Inc.*, No. C-16-03533-WHA, 2017 WL 3021037, *3-5 (N.D. Cal. July 17, 2017) (plaintiffs had standing to assert claims based on technical violations of CAPRL that led to additional unwanted monthly charges); *Roz v. Nestle Waters N. Am., Inc.*, 2:16-CV-04418-SVW-JEM, 2017 U.S. Dist. LEXIS 216072, *11 (C.D. Cal. Dec. 6, 2017) ("A plaintiff may [establish standing] by simply proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'") (quoting *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015)); *Roz v. Nestle Waters N. Am., Inc.*[15], 2017 U.S. Dist. LEXIS 5177 at 25 (denying motion to dismiss for lack of standing based on CAPRL violations); *Kissel v. Code 42 Software, Inc.*, No. SACV-15-1936-JLS(KESx), 2016 U.S. Dist. LEXIS 184368, *24-25 (C.D. Cal. Apr. 14, 2016) (finding injury in fact where defendant failed to comply with CAPRL requirements and defendant "charged and continue[d] to charge" plaintiffs' credit card); *cf. Kissel v. Omega Natural Sci,, Inc.*, CV-16-2770-GW(SKx) 2016 U.S. Dist. LEXIS 187625, *7-8 (C.D. Cal. Aug. 22, 2016) (finding no injury in fact where plaintiff failed to allege that "that she would have done anything differently with her [Product] subscription had she been sent a more robust email after making her purchase, that she was unable to manage or cancel her account, or that the supposed lack of a proper acknowledgment affected her in any way.").[16]

---

[15] *Roz* involved shipments of water and thus, unlike the present case resolved the standing issue based on the unconditional gifts provision in § 17603, which might not apply to the present case. *See Johnson v. Pluralsight, LLC*, 236 F.Supp.3d 1176, 1183-84 (E.D. Cal. Feb. 16, 2017). However, the Court would agree with Plaintiff that, the issue of whether § 17603 applies to Audible Credits has not been fully briefed, nor does it need to be at this time.

[16] Defendant's argument that Plaintiff's injury was actually caused by the alleged FAL violations as opposed to the CAPRL violations is unpersuasive. Had Plaintiff been provided with proper CAPRL disclosures, he might not have provided his credit card and/or permitted his card to be charged each month. As such, when his thirty day trial ended, he could not have been charged the monthly fee without additional authorization. Moreover, Defendant cites not authority for the proposition that two types of unlawful conduct, i.e. FAL violations and CAPRL violations cannot both give rise to the same injury. Given the significant case law permitting such claims and Defendant's

In sum, the Court would deny Defendant's motion with respect to Plaintiff's UCL claim based on CAPRL.

### 4. McKee Fails to State a Claim for Restitution, Unjust Enrichment, and Money Had and Received

McKee's tenth cause of action is for Restitution, Unjust Enrichment, and Money Had and Received. *See* SAC ¶¶ 150-155. The Court previously dismissed this claim because McKee failed to allege a specific sum of money had and received by Defendant. *See* Ruling II at 38. Defendant contends that the SAC also fails to state a claim under this cause of action. The Court would agree.

"To plead a claim for unjust enrichment, a plaintiff must allege a receipt of a benefit and unjust retention of the benefit at the expense of another." *In re Apple In-App Purchase Litig.*, 855 F. Supp. 2d 1030, 1042 (N.D. Cal. 2009) (citing *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 989 (N.D. Cal. 2009)). "The foundation of an action for conversion on a money had and received count is the unjust enrichment of the wrongdoer, and in order for plaintiff to recover in such action she must show that a definite sum, to which she is justly entitled, has been received by Defendant." *Walter v. Hughes Communications, Inc.*, 682 F. Supp. 2d 1031, 1047 (N.D. Cal. 2010) (quoting *Bastanchury v. Times-Mirror Co.*, 68 Cal. App. 2d 217, 236 (1945)).

"A plaintiff must plead that the defendant 'is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff.'" *Id.* (quoting *Schultz v. Harney*, 27 Cal. App. 4th 1611, 1623 (1994)). California courts have held that when a "common count is used as an alternative claim seeking the same recovery demanded in a specific cause of action based on the same facts, the common count may be dismissed if the cause of action is dismissed." *In re Apple In-App Purchase Litigation*, 855 F. Supp. 2d at 1032 (citing *McBride v. Boughton*, 123 Cal. App. 4th 379, 394-95 (2004)).

Here, McKee assigns a value of $29.90 for the two Credits he lost as a result of Defendant's cancellation policies. *See* SAC ¶ 153. However, he also alleges that he is owed an additional, still unspecific value reflective of the "premium" he paid based on Defendant's false statements. *Id.* Therefore, at least as pled, it would appear that McKee again fails to allege that Audible is indebted to him for a "certain sum." *See* Ruling II at 19 (citing *Walter*, 682 F.Supp.2d

---

failure to include, much less address other district court's handling of the issue, dismissal at this early stage is unwarranted.

at 1047).

McKee argues that he actually intended to bring two separate causes of action – one for the certain sum of $29.90 under a common count of Money Had and Received – and another for $29.90 plus the unspecific premium under a theory of Unjust Enrichment based on his FAL claims.  *See* McKee Opp'n at 2-3.  According to McKee, the Money Had and Received claim is based entirely on losing the value of his Credits upon cancelling his account.   *Id.* at 12:3-12.  Alternatively, McKee contends that the premium, as well as the value of his Credits, was unjustly received as a result of the false statements made during the sign up process.  *Id.* at 11:26-12:2.

In its Reply, Defendant argues that Plaintiff's new Unjust Enrichment claim fails to the extent it includes an unspecific premium amount.  *See* McKee Reply at 6:12-21.  The Court agrees.  As stated above, and in its previous ruling, under such a theory Plaintiff is required to plead a sum certain.  Defendant also argues that, even if the Court were to consider Plaintiff's "alternative" claim based solely on the expiration of his Credits, Plaintiff's Credits were not a "certain sum for money had and received by the defendant for the use of the plaintiff."  *Id.* at 6 (quoting *Walter*, 682 F.Supp.2d at 1048).  The Court agrees with Defendant on both fronts.

Plaintiff purchased a membership that came with Credits that were subject to certain cancellation policies.  The value of the Credits, once purchased was not set at the cost of membership, but could be redeemed for audiobooks ranging in price.  Thus, at base, Plaintiff did not entrust a sum certain to Defendant.   Secondly, the Audible business model differs substantially from the traditional setting where a defendant actually holds a given sum meant for a plaintiff's benefit.  Here, Audible did not hold onto anything for use by the Plaintiff.  In the absence of case authority recognizing such a novel application of the doctrine of Money Had and Received, the Court would grant the MTD with respect to this claim.

In sum, the Court would grant the MTD with respect to McKee's tenth cause of action.  It would not grant leave to amend given this was Plaintiffs' third bite at the apple.  *See Chodos v. W. Publ. Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is particularly broad.").

### C.  Conclusion

The Court would GRANT Defendant's Motion to Dismiss as to the Fifth and Tenth

causes of action with prejudice.  The Court would DENY the Motion to Dismiss as to Seventh and Eighth Causes of Action.

**IV.  Audible's Motion to Compel Arbitration as to Plaintiffs' Weber and Rogawski**

As mentioned briefly above, the Court would defer its ruling on this motion until April 2, 2018.  Both parties appear to agree that Defendant's initial moving papers relied on evidence concerning a different Eric Weber than the one participating as a named plaintiff in this action. Defendant provided additional evidence concerning the correct Eric Weber in its Reply.  Plaintiff may file a Sur-Reply in response to the new evidence Defendant submitted in its Reply papers with respect to Plaintiff Weber <u>no later than March 22, 2018</u>.  The Court would also order the parties to meet and confer regarding the content of Audible's mobile and standard websites on the dates that Plaintiffs' Weber and Rogawski made purchases before the end of this week.  If the parties cannot stipulate to that content the Court will expect an explanation as to why such a stipulation is impossible.  Finally, because Plaintiff's Motion for Corrective Action is also closely related to the motion to compel Weber and Rogawski, the Court will also defer ruling on that motion until April 2, 2018.

**V.  Conclusion**

The Court would GRANT Defendant's motion to dismiss the Out of State Plaintiffs and GRANT-IN-PART, DENY-IN-PART Defendant's motion to dismiss as to Plaintiff McKee as stated herein.  The Court would DEFER consideration of the other motions until April 2, 2018.